KEITH A. PITT, OSB No. 973725
keith@slindenelson.com
NICHOLAS J. SLINDE, OSB No. 003900
nick@slindenelson.com
PHIL J. NELSON, OSB No. 013650
phil@slindenelson.com
SLINDE NELSON STANFORD
111 SW Fifth Avenue, Suite 1940
Portland, OR  97204
Telephone:  (503) 417-7777
Fax:  (503) 417-4250
         *Of Attorneys for Defendant Walker Place, LLC*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| ROSS DRESS FOR LESS, INC., a Delaware corporation, | Case No. 3:14-cv-01971-SI |
| Plaintiff, | **WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT** |
| v. | **(ORAL ARGUMENT REQUESTED)** |
| MAKARIOS-OREGON, LLC, an Oregon limited liability company; and WALKER PLACE, LLC, an Oregon limited liability company, | |
| Defendants, | |

# TABLE OF CONTENTS

Page(s)

MEMORANDUM OF LAW .................................................................................................. 1

Introduction ...................................................................................................................... 1

Actual Undisputed Facts and Proper Context ................................................................. 2

The Actual Undisputed Facts Regarding Strip/Waste of the Basement ........................... 5

Argument ........................................................................................................................ 7

I.      The "Sidewalk Vaults" and "Vent Stack" are Part of the "Occupied" Space and/or "Leased Premises" of the Failing Building and Plaintiff has Contractual Obligations under the Failing Lease To Monitor and Maintain these Items. ................................. 7

        A.      The "Sidewalk Vaults" In the Leased and Occupied Space. .......... 7

        B.      The "Vent Stack" In the Leased and Occupied Space. ................. 10

II.     Plaintiff Must Perform all Work "Necessary," Including the Removal of "Lateral Support Dependence" Between the Two Building, to "Physically Separate" the Structures and Make Them "Entirely Independent and Self-Sufficient" Under the Applicable Leases. ................................................................................. 11

III.    Plaintiff's Removal of the Historical "Retail/Mercantile" Occupancy in the Failing Building Basement Constitutes Waste and Violates the Surrender Obligations of the Failing Lease as a Matter of Law. .......................................................... 16

        A.      Plaintiff's Surrender Obligations/Violations Under The Failing Lease. ................................................................................. 16

        B.      Plaintiff's Specific "Factual" Arguments Fail. ............................ 18

                i.      Whatever purported "knowledge" or "consent" of the ownership to the 1996 remodel, no "waiver" of these claims occurred as a matter of law. .................... 19

                ii.     "Seismic Upgrades" Will Be Required To Restore Historical Occupancy And the Removal Historical Occupancy Will Impact the Future "Options" and "Use" of the Failing Building. .......................................... 21

                iii.    The "Basement Space" of the Failing Building Has Inherent Value and Would Be Desirable To A Future Retail Tenant. ....................................................... 23

SLINDE NELSON STANFORD
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250

## TABLE OF CONTENTS (con't.)

Page(s)

IV.  Plaintiff's Motion for Partial Summary Judgment – Based on the
Timeliness of Discrete Aspects of Walker Place's Counterclaims
Under ORS 12.080 (1) and (3) – Should Be Denied. ............................... 24

    A.  ORS 12.080(1) ...................................................................... 25

    B.  ORS 12.080(3) ...................................................................... 28

Conclusion ............................................................................................. 31

CERTIFICATE OF COMPLIANCE WITH L.R. 7-2(B)(2) ........................................ 32

SLINDE NELSON STANFORD
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250

# TABLE OF AUTHORITIES

## Cases

*Ball v. Day,*
  57 Or App 384, 644 P.2d 649 (1982)........................................................... 9

*Bank of Eastern Oregon v. Griffith,*
  101 Or App 528, 792 P.2d 1210 (1990)...................................................... 19

*City Hotel Co. v. Aumont Hotel Co.,*
  107 S.W.2d 1094 (1937)............................................................................ 27

*Cote v. A. J. Bayless Markets, Inc.,*
  128 Ariz. 438, 626 P.2d 602 (1981).......................................................... 27

*De Wolfe v. Kupers,*
  106 Or 176, 211 P. 927 (1923) .................................................................. 10

*Goodwin v. Kingsmen Plastering, Inc.,*
  267 Or App 506, 340 P.3d 169 (2014)...................................................... 29

*Griffin Grocery Co. v. McBride,*
  217 Ark. 949, 235 S.W.2d 38 (1950)........................................................ 27

*In re Cohoes Indus. Terminal, Inc.,*
  78 B.R. 681 (S.D.N.Y. 1987)..................................................................... 27

*In re Stout's Estate,*
  151 Or 411, 50 P.2d 768 (1935) ............................................................... 18

*Ionian Corp. v. Country Mut. Ins. Corp.,*
  88 F.Supp.3d 1187 (D.Or.2015) ............................................................... 19

*James S. Black & Co. v. F.W. Woolworth Co.,*
  14 Wash.App. 602, 544 P.2d 112 (1975)................................................... 27

*Kahn v. Love,*
  3 Or 206 (1870)......................................................................................... 10

*Kantor v. Boise Cascade Corp.,*
  75 Or App 698, 708 P.2d 356 (1985)........................................................ 26

*Meunier v. Northwestern Mut. Life Ins. Co.,*
  51 F.Supp.3d 1023 (D.Or.2014) ............................................................... 26

*Riverview Condominium Ass'n v. Cypress Ventures, Inc.,*
  266 Or App 574, 339 P.3d 447 (2014)...................................................... 29

*Schimmelfennig v. Grove Farm Co.,*
  41 Haw. 124, 1955 WL 8784, *5 (1955) ................................................... 27

**SLINDE NELSON STANFORD**
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250

*Stafford Properties of Oregon, Inc. v. Ben Metz, Inc.,*
   284 Or 3, 584 P.2d 750 (1978) .............................................. 9

*Stanley v. Mueller,*
   222 Or 194, 350 P.2d 880 (1960) ........................................... 19

*S-Tronix v. Submedia, LLC,*
   2009 WL 152521, *3 (D.Or.2009).......................................... 17, 26

*Taylor v. Detroit Diesel Realty, Inc.,*
   2014 WL 1794582, *6  (S.D.Miss.2014).................................... 27

*Tri-County Metropolitan Transit Dist. v. Time Warner Telecom of Oregon, LLC,*
   2008 WL 4572519, *6 (D.Or. 2008)........................................ 19

*Vollertsen v. Lamb,*
   302 Or 489, 732 P.2d 486 (1987) ........................................... 29

*Wilkens v. Western States Grocery Co.,*
   167 Or 103, 114 P.2d 542 (1941) ........................................... 9

*Winans v. Valentine,*
   152 Or 462, 54 P.2d 106 (1936) ............................................ 20

*Zurcher v. Booth,*
   80 Or 335, 157 P. 147 (1916) ............................................... 26

## Statutes

Oregon Revised Statute,
   § 12.080......................................................................... 2, 24, 28
Oregon Revised Statute,
   § 12.080(1)..................................................................... 24, 25, 26, 28
Oregon Revised Statute,
   § 12.080(3)..................................................................... passim
Oregon Revised Statute,
   § 42.300......................................................................... 13

## Other Authorities

2 Tiffany Real Prop.
   § 636 (3d ed.)................................................................. 20
49 Am. Jur. 2d Landlord and Tenant
   § 713............................................................................. 28

## Codes

Portland City Code, Title 24 .................................................. 3

**SLINDE NELSON STANFORD**
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250

Defendant Walker Place, LLC ("Walker Place"), by and through its attorneys, Slinde Nelson Stanford, respectfully submit this Response to plaintiff Ross Dress for Less, Inc.'s ("Plaintiff" or "Ross") Motion for Partial Summary Judgment in the above-captioned matter.

In support of this Response, Walker Place relies upon the Court record/file herein, its prior moving papers on these issues (Dkt. #55), the additional declaration(s) and exhibits supplied herein, and the attached Memorandum of Law, all incorporated by this reference.

## MEMORANDUM OF LAW

### Introduction

In 1996 Plaintiff acquired the Failing Lease and Richmond Lease out of the bankruptcy involving JJ Newberry Company ("Newberry").  In acquiring those leases, Plaintiff acquired a unique set of benefits and burdens regarding these two buildings.  <u>The Benefit:</u> a substantially discounted, below market lease rate for the entire 20 years of the Plaintiff's occupancy, which discount also existed during the years Newberry held the leases.[1]  <u>The Burden:</u>  At the conclusion of the Failing Lease, Plaintiff assumed affirmative obligations (1) to surrender the premises of the Failing Building in a state of "good condition and repair" and not in a condition of "strip or waste," and (2) to render the two buildings "entirely independent and self-sufficient" from one another.

Plaintiff, having now consumed all available *benefits* from these leases – which were substantial – refuses to perform the corresponding *burdens*, retreating instead into a series of self-serving arguments and unprincipled readings of the applicable lease provisions.

---

[1]    To properly apprise the Court of the order of magnitude of the "benefit" Plaintiff obtained in discounted rent for the past 20 years, attached to the declaration of Brandon Anderson is an analysis of the below market rent Plaintiff paid during this period, both for the leased premises in the Failing Building alone, as well as for both buildings combined, the latter of which exceeds, over the past 20 years, *under a conservative calculation*, **$14,000,000.00** in discounted rent.  (Anderson Decl., ¶¶ 6-8; Ex. B, pg. 3)

As detailed below, Plaintiff, similar to Walker Place, seeks partial summary judgment on the three primary issues in this litigation, *viz.*:

>    (1)   Plaintiff's "separation" obligations to fully and "physically separate" the Failing Building and Richmond Building, rendering the two "entirely independent and self sufficient" structures;[2]

>    (2)   Plaintiff's "surrender" obligations to address/restore the historical occupancy within the basement of the Failing Building, which occupancy Plaintiff affirmatively stripped and removed in connection with its 1996 renovation of the Failing Building; and

>    (3)   The timeliness of Walker Place's counterclaims, as defined by Plaintiff's clear "separation" and "surrender" obligations in the Failing Lease, and under ORS 12.080.

Plaintiff also seeks partial summary judgment on a secondary issue as to whether it is/was required to maintain the "sidewalk vaults" and "vent stack, to return the same in "good condition and repair" and not in a condition of "strip or waste," and whether those items are located within the "leased premises" as defined under the Failing Lease.

### Actual Undisputed Facts and Proper Context

Although it is an axiom of civil litigation that sometimes the "facts" favors one party, and the "law" favors the other, here *neither* the actual (undisputed) facts *nor* the applicable law favors Plaintiff's baseless positions.[3]

---

[2]      As to Plaintiff's "separation" obligations, Walker Place incorporates the corresponding facts/argument previously submitted by Makarios' motion for partial summary judgment, as well as Walker Place own prior summary judgment submissions. Additionally, Walker Place joins in the anticipated opposition brief from Makarios to Plaintiff's motion on this discrete issue.

[3]      On that score, it is noteworthy that in the 31 pages of its motion, Plaintiff superficially cites to *only* five cases in connection with these matters arising exclusively under Oregon law, four of which are simply *oblique* references to Ninth Circuit opinions. The absence of any substantive legal authority for Plaintiff's manufactured positions/theories is telling.

SLINDE NELSON STANFORD
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250

Indeed, a cursory review of Plaintiff's repetitive, self-serving "characterization" of the purported "Statement of Undisputed Facts," quickly reveals that Plaintiff, in an altogether transparent legerdemain, seeks to misdirect this Court away from a proper analysis of the "occupancy" issue, as further defined by the "surrender" obligations of the Failing Lease, as amended, and instead "reframe" the issue to one of:

- Whether the basement has any inherent value as "retail/mercantile" space whatsoever;

- Whether any "future tenant" would desire that space for a "retail/mercantile" use, and relatedly whether Plaintiff is responsible to restore the *historical* occupancy of the basement for that "future tenant's" desired use; and

- Whether full seismic upgrades of the Failing Building, arising from a typical "future tenant's" improvements of the basement, first, and second floors, would be triggered under Title 24 of City Code.

The Court should pause here. First, any suggestion that the basement space has no "retail/mercantile" value, in addition to being absurd, on its face, is contrary to both common sense and the objective fact that numerous "below-grade" retail/mercantile operations presently exist in the Central Business District of downtown Portland.[4] Other that Plaintiff's own self-serving assertions, it has supplied no evidence to the contrary.

Second, whether Plaintiff has committed "waste" or is otherwise in material breach regarding its permanent strip and removal of the *historical* occupancy in the basement is, *in the first and last instance*, defined by its "covenants" and "surrender" obligations under the Failing Lease, as amended, and *not* by whether a "future tenant" presently exists. Indeed, no language exists in the Failing Lease, which limits/relieves Plaintiff of its express "surrender" obligations

---

[4]       Anderson Decl., ¶ 9.

**PAGE 3 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

based on the intended/expected future uses of that space, either by Walker Place or a "future tenant."

The reason for this is obvious. Implicit in Plaintiff's theory is that it should be allowed to commit any manner of waste, damage, and destruction within and to the Failing Building and, unless and until Walker Place produces an actual "future tenant," Plaintiff's conduct is somehow neither actionable or wrongful, despite its express "covenants" and "surrender" obligations under the lease. Again, neither common sense, the express language of the Failing Lease, nor the applicable law supports such a theory.

Nor are Plaintiff's "surrender" obligations informed by whether a "future tenant" would *ever* seek to restore the *historical* occupancy in the basement given the objective cost to perform such seismic upgrades is now manifestly prohibitive, all of which are a direct result of *Plaintiff's* acts/omissions and decision to strip the *historical* occupancy from the Failing Building.[5]

Third, contrary to Plaintiff's carefully vague assertion whether a "future tenant's" typical improvements would itself trigger a full seismic upgrade of the Failing Building, Plaintiff knows full well that no such trigger exists under Title 24.[6]  Again, other that Plaintiff's own self-serving assertions, it has supplied no evidence to the contrary.

In the interest of clarity and a proper recitation of the record, the following represents the actual undisputed facts, grounded in both *reality* and the *express terms* of the Failing Lease, pertaining to the "surrender" obligation of Plaintiff to address/restore the *historical* "retail/mercantile" occupancy of the Failing Building, which occupancy Plaintiff affirmatively removed in connection with its 1996 renovation.[7]

---

[5]    The cost to perform a full seismic upgrade to restore the historical occupancy in the basement is approximately $9-11 million.  (Bailey Decl., Exs. A, B).

[6]    Bailey Decl., ¶ 4.

[7]    As to the actual facts related to the other issues raised by Plaintiff, Walker Place will address those matters, where appropriate, as part of its analysis of Plaintiff's misguided motions in Sections I-IV below.

**SLINDE NELSON STANFORD**
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250

**The Actual Undisputed Facts Regarding Strip/Waste of the Basement**

In 1996, Plaintiff renovated the basement, first and second floors of the Failing Building to adapt it to its needs. Prior to that renovation, the Failing Building included an open "grand staircase" leading from the main retail floor of the Failing Building down to the basement retail floor.[8]   Further, prior to that renovation, the Failing Building provided unrestricted and full "retail/mercantile" occupancy in the basement, which use of that space was likewise available to Plaintiff.[9]

Notwithstanding, apparently undesirable to Plaintiff, it filled in the "grand staircase" with new floor framing, and undertook other alterations, abandoning the previous "mercantile/retail" use of that space.[10] In addition – and more importantly – when Plaintiff submitted its plans to the City of Portland for approval in 1996, Plaintiff *affirmatively* stripped the *entire* Failing Building basement of its historical occupancy, noting:

> "VACANT NO OCCUPANCY – NO STORAGE SEPARATE PERMIT REQUIRED FOR OCCUPANCY."[11]

In electing to strip the *historical* occupancy from the Failing Building basement, Plaintiff *never* considered what effect that decision may have on *future* use of that space.[12] Nor did Plaintiff ever seek approval from or alert the ownership of the Failing Building of Plaintiff's self-serving election to strip historical occupancy from the basement prior to commencing its renovations.[13]

---

[8]      Dkt # 56, Pitt Decl., Ex. A, Pg. 7 (Haskins Dep., Pg. 142:10-18).

[9]      *Id.*, Ex. A, Pgs. 7 and 14 (Haskins Dep., Pgs. 142:20-25; 151:6-13).

[10]     *Id.*, Ex. B (Ross 1996 Construction Drawings, sheet D1.0, D1.1, A1.0, A1.1, S1.)

[11]     *Id.*, Ex. B (Sheet A1.0).

[12]     *Id.*, Ex. A, Pgs. 14-17 (Haskins Dep., Pgs. 151-154).

[13]     On that score, there *no* evidence that the ownership of the Failing Building ever saw, was aware of, or understood the effect of that notation until it *actually* evaluated/analyzed it as part of this litigation.

**PAGE 5 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

Further, as a *direct* result of that 1996 election – *i.e., Plaintiff's* election to strip *all* occupancy from the basement – substantial seismic upgrades are now required to restore that *historical* "retail/mercantile" occupancy therein.[14]    Stated in concrete numbers, *prior* to Plaintiff's election, the occupancy of the Failing Building basement included a "retail/mercantile" use, and allowed a total of 317 occupants.  *Today*, by stark contrast, pursuant to the 2004 City of Portland seismic code, the *allowable* "use" of the basement has been reduced to "1" occupant.[15]

Further still, Plaintiff's assertions regarding the available 149 person "occupancy bank" under Title 24, allocated to the Failing Building, *as a whole*, is similarly unavailing.  As Plaintiff knows, the "occupancy bank" exists to allow, *the owner of the Failing Building*, to increase the allowable "uses" of various portions of the building, without triggering a full seismic upgrade under Title 24.[16]  Here, should Walker Place utilize the *entire* "occupancy bank" to restore only a portion of the "retail/mercantile" occupancy to the basement – which existed in 1996 – it would manifestly *not* remedy/restore the *historical* occupancy and allowable use of that space by even half.  And of equal – if not greater – importance, to do so would, without question, restrict future *increases* of occupancy (and use) in *other* portions of the Failing Building.[17]    Stated in irreducible terms, even with the "occupancy bank," Plaintiff has now *permanently* foreclosed (innumerable) leasing "options" for the occupancy/use of the Failing Building, as a whole, in perpetuity.[18]

---

[14]    Bill Bailey Decl., ¶ 4, Ex. A, Pgs. 4, 7, and Ex. B, Pg. 16.

[15]    *Id.*

[16]    Bailey Decl., ¶ 5.

[17]    Bailey Decl., ¶¶ 5-8; Ex._D.  Specific illustrations of such restrictions are detailed in the Bailey Declaration and in Section III (ii) below.

[18]    Nor is the "occupancy bank," allocated to the *owner* of the Failing Building, available to *Plaintiff* to remedy/address the existing issues in the abandoned basement. Plaintiff, as practical matter, seeks to enlist this Court to endorse a remedy that effectively "steals" the entire "occupancy bank" to cure the material breach of Plaintiff's "surrender" obligations under

**PAGE 6 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

**SLINDE NELSON STANFORD**
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250

When cleared of all the fog and misdirection, the actual undisputed facts are simple and straightforward.  As detailed below, Plaintiff's motions, devoid of both legal and factual support, have no merit whatsoever.  Accordingly, the Court should deny Plaintiff's motions, in total.

**Argument**

I.    **The "Sidewalk Vaults" and "Vent Stack" are Part of the "Occupied" Space and/or "Leased Premises" of the Failing Building and Plaintiff has Contractual Obligations under the Failing Lease To Monitor and Maintain these Items.**

Plaintiff asserts it has no obligation to address the deteriorated conditions surrounding the "sidewalk vaults" or the "vent stack" at the Failing Building, based *solely* on the contention that these conditions exist outside of the "leased premises" under the Failing Lease.[19]

Contrary to Plaintiff's bare assertions, when viewed in the proper context, and alongside the historical facts demonstrating that Plaintiff and its predecessor clearly (1) "occupied" the space under the sidewalks, to which the "leased premises" of "the basement" extends, and (2) "used" the vent stack *solely* in connection with the retail "leased premises" on the second floor, which Plaintiff also exclusively occupies.  Although the analysis overlaps at points, each is addressed separately below.

A.    **The "Sidewalk Vaults" In the Leased and Occupied Space.**

The Failing Lease defines the <u>Premises</u> in relevant part:

> "That certain space in the building known as the Failing Building *** particularly described as follows:
>
> All of the first or ground floor of said building except the building entrance, elevator lobby, elevators and main stairway; <u>***all of the basement under said building***</u> except the space occupied by the heating plant and the necessary space now used by the Lessors in the operation and management of said building

---

the Failing Lease, and for statutory waste under the common law. The Court should decline the invitation to do so.

[19]    Dkt. #58 – Pl. Mot., Pgs. 18-19.

**PAGE 7 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

SLINDE NELSON STANFORD
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250

***; and all of the second floor of said building except the portion thereof used for elevators and stairways."[20]

As to the <u>Space Under Sidewalks</u> (clearly encompassed within the *physical* "basement" as well as existing *under* the "sidewalk vaults"), the Failing Lease provides:

"The lessors do not warrant to the Lessee a continued use of the open space under the sidewalk adjoining the leased premises, ***but the lessee shall have the use of this space and shall enjoy all the rights to such space*** as would ***accrue to the Lessors had they remained in full possession of the premises***."[21]

Here, whether or not the space under the "sidewalk vaults" is interpreted, as a matter of definition, to be included/excluded from the "leased premises" under the Failing Lease, that is (of course) not the end to a proper inquiry in this matter. First, the Failing Lease expressly declares that Plaintiff "shall have the use of this space and shall enjoy all the rights to such space," and on the terms as "would accrue to the Lessors had they remained in full possession of the premise." As such, despite all of its protests, there is no question that Plaintiff – as well as its predecessor, Newberry – had the express right to "use" and did, in fact, exclusively "occupy" that space, under the express provisions of the Failing Lease.[22]

Second, based on the historical finishes that remain in the basement along its outer walls, Newberry necessarily monitored and/or maintained the "sidewalk vaults" as part of its prior retail/mercantile use and occupancy of that space, which would have been required, as a practical matter, from *any* retailer selling merchandise and servicing customers in that space.[23] Plaintiff

---

[20]    Dkt #56 – Pitt Decl., Ex. G (1956 Failing Lease, Pg. 1) (emphasis supplied).

[21]    *Id.*, Ex. G, Pgs. 10-11 (1956 Failing Lease) (emphasis supplied). By way of context, the reason for the alternate description of the "space" under the "sidewalks" is attributed to the fact that the City of Portland has a municipal easement to the sidewalks (and the space beneath) to the extent it should ever need it.

[22]    Anderson Decl., ¶ 4; *see also* Dkt #70-1, Ex. 22, pt. 1, at court Pg. 36 (2006 Rippey Report, ROS_0000383) ("The basement appeared to extend below the sidewalk on both the street sides of the building.")

[23]    *Id.* This situation was only exacerbated due to the stark fact that Plaintiff abandoned the basement, and apparently made no effort to monitor or address the condition of the space it otherwise had a right to occupy under the lease.

**PAGE 8 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

likewise pays rent for the right to occupy the *entire* basement of the Failing Building, *including* the space beneath the sidewalks.[24] Given the unqualified right to use, as well as the payment of rent, Plaintiff necessarily assumed an obligation to monitor and maintain that space, notwithstanding that Plaintiff chose to abandon it.[25]

Third, under the Lessee's Covenants of the 1956 Failing Lease, Plaintiff's obligations to properly "maintain" the premises, included, among others:

> "Lessee covenants and agrees:  *** "(c) That it will during the term hereof ***at its sole cost and expense*** keep the leased premises in ***good condition and repair***….; ***(e) that it will keep the sidewalk adjoining the leased premises free and clear of snow and ice***; *** (h) ***Not to commit or suffer any strip or waste*** of the leased premises…"[26]

It is noteworthy that no corresponding repair/maintenance obligation exists, *running to the lessor*, that requires Walker Place to address/repair any deteriorating conditions within the space the lessee (here, Plaintiff) had a right to use or occupy under the Failing Lease.[27]   If

---

[24]      *Id.*

[25]      *Stafford Properties of Oregon, Inc. v. Ben Metz, Inc.,* 284 Or 3, 584 P.2d 750 (1978) (Oregon courts may give a "practical construction" to a commercial lease regarding the responsibility to repair a condition on the property when "there is a conflict in the evidence relating to statements ***or conduct by parties to a contract relied upon as evidence of their practical construction of the contract, it is for the jury, rather than the trial judge, to resolve such a conflict, under appropriate instructions by the trial court***.");  *Wilkens v. Western States Grocery Co.,* 167 Or 103, 114-115, 114 P.2d 542 (1941) ("We think that it was for the jury to determine from a consideration of all the facts and circumstances in evidence whether the steps and platform constituted a common entrance for the use of the defendants and the other tenants of the dock premises, control over which was reserved by the lessors, or whether possession and control passed to the defendant under the lease. '***Parcel or no parcel is always a question for the jury.***'") (emphasis supplied)

[26]      Dkt #56, Pitt Decl., Ex. G, Pgs. 8-9 (1956 Failing Lease) (emphasis supplied). Plaintiff is, under express terms of the lease covenants, required to keep the exterior sidewalk "free and clear of snow and ice." That Plaintiff and its predecessor occupied space beneath the sidewalks, no specific covenant was required beyond the covenant of "good condition and repair" and "not to commit or suffer strip or waste," which includes "waste" by permissive acts of omission, allowing the space to fall into a state of disrepair.

[27]      *Ball v. Day*, 57 Or App 384, 387, 644 P.2d 649 (1982) ("***As a general rule, a commercial landlord has no duty to make repairs***, and a decision by the tenant to alter the leased premises cannot in itself impose a duty upon the landlord to make repairs compatible with

---

**PAGE 9 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff did not have the obligation to maintain the premises and space to which it also had a right to exclusively use and occupy, apparently it believes no one did.[28] Again, when laid bare, Plaintiff's positions and arguments are, at best untenable, and at worst border on the absurd.

###### B.    The "Vent Stack" In the Leased and Occupied Space.

Although Plaintiff asserts the description of the "exterior vent stack" conclusively establishes it cannot be part of the "leased premises" and, therefore, outside of Plaintiff's obligation to maintain, a review of the historical and current purpose/use of the "vent stack" compels the opposite conclusion.

Here, the "vent stack," originally installed by Newberry has, for the *entire* history of the building, serviced *only* the retail premises occupied by Newberry, and now its successor, Plaintiff.[29]    Therefore, the obligation to maintain the "vent stack" should receive an identical treatment as that followed by the parties with regard to the "rooftop" HVAC equipment installed and exclusively utilized by Plaintiff, which equipment likewise services *only* Plaintiff's retail space, and is maintained by Plaintiff as matter of course.[30]

Similar to the "sidewalk vaults," the problem is that Plaintiff harbors the misguided belief that if it does not desire to use something, and effectively abandons an item or space in place, it is somehow relieved of its obligation to maintain that item or space.  Notwithstanding, given that Plaintiff affirmatively assumed *all* obligations of its predecessor (Newberry) under the Sixth

---

the tenant's alterations.") (emphasis supplied).  That Plaintiff elected to abandon the basement does not alter the analysis.

[28]    *Kahn v. Love,* 3 Or 206, 207 (1870) ("A tenant has no remedy against a landlord for suffering premises to be out of repair, unless the landlord has agreed to keep it in repair. Unless there be an express agreement to that effect, the tenant, whether for life, for years, or at will, cannot compel him to repair.") (citation omitted).

[29]    Bailey Decl., ¶¶ 12-14.

[30]    *De Wolfe v. Kupers,* 106 Or 176, 187, 211 P. 927 (1923) ("The duty of repair of leased premises, in the absence of any other agreement upon the subject, is imposed upon the tenant[.]")

**PAGE 10 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

Amendment to the Failing Lease,[31] it has no principled basis to simply "discard," in piecemeal fashion, the full panoply of historic and existing maintenance obligations, originating with its predecessor, through a tactical "abandonment" of the same. Again, Plaintiff enjoyed substantial benefits under the Failing Lease, and now it must accept *all* corresponding burdens.

Accordingly, the Court should deny Plaintiff's motion, in total, as to these discrete maintenance and "surrender" obligations under the Failing Lease.

II.    **Plaintiff Must Perform all Work "Necessary," Including the Removal of "Lateral Support Dependence" Between the Two Building, to "Physically Separate" the Structures and Make Them "Entirely Independent and Self-Sufficient" Under the Applicable Leases.**

Plaintiff's argument regarding the separation obligation is entirely without merit. In keeping with Section 16.02 of the Richmond Lease – the 1956 Failing Lease sets forth a corresponding set of requirements regarding the "Severance" obligations in this matter:

> "The Lessee [Ross] agrees that, prior to the expiration of this lease or, in the event of termination of this lease for any reason whosoever, promptly after such termination, *it will at its sole cost and expense do and perform such work as shall be necessary to physically separate, and constitute entirely independent and self-sufficient, the demised premises from the adjacent 'Richmond Building' premises*. Without limiting the generality of the foregoing, such work shall include: removal of the escalators and the closing in of the openings in the floors and walls of the Failing Building which accommodate the same; *construction of footings and masonry curtain walls along the easterly boundary line of the demised premises;* and such appropriate alterations, changes and relocations of portions of the plumbing, electric*, and other systems and apparatuses as may be necessary to make the 'Failing Building' space independent of the 'Richmond Building'.*"[32]

In reviewing Plaintiff's motion, it is clear that Plaintiff's separation "plans" makes no attempt to "physically separate" the Failing Building "from the adjacent 'Richmond Building'

---

[31]    Dkt #56, Pitt Decl., Ex. F, Pg. 1 (Sixth Amendment) ("D.  Lessee represents and warrants that it has succeeded to all right, title and interest of Lessee's predecessor in and to the Lease and *has assumed the obligations of Lessee thereunder.…*").

[32]    Dkt #56, Pitt Decl., Ex. G, Pg. 4 (1956 Failing Lease, "Severance") (emphasis supplied).

**PAGE 11 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

**SLINDE NELSON STANFORD**
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250

premises," and which – similar to the Richmond Lease – *requires* the "construction of ***footings and masonry curtain walls*** along the easterly boundary line demised premises" as excerpted above.

Indeed, Plaintiff's "plans" for metal stud "partition walls" resting on the existing ***shared floors*** of the two buildings are not remotely equivalent to a masonry "curtain wall," which necessarily encompasses an exterior skin for the Failing Building, and is required to render it "entirely independent and self-sufficient" from the Richmond Building.[33]

In an attempt to avoid these unambiguous "severance" obligations, Plaintiff argues that the 1946 Failing Lease between Newberry and the prior Failing Building ownership somehow changes the analysis by stating the Richmond Building was described (in that *prior document 10 years earlier*) to be constructed in a way that "partition walls" could be added between it and the Failing Building so the Richmond Building could be used as a "self-contained" building as regards to certain systems.

Lest there be any continuing doubt as to which document(s) control the disposition of this discrete matter, the 1996 Amendment to the Failing Lease unambiguously affirms the 1956 Failing Lease controls, providing in relevant part:

> "D. Lessee represents and warrants that it has succeeded to all right, title and interest of Lessee's predecessor in and to the Lease and ***has assumed the obligations of Lessee thereunder, including specifically, but not by way of limitation, the obligation to physically separate and restore the premises*** at the expiration or termination of the Lease, ***as described in the paragraph entitled 'Severance' on page 3 of the August 31, 1956 amendment and restatement of the Lease.***"[34]

---

[33]     In order to construct a "curtain wall," the concrete floors and steel beams that span the Richmond and Failing Building structures need to be cut away.. The escalator framing that crosses the property lines on the first and second floors likewise must be cut to "physically separate" the two buildings. Under Plaintiff's "plans" there is no question that the two buildings would continue to be "*physically dependent*" in perpetuity, in clear violation of the Failing Lease.

[34]     Dkt #56, Pitt Decl., Ex. F, Pg. 1 (1996 Amendment, Recital D) (emphasis supplied).

**PAGE 12 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

Contrary to Plaintiff's assertions, the parties' "intent" regarding the import of the Failing 1956 Lease *alone* – as well as *corresponding* 1956 Richmond Lease[35] – is beyond dispute, which documents clearly control what is now required to comply with Plaintiff's end-of-lease "severance" obligations regarding these two buildings.[36]

It is particularly instructive here when, *in 1996,* as part of the parties' agreement to allow Plaintiff to "assume" the then existing obligations of Newberry, *including the end-of-lease "severance" obligations* of Newberry, the parties were exceedingly clear to expressly "call out" the controlling provisions from the 1956 Failing Lease.  The 1946 Failing Lease, which was executed *10 years earlier*, under very different circumstances, cannot be used to contradict the plain meaning of the 1956 Failing Lease.

Moreover, even a cursory review of the underlying "deeds," to the extent they provide any tangential guidance at all as to the plain meaning of the language within the leases (which they do not), the 1956 Failing Lease deed expressly belies Plaintiff's present separation "plan," stating in relevant part:

> "Each party hereto herby grants to the other *** an easement of entry upon the lands and premises of the other *** such easement being to the extent reasonably required to remove the escalators crossing the property line and properly close the openings in the floors which accommodate said escalators, ***construct such good and sufficient masonry curtain walls along the property line** between the Failing Building and the premises hereby conveyed [the Richmond Building] **as may be required to physically separate said structures, and make such alterations and changes in and to the electrical, plumbing and other systems and apparatuses and may be necessary to completely separate said buildings***."[37]

---

[35]    Plaintiff, having submitted a *single* "plan" to the City in October of 2015, recognizes that, as a practical and legal matter, it must comply with the corresponding obligations of *both* the Failing Lease and Richmond Lease in effecting a separation of these two buildings.  (Dkt #56, Pitt Decl., Ex. E, Pgs. 3 and 4 (Bowles Dep., Pgs. 226:22-25; 227:1-15)).

[36]    ORS 42.300 ("Except for the recital of the consideration, *the truth of the facts recited from the recital in the written instrument shall not be denied by the parties thereto,* their representatives or successors in interest by subsequent title.")

[37]    Dkt #61, Reichmuth Decl., Ex. 5 (August 24, 1956 Failing Deed).

**SLINDE NELSON STANFORD**
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250

Plaintiff's reliance on the 1956 deed is truly remarkable when it simply serves to underscore that Plaintiff's "Severance" plan neither contains "masonry curtain walls along the property line," nor does it "physically separate said structures" or "completely separate said buildings," and this remains true whether one looks at the excerpted language of the deed, or the controlling language of the 1956 Failing Lease.

Although Plaintiff would like to muddy the waters with references to "easements" and "footings" in the 1956 deed, the plain language of that instrument identifies that the two "structures" are ultimately to be "physically separate" or, stated in different terms, the two "buildings" are to be "completely separate."  Respectfully, Plaintiff's proposed "plan" does not come close to achieving such a result, and it makes no colorable pretense at doing so.

Finally, Plaintiff's feigned shock/surprise as to what is *actually* required to separate the two buildings, within the meaning of the applicable leases, is not well taken.  First, in Plaintiff performing its build-out of the space in 1996, it created a pro forma which included an allocation, in the form of a "sinking fund" to address, in part, the future separation obligation at the termination of the leases.

> "Both leases require that we physically separate each building at the end of the lease term.  Therefore, we need to establish a sinking fund.  ***The proforma includes $150,000 in the LHI for this end of lease contingency <u>and</u> building restoration***."[38]

In 1996, without undertaking any substantive analysis, Plaintiff allocated *only* $150,000.00 to address both the "Severance" *and* its other end-of-lease "building restoration" obligations.  In his deposition, Plaintiff's Vice President of Real Estate, Greg McGillis, acknowledged this allocation was "inadequate" to address the present "Severance" obligations.[39]  Indeed, putting aside what is *actually* required to "physically separate" the two buildings, that

---

[38]    Pitt Decl., ¶ 2; Ex. A (Sinking Fund) (emphasis supplied).

[39]    Dkt #56, Pitt Decl., Ex. D, Pg. 17 (McGillis Dep., Pg. 102:1-25).

**PAGE 14 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

1996 "sinking fund" allocation is wholly "inadequate" to even pay for Plaintiff's *own* separation plan by a multiple of 10.

Second, apparently realizing this profound oversight years later, Plaintiff's "***goal now is to find out how little we can spend to separate the buildings*** in compliance with the lease."[40]

Third, and of particular interest, *over four years earlier,* on March 16, 2009, Plaintiff sought and received an independent evaluation of what is required to separate the two buildings:

> "Dave an I scratched our heads to come up with what we think are required to accomplish what you need.  Please see attached.
>
> I formatted the work to be in five (5) groups as follows:
>
> 1) Group A.  This is for the demising walls.  ***I'm figuring double masonry walls because, if separated, one future owner may have the option to demolish 'his' building without the whole thing coming down***.  Masonry is figured for sheer. ***.*"[41]

Although Plaintiff apparently declined to accept that evaluation, it is, without question, instructive in that it begins to formulate what is *ultimately* required as the end result for these two buildings.  Furthermore, it objectively demonstrates that Walker Place's "Severance" proposal is neither a naked "money grab" nor created from whole cloth, and it reflects an honest reading of the leases, *both* of which require that *each* building be able to exist and function on its own without other.[42]

In assisting Plaintiff in its quest to "find out how little" it is required to spend in meeting its "Severance" obligations under the leases, the Court should respond that Plaintiff is required to

---

[40]     Pitt Decl., ¶ 3; Ex. B (September 2013 email exchange) (emphasis supplied).

[41]     Pitt Decl., ¶ 4; Ex. C (2009 email re double masonry walls) (emphasis supplied).

[42]     Again, the 1956 Failing Lease explicitly requires Plaintiff to "***perform such work as shall be necessary to physically separate, and constitute entirely independent and self-sufficient***" the buildings, which work, if *necessary* to meet current code requirements, undeniably includes addressing/separating the horizontal, seismic load interdependence now existing between the two buildings.  Indeed, the "Severance" obligation that expressly "survives" the termination of the Failing Lease, necessarily exists independent of any other *pre-termination* provision to the contrary.

**PAGE 15 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

spend as much as it takes to *fully* comply with the plain meaning of both leases, which requires Plaintiff to render the Failing Building capable of standing on its own, along with an exterior "masonry curtain wall with footings" at its termination.  Again, Plaintiff enjoyed substantial benefits under the Failing Lease, and now it must accept *all* corresponding burdens.

Accordingly, the Court should deny Plaintiff's motion on this discrete matter, in total.

**III.    Plaintiff's Removal of the Historical "Retail/Mercantile" Occupancy in the Failing Building Basement Constitutes Waste and Violates the Surrender Obligations of the Failing Lease as a Matter of Law.**

Plaintiff asserts the claims related to the stripped historical occupancy from the Failing Building basement are subject to summary judgment, arguing in general (1) the prior ownership purportedly had "knowledge" of or "consented" to the 1996 remodel and, therefore, somehow "waived" these current claims, (2) there is purportedly no evidence that "seismic upgrades" will be required in the future, and (3) there is purportedly no evidence that the "basement space" will be desirable to a future retail tenant.

In responding to these baseless assertions, the following analysis first details that Plaintiff committed waste in the Failing Building basement as a matter of law, and second that Plaintiff's purported "factual" defenses are contrary to the actual facts, and otherwise without merit.

**A.    Plaintiff's Surrender Obligations/Violations Under The Failing Lease.**

This discrete issue – and Plaintiff's associated "surrender" obligations herein – are governed by two documents: (i) The 1996 Sixth Amendment to the Failing Lease, and (ii) the 1956 Amended and Restated Failing Lease, each of which affirmatively places the obligation – and liability – on Plaintiff to address and restore the "retail/mercantile" occupancy to the Failing Building basement.

The Sixth Amendment to the Failing Lease states, in relevant part:

"3.    *** ***In altering or remodeling the leased premises, <u>Lessee shall not injure or change the general structural character of the leased premises or the building of which the premises are a part</u>*** and all work shall be done in full compliance with all federal, state and municipal laws and regulations ***. Lessee

**PAGE 16 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

agrees that *__it will bear any responsibility for costs and expenses associated with any modifications to the building__* which, *__as a result of Lessee's work or other activities in the building,__* may be required by \*\*\* *__seismic laws \*\*\*.__*

4.    *__Except as hereby modified, the Lease shall remain in full force and effect__*."[43]

Under the Lessee's Covenants of the 1956 Failing Lease, Plaintiff's "surrender" obligations are:

"Lessee covenants and agrees:   \*\*\* (f) That it will *__at the expiration of the term hereo__*f, or at the earlier termination of this lease *__surrender the premises to the Lessors__* or those having there estate therein *__in the same condition as that which the Lessee is, by the terms of this lease, obligated to put the premises__*, reasonable use and wear thereof, and damage due to fire, excepted. \*\*\*."[44]

The "same condition as that which the Lessee [Plaintiff] is, by the terms of the lease, obligated to put the premises," expressly *includes* the following:

"(c) That it will during the term hereof *__at its sole cost and expense__* keep the leased premises in *__good condition and repair__*.… \*\*\* (h) *__Not to commit or suffer any strip or waste__* of the leased premises…"[45]

Here, the language excerpted from both the 1996 Sixth Amendment and the 1956 Failing Lease imposes affirmative, unambiguous obligations on Plaintiff with regard to (1) any consequences that "result" from its work/activities in the Failing Building, and (2) its "surrender" obligations to deliver the leased premises in a state of "good condition and repair" and not in a condition of "strip or waste."[46]

---

[43]    Dkt #56, Pitt Decl., Ex. F, Pg. 3 (1996 Sixth Amendment, Paragraph 3-4) (emphasis supplied).

[44]    Dkt #56, Pitt Decl., Ex. G, Pg. 9 (1956 Failing Lease) (emphasis supplied).

[45]    Dkt #56, Pitt Decl., Ex. G, Pgs. 8-9 (1956 Failing Lease) (emphasis supplied).

[46]    *S-Tronix v. Submedia, LLC*, 2009 WL 152521, \*3 (D.Or. 2009) ("[I]n Oregon 'it is hornbook law that strict and literal, rather than 'substantial,' compliance is required of express conditions.'") (citation omitted).

**PAGE 17 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

Indeed, it is clear that in contemplating that Plaintiff would undertake *some* type of "remodel" in the Failing Building in 1996, the parties were exceedingly clear that Plaintiff *alone* would be responsible for "any modifications **to** the building," that may be required "as a result of [Plaintiff's] work or other actives **in** the building," including, among other "code" requirements, compliance with all "seismic laws."  As noted at the outset of this Response, as a *direct* result of the 1996 work, and *Plaintiff's* election to strip *all* occupancy from the basement in the Failing Building, substantial seismic upgrades are now required to restore *historical* retail/mercantile occupancy of the basement.[47]

Moreover, the above language must be read in conjunction with express language in the 1956 Failing Lease that *requires* Plaintiff to keep the leased premises in "good condition and repair" and affirmatively *precludes* Plaintiff from committing "strip or waste" of the entire leased premises, *including the basement*.  Nor can there be any dispute that Plaintiff's unilateral removal of *all* "retail/mercantile" occupancy from then basement constitutes "strip or waste" of that portion of the Failing Building.[48]

In the final analysis, Plaintiff is, without question, required to "surrender" the *entire* "leased premises," including the basement, with the same *historical* retail/mercantile occupancy that existed in 1956 and when Plaintiff acquired the lease in 1996.

### B.    Plaintiff's Specific "Factual" Arguments Fail.

Each of Plaintiff's "factual" defenses is contrary to the actual facts and fail as a matter of law.  Although the analysis overlaps, each of Plaintiff's arguments is addressed separately below.

---

[47]    The above language is also clearly not limited in time to only when Plaintiff initially undertook such "work" in 1996 but, rather, is broadly stated to encompass "*modifications to the building*" that "*may be required*" as "*a result of Lessee's work or other activities*."  This "*as a result*" language places the obligation on Plaintiff to address its removal of the historical occupancy in the basement and remedy the same at the termination of the lease.

[48]    *In re Stout's Estate*, 151 Or 411, 422, 50 P.2d 768 (1935) ("The question of what constitutes <u>*waste is determined primarily by the circumstance of whether or not the act, either of commission or omission, results in injury*</u> to the reversioner or the remainderman.")

**PAGE 18 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

i.     **Whatever purported "knowledge" or "consent" of the ownership to the 1996 remodel, no "waiver" of these claims occurred as a matter of law.**

Here, there is absolutely *no* evidence of an "express" (*i.e.,* written) waiver, by Walker Place (or its predecessors), regarding any contractual, statutory, or common law right underpinning the specific damages and relief now sought by Walker Place in its First, Second, and Third Counterclaims in this matter.[49]  Moreover, there is *no* evidence remotely supporting an "implied" waiver – requiring a "clear, unequivocal, or decisive act" – under Oregon law.[50]

Applied to the this issue, clearly no waiver can exist regarding the end-of-lease "surrender" obligations of Plaintiff to address the consequences of its stripping of *all* "retail/mercantile" occupancy from the Failing Building basement – which became permanent/irrevocable in 2004 under the City code – and only discovered as part of this litigation.[51]

As to the effect of the 1996 Sixth Amendment to the Failing Lease on this issue, it is reasonable to assume the ownership of the Failing Building, whether in 1996 or thereafter, always intended and expected that it was protected against whatever consequences may have

---

[49]     Under the heading of "Waiver," the 1956 Failing Lease also precludes an alleged waiver, stating in relevant part: "A waiver of any breach of any covenant, term or condition of this lease *shall not be considered a waiver of any other breach of the same or any other provision or covenants*…." (Dkt #56, Pitt Decl., Ex. G, Pg. 15 (1956 Failing Lease, Waiver)).

[50]     *Tri-County Metropolitan Transit Dist. v. Time Warner Telecom of Oregon, LLC,* 2008 WL 4572519, *6 (D.Or. 2008) ("'Waiver by conduct, however, requires a 'clear, unequivocal, decisive act.'"); *Ionian Corp. v. Country Mut. Ins. Corp.,* 88 F.Supp.3d 1187, 1199 (D.Or.2015) ("Waiver may be implied by conduct, but there must be "clear, decisive and unequivocal conduct which indicates a purpose to waive the legal rights involved[.]"); *Bank of Eastern Oregon v. Griffith*, 101 Or App 528, 536, 792 P.2d 1210 (1990)('Waiver is a voluntary, intentional relinquishment of a known right. *** **However, the intention to waive must clearly appear; it will not be inferred, except from a clear and unequivocal act manifesting an intent to waive.**") (emphasis supplied).

[51]     *Stanley v. Mueller,* 222 Or 194, 207, 350 P.2d 880, 887 (1960) ("It is settled law that a waiver of a legal right results *only when there is both full knowledge of all the facts* and the existence of the right of election coupled with an intention to relinquish it.").

---

**PAGE 19 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

SLINDE NELSON STANFORD
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250

"resulted" from Plaintiff's "renovations" in this matter, and that no waiver of the express lease provisions governing this matter would be implied. Indeed, the above language must also be read in conjunction with express language in the original lease that required Plaintiff to keep the leased premises in "good condition and repair" and affirmatively precluded Plaintiff from committing "strip or waste" of the leased premises, including the basement.

As simple thought experiment illustrates this point. Under its misguided formulation, Plaintiff, in essence, is seeking a ruling that the ownership of the Failing Building, upon executing the Sixth Amendment to the lease in 1996, *and without any additional discussion whatsoever,* simultaneously understood (and somehow tacitly agreed) that although it was then *transferring* approximately 30,000/sq. ft. to Plaintiff, of prime downtown "retail/mercantile" commercial space, for a period of 20 years, Plaintiff would only be *returning* approximately 20,000/sq. ft. of such space at the termination of the lease. To state the above proposition is to demonstrate its absurdity.

Moreover, a bare "knowledge" of the prior ownership that Plaintiff was undertaking substantial renovation in 1996, to suit Plaintiff's specific desires in terms of floor plan, does not equate to an "acceptance" (or waiver) that Plaintiff would not restore the Failing Building at the termination of the lease.[52]

Similarly, a bare "consent" to Plaintiff's renovation plans, even if it did occur prior to the commencement of Plaintiff's build-out – which it did not – would not alter the analysis.[53] Having

---

[52]     2 Tiffany Real Prop. § 636 (3d ed.) ("Permission in a lease to make alterations will be construed as limited to such changes as will further the use of the property for the purposes for which it was rented, *and is to be construed in connection with other provisions of the lease, such as prohibition against injury to the property, covenants against waste and to return the property in its original condition*…..") (emphasis supplied).

[53]     *Winans v. Valentine*, 152 Or 462, 467, 54 P.2d 106 (1936) ("In all leases there are implied covenants unless expressly excluded. These implied covenants form as much a part and parcel of the contract as if actually written or incorporated therein. *** *The law implies an obligation on the part of the tenant to use the premises leased in a proper and tenantable manner, and not to expose the buildings to ruin or waste by acts of omission or commission.*") (emphasis supplied).

**PAGE 20 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

said that, Plaintiff's curious reliance on its 1996 letter to the attorney for the Failing Building ownership on this point seeks to prove too much. Specifically, that letter purports to inform the ownership of the following:

> "*** [O]ur present construction project cost estimate for leasehold improvements is approximately $2,000,000. *Included in such amount is the cost of bringing both buildings up to required code compliance including, but not limited to, the electrical, mechanical, and 'ADA'*."[54]

Contrary to Plaintiff's stated intentions above, no such "ADA" or other similar code upgrades occurred within the leased premises of the Failing Building.[55] To be sure, the Sixth Amendment to the Failing Lease required no such "ADA" or related upgrades. However, when Plaintiff requests this Court to simply trust that it keeps its word or actually does what it says it is going to do in its internal/external correspondence, the Court should view such "evidence" with extreme skepticism.

> ii. **"Seismic Upgrades" Will Be Required To Restore Historical Occupancy And the Removal Historical Occupancy Will Impact the Future "Options" and "Use" of the Failing Building.**

As noted at the outset, the "occupancy bank" exists to allow, *the owner of the Failing Building*, to increase the allowable "uses" of various portions of the building, without triggering a full seismic upgrade under Title 24.[56] Here, there is absolutely no dispute that the "occupancy bank" is wholly insufficient to restore the historical retail/mercantile occupancy that existed when Plaintiff acquired the lease in 1996.

Contrary to its self-serving contentions, and of equal importance, Plaintiff's strip and waste of the historical occupancy from the basement of the Failing Building has, without

---

[54]    Dkt # 58, Pl. Mot., McGillis Decl.

[55]    Bailey Decl., ¶¶ 9-11.

[56]    Bailey Decl., ¶¶ 4-5.

**PAGE 21 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

question, forever restricted and affected the leasing "options" now available to Walker Place in perpetuity. Two examples illustrate this unassailable point.

First, in a letter from Plaintiff's counsel to Walker Place's counsel, dated May 16, 2007, *Plaintiff* itself proposed a concept plan to "consolidate" its retail operation *entirely* into the Failing Building stating, in relevant part:

> "In concept, Ross' plan would be to use a portion of the basement space for stock and office, ___leaving approximately 7300 sq. ft. for retail___ [in the basement], ___in addition to the retail on the first and second floor.___ The enclosed drawings illustrate this layout. In order for this to be a workable plan, a number of items would need to be addressed.
> ****
> Within the building Ross would need to address vertical transportation. ___Based on Ross' initial review, it should be possible to open up the former Newberry staircase leading from the first floor down to [the] basement, and to add a dedicated freight elevator, a passenger elevator and an escalator.___ This work would need to comply with any structural requirements imposed by any governmental authority related to the addition of the vertical transportation."[57]

In analyzing Plaintiff's *own* "concept plan" – a real world example of the clear impact directly resulting from Plaintiff's strip and waste of historical occupancy from the Failing Building – such concept plan, if actually executed, would trigger a full seismic upgrade of the entire Failing Building under Title 24 of the City Code.[58]

Second, should Walker Place ever desire to increase the use of the first floor of the Failing Building, in the form of a typical restaurant in downtown Portland, such increase, if actually executed, would trigger a full seismic upgrade of the entire Failing Building under Title 24 of the City Code.[59]

In the final analysis, it is simply an indisputable and concrete fact that as direct result of Plaintiff's strip/waste of the historical occupancy from the basement, the Failing Building will,

---

[57]    Bailey Decl., ¶¶ 6-7; Ex. C (emphasis supplied).

[58]    Bailey Decl., ¶ 7; Ex. D.

[59]    Bailey Decl., ¶ 8; Ex. D.

**PAGE 22 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

as a matter of necessity, *have to adjust and modify its leasing "options,"* in perpetuity, in a way that would never have been required absent Plaintiff's acts/omissions regarding this matter.

The magnitude of injury is profound in that this permanent loss of "options" exists not only in the abandoned basement, but also serves to *forever* restrict future increases of occupancy and use in *other* portions of the Failing Building as well.

> ### iii.    The "Basement Space" of the Failing Building Has Inherent Value and Would Be Desirable To A future Retail Tenant.

The suggestion by Plaintiff that the basement space has little to no "retail/mercantile" value, in addition to being absurd, on its face, is contrary to both common sense and the objective fact that numerous "below-grade" retail/mercantile operations presently exist in the Central Business District of downtown Portland.[60]

Further, contrary to Plaintiff's baseless assertions, Walker Place's expert, Michael Heerman, clearly stated the Failing Building has, in fact, suffered damage as direct result of Plaintiff's removal of historical occupancy from the basement, both in his expert report and in his subsequent deposition.[61]   On that score, in his deposition, Mr. Heerman clearly testified that he is personally aware of numerous national retailers who would be interested in the basement of the Failing Building, as retail/mercantile space, and that the first floor is more marketable and valuable if the basement space is likewise available/unrestricted for retail/mercantile use.[62]

Accordingly, under a proper interpretation of the provisions of the Failing Lease, along with Plaintiff's refusal to address and restore the historical "retail/mercantile" occupancy in the basement and the *permanent* loss of that historical occupancy, including the consequent effect on

---

[60]    Anderson Decl., ¶ 9.

[61]    Dkt #56, Pitt Decl., Ex. H (Heerman Report).

[62]    Pitt Decl., ¶ 5; Ex. D (Heerman Dep., Pgs. 43-47 and 68-75).

the future use of the Failing Building as a whole, the Court should deny Plaintiff's motion, in all respects, regarding this discrete matter.

**IV.** **Plaintiff's Motion for Partial Summary Judgment – Based on the Timeliness of Discrete Aspects of Walker Place's Counterclaims Under ORS 12.080 (1) and ORS 12.080(3) – Should Be Denied.**

Invoking ORS 12.080(1) and (3), Plaintiff seeks partial summary judgment against Walker Place's Counterclaims, on statute of limitations grounds, pertaining to the following:

(1) The 1996 "renovations" affecting the use and condition of the Failing Building basement, arguing "to the extent that Walker Place's Counterclaims arise out of Ross's choice to renovate the basement as unoccupied space, the statute of limitations ran out in 2002 (six years after 1996) and the Walker Place claims are now barred,"[63] and

(2) The present "condition" of the sidewalk vaults within the Failing Building basement, arguing "the Landlords have been aware of the problems with the sidewalk vaults vault since at least 2006, and thus any potential claims relating to these issues are barred by the passage of time and the limitations imposed by law."[64]

In keeping with Plaintiff's previous motions, this one is similarly long on conclusion but short on substantive analysis. Indeed, Plaintiff cites no legal authority to support its argument other than a bare recitation of ORS 12.080(1), (3).[65]

Although Plaintiff does not attempt to distinguish between the two subsections of ORS 12.080,[66] each will be addressed in turn below.

---

[63]    Dkt #58, Pl. Mot., Pg. 30.

[64]    *Id.*

[65]    The Court should note that Walker Place, as part of its *own* motions, is seeking partial summary judgment, *against Plaintiff's Seventh Affirmative Defense* (raising ORS 12.080), as the statute is inapplicable to Plaintiff's "end of lease obligations," which encompasses every matter alleged in Walker Place's First and Second Counterclaims.  (Dkt. #55, Walker Place Mot., Pgs. 16-18).

[66]    ORS 12.080(1) is applicable to an "action upon a contract"; ORS 12.080(3) is applicable to an "action for waste *** or injury to any interest of another in real property."

A.     ORS 12.080(1).

As to the "contractual," end-of-lease obligations (*i.e.,* the "surrender" obligations), which include returning the Failing Building – and its basement and "sidewalk vaults" – to state of good repair and not in a condition of strip or waste – those claims are not barred by ORS 12.080 (1).[67]

These discrete issues – and Plaintiff's associated "surrender" obligations herein – are expressly governed by two documents: (i) The 1996 Sixth Amendment to the Failing Lease, and (ii) the 1956 Amended and Restated Failing Lease.

The Sixth Amendment to the Failing Lease states, in relevant part:

> "3.     *** ***In altering or remodeling the leased premises, <u>Lessee shall not injure or change the general structural character of the leased premises or the building of which the premises are a part</u>*** and all work shall be done in full compliance with all federal, state and municipal laws and regulations ***. Lessee agrees that *<u>it will bear any responsibility for costs and expenses associated with any modifications to the building which</u>*, *<u>as a result of Lessee's work or other activities in the building</u>,* may be required by federal, state or local laws including but not limited to the American with Disabilities Act, *<u>seismic laws</u>,* fire and life safety laws, environmental or hazardous materials laws and regulation.
>
> 4.     *<u>Except as hereby modified, the Lease shall remain in full force and effect</u>*."[68]

Under the <u>Lessee's Covenants</u> of the 1956 Failing Lease, Plaintiff's "surrender" obligations are as follows:

> "Lessee covenants and agrees:   *** (f) That it will *<u>at the expiration of the term hereo</u>*f, or at the earlier termination of this lease *<u>surrender the premises to the Lessors</u>* or those having there estate therein *<u>in the same condition as that which the Lessee is, by the terms of this lease, obligated to put the premises</u>*, reasonable use and wear thereof, and damage due to fire, excepted. ***."[69]

---

[67]     This analysis applies to every allegation, item, and "count" within Walker Place's First and Second Counterclaims, all of which are timely as a matter of law under ORS 12.080(1).

[68]     Dkt #56, Pitt Decl., Ex. F, Pg. 3 (1996 Sixth Amendment, Paragraphs 3 and 4) (emphasis supplied).

[69]     *Id.*, Ex. G, Pg. 9 (1956 Failing Lease) (emphasis supplied).

SLINDE NELSON STANFORD
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250

The "same condition as that which the Lessee [Ross] is, by the terms of the lease, obligated to put the premises," expressly *includes* the following:

> "(c) That it will during the term hereof *at its sole cost and expense* keep the leased premises in ***good condition and repair****…. \*\*\** (h) ***Not to commit or suffer any strip or waste*** of the leased premises…"[70]

Here, the language excerpted from both the 1996 Sixth Amendment and the 1956 Failing Lease imposes affirmative, unambiguous obligations on Plaintiff with regard to (1) any consequences that "result" from its work/activities in the Failing Building, and (2) its broad "surrender" obligations to deliver the leased premises in a state of "good condition and repair" and not in a condition of "strip or waste."[71]

There can be no colorable assertion that *any* matter detailed in the First and Second Counterclaims of Walker Place regarding the contractual "surrender" obligations of Plaintiff, which require a return of the *entire* leased premises and occupied portions of the Failing Building in state of good repair and not in a condition of strip or waste – the "performance" of which necessarily arises *at the termination of the Failing Lease* – are somehow time barred under ORS 12.080(1).[72]

---

[70]    *Id.*, Ex. G, Pgs. 8-9 (1956 Failing Lease) (emphasis supplied).

[71]    *S-Tronix v. Submedia, LLC*, 2009 WL 152521, \*3 (D.Or. 2009) ("[I]n Oregon 'it is hornbook law that strict and literal, rather than 'substantial,' compliance is required of express conditions.'") (citation omitted).

[72]    *Meunier v. Northwestern Mut. Life Ins. Co.,* 51 F.Supp.3d 1023 (D.Or.2014) ("Under Oregon law, a claim for breach of contract accrues when the contract is breached. *A breach of contract is nonperformance of a duty due under a contract.*") (emphasis supplied); *Kantor v. Boise Cascade Corp.,* 75 Or App 698, 703, 708 P.2d 356 (1985) (same); *Zurcher v. Booth,* 80 Or 335, 338, 157 P. 147 (1916) ("An action upon a contract or liability express or implied can only be commenced within six years after the cause of action shall have accrued. *The statute of limitations begins to run from the time when a complete cause of action accrues; that is, when an action may be maintained.*") (emphasis supplied)

**PAGE 26 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

The complete absence of *any* legal citation/analysis from Plaintiff is not surprising.  The law is well established that a claim pertaining to a tenant's "surrender" obligations under a commercial lease (here, Plaintiff) does not "accrue" until the lease expires or is terminated.[73]

This long-standing rule has been recognized and followed by federal courts,[74] by state courts that have confronted this issue as an historical axiom of commercial lease interpretation,[75] and by respected legal treatises.[76]

_____

[73]    *James S. Black & Co. v. F.W. Woolworth Co.,* 14 Wash.App. 602, 544 P.2d 112, 118 (1975) ("A lessor whose lease contains a covenant to repair may bring an action as soon as the premises become out of repair, but the lessor is not required to do so; he may wait until after the expiration of the term of the lease."); *Cote v. A. J. Bayless Markets, Inc.,* 128 Ariz. 438, 442, 626 P.2d 602 (1981) ("'***Where the lease contains a covenant to repair and a covenant to leave in repair, the covenants are generally treated as independent covenants....*' *** The covenant to surrender the premises in good condition could not be breached until the end of the term*.") (citations omitted; emphasis supplied)

[74]    *Taylor v. Detroit Diesel Realty, Inc.,* 2014 WL 1794582, *6  (S.D.Miss. 2014) ("As Plaintiffs have argued, [the tenant's] basis for arguing that Plaintiffs' claims are barred by *the statute of limitations is inapplicable to Plaintiffs' claims that arise out of the surrender of possession provision of the lease*, which requires that [tenant] surrender the Premises "in good condition and repair except for ... ordinary wear and tear...." [The tenant's] *duty to surrender the Premises in good condition and repair did not arise until the conclusion of the lease*....") (emphasis supplied; citations omitted); *In re Cohoes Indus. Terminal, Inc.,* 78 B.R. 681, 705-706 (S.D.N.Y. 1987) ("An obligation to repair during the term is not modified or cut down by the obligation to surrender at the end of the term in good condition, reasonable use and wear excepted. Even if the two clauses were read together, the tenant would be obligated to make repairs during the term as well as at the termination of the lease. *Therefore, the duties imposed on the debtor included making repairs required under the repair clause and to surrender the premises in good condition and repair.*") (emphasis supplied)

[75]    *Griffin Grocery Co. v. McBride,* 217 Ark. 949, 952, 235 S.W.2d 38 (1950) ("A covenant to surrender premises in a specified condition, as distinguished from a covenant to make repairs, is not breached until failure to deliver possession in the required condition upon termination of the lease."); *Schimmelfennig v. Grove Farm Co.,* 41 Haw. 124, 130-131, 1955 WL 8784, *5 (1955) ("The decided weight of authority sustains the rule that a right of action for breach of covenant to deliver up leased premises in a particular condition at the expiration of a term relates to the future, and accrues only *upon expiration of the term* recited.") (emphasis in original); *City Hotel Co. v. Aumont Hotel Co.*, 107 S.W.2d 1094, 1095 (1937) ("*The courts have uniformly observed a distinction between a covenant upon the part of a lessee to keep leased premises in repair, and a covenant to deliver up the premises at the expiration of the term in as good condition of repair as they were at the beginning of the term.* A covenant to keep in repair requires the tenant to keep the premises in repair at all times during the term, and if he permits them to get out of repair at any time, the lessor, upon that breach, may sue during the term as for injury to the reversion; *whereas, on a covenant to leave the premises in as good condition as he*

SLINDE NELSON STANFORD
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250

Therefore, when viewed as "an action upon contract" under ORS 12.080(1), *all* of the matters encompassed within Walker Place's First and Second Counterclaims – including those discrete issues identified by Plaintiff in its present motion – *are timely as a matter of law*. Accordingly, the Court should deny Plaintiff's motion for summary judgment.

**B.    ORS 12.080(3).**

As to its statutory waste claim – as set forth in Walker Place's Third Counterclaim – which includes damages related to Plaintiff's refusal to return the "sidewalk vaults" to state of good repair and not in a condition of strip or waste, that discrete issue is not barred by ORS 12.080(3).

Here, in asserting that any claims related to the "sidewalk vaults" are time barred, Plaintiff relies *exclusively* on a misguided invocation of what it terms the "2006 Rippey Report," a report authored by structural engineer T.M. Rippey, *dated July 24, 2006*, who performed a Property Condition Assessment, as part of Walker Place's due diligence in *purchasing* the Failing Building, which purchase did not occur until **December 1, 2006**.[77]

The 2006 Rippey Report divided its assessment into two categories (1) "Major Structural Concerns," and (2) "Minor Structural Concerns."  Mr. Rippey's observations pertaining to the sidewalk vaults were placed in the *Minor Structural Concerns* category, providing in totality:

> 2.    ***The original vaulted sidewalk on the south side of the building was in variable condition.  It may be advisable to perform a more thorough analysis on this area of the sidewalk to ensure that the corroded case iron beams we noted are still***

---

*found them, no action will lie against the lessee until the end of the term, for obvious reasons.*")

[76]    49 Am. Jur. 2d Landlord and Tenant § 713 ("If, under a covenant to keep in repair, the tenant permits the premises to become out of repair at any time, the lessor, upon that breach, may sue during the term as for injury to the reversion. ***However, a lessor under a lease containing a covenant to repair is not required to bring suit as soon as the premises fall out of repair; he or she may wait until after the expiration of the term of the lease. Also, it has been held that a covenant to make repairs is not, technically, breached until the expiration of the term.***")

[77]    Anderson Decl., ¶¶ 2 and 4.

**PAGE 28 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

**SLINDE NELSON STANFORD**
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250

*competent enough to support the sidewalk loading.*  We noted corrosion in these areas; however, none appeared to have failed at the time of our observation.

   3.   *There is a significant amount of corrosion of the steel angle support under the sidewalk vault at the west wall of the building toward the south end*.  In this vault, apparently water service comes into the building and the water meters are apparently located here.  Those supports need to be replaced.  This support could likely be replaced by shoring up the vault and removing the existing steel ledger, burning off the bolts and re-epoxying a new steel ledger with new bolts to the existing west concrete wall.[78]

In evaluating whether the 2006 Rippey Report triggered the running of the statute of limitations in relation to *Walker Place's* present claim sounding in tort, it is well established that an "action for waste *** or injury to any interest of another in real property" is subject to a discovery rule.[79]

First, Plaintiff's argument fails, on the weight of its own illogic, as it should require no extensive analysis to conclude that *Walker Place* had *no* viable statutory waste claims against Plaintiff *prior* to purchasing the Failing Building, which did not occur until later that year.[80]

Second, the application of the "discovery rule" involving damages/injury to real property nearly always involves a question of fact, requiring the adverse party to establish the claimant's objective knowledge of three discrete elements – injury, causation, and tortious conduct – necessarily precluding summary judgment.[81]

---

   [78]   2006 Rippey Report, ROS_0000377 (emphasis supplied);  The last observations in Paragraph 3 was simply repeated later in the report, in a somewhat truncated fashion at Paragraph 8 of the report. (Rippey Report, ROS_0000382)

   [79]   *Goodwin v. Kingsmen Plastering, Inc.,* 267 Or App 506, 509, 340 P.3d 169 (2014) (Expounding ORS 12.080(3): "With a discovery rule, the period of limitations would be deemed to commence *upon either the date that plaintiff actually discovered the injury or the date that a person exercising reasonable care should have discovered the injury*.") (emphasis supplied).

   [80]   *Vollertsen v. Lamb*, 302 Or 489, 497, 732 P.2d 486 (1987) ("The law of waste can be considered as a part of the law of torts, since it deals with wrongful and *actionable conduct and the available remedies for such wrongs*.")

   [81]   *Riverview Condominium Ass'n v. Cypress Ventures, Inc.,* 266 Or App 574, 601, 339 P.3d 447 (2014) ("*Discovery of an 'injury' occurs when a plaintiff knows or should have known of the existence of three elements: '(1) harm; (2) causation; and (3) tortious conduct.'* Thus, 'the facts that a plaintiff must have discovered or be deemed to have discovered include

**PAGE 29 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

**SLINDE NELSON STANFORD**
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250

Third, a review of the 2006 Rippey Report shows, at best, that certain conditions existed in relation to a *portion* of the sidewalk vaults at that time.  Of particular note, however, the specific condition identified in Paragraph 3 of the report – *i.e.,* the "significant amount of corrosion of the steel angle" – existed in the *mechanical room* of the Failing Building, which is *neither* part of the leased premises *nor* occupied by Plaintiff, and was previously addressed by *Walker Place* in 2007.[82]

 Now, to the extent the *limited* observation within Paragraph 2 of the 2006 Rippey Report identifies a potential *pre-purchase* "injury," *later* suffered by Walker Place, within the meaning of the "discovery rule," the remaining two elements – "causation" and "tortious conduct" – *attributed to Plaintiff*, are entirely absent from that report.  Indeed, conspicuously omitted from Plaintiff's motion are any *post-purchase* inspections or communications, of Walker Place, that establish those missing elements.

On that score, it is arguable the statute of limitations under ORS 12.080(3) was not triggered until Plaintiff, following Walker Place's 2012 inspection/demand to remedy this discrete issue, refused to address the current deficiencies in the sidewalk vaults, which did not occur until sometime after 2012.[83]

---

not only the **conduct of the defendant**, but also, under *Gaston*, **the tortious nature of that conduct**.' For purposes of determining what facts a plaintiff should have known, '[t]he discovery rule applies an objective standard—how a reasonable person of ordinary prudence would have acted in the same or a similar situation', **the application of that standard presents a factual question for the jury**, but the question is susceptible to judgment as a matter of law if 'the only conclusion a reasonable jury could reach is that the plaintiff knew or should have known the critical facts at a specified time and did not file suit within the requisite time thereafter.'")

[82]     Anderson Decl., ¶ 4.

[83]     See Exhibit E to Walker Place Answer and Counterclaims, and which is also attached as Exhibit E to the Declaration of Keith A. Pitt. Under that scenario, Walker Place's claim for damages resulting from the deteriorating "sidewalk vaults" is timely as a matter of law.

**SLINDE NELSON STANFORD**
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250

Notwithstanding, there clearly exists, at a minimum, a genuine issue of material fact surrounding whether Walker Place either did or somehow should have "discovered" this discrete claim against Plaintiff outside the limitations period of ORS 12.080(3).

Accordingly, as to Walker Place's Third Counterclaim, when viewed as "an action for waste or injury to real property," the Court should deny Plaintiff's motion pursuant to ORS 12.080(3) as to this discrete matter.

## Conclusion

For the preceding reasons, the Court should deny Plaintiff's motion for partial summary judgment, in total, and as to each of the discrete matters therein.

DATED this 22nd day of February 2016.

SLINDE NELSON STANFORD

By: _____ / s / Keith A. Pitt _____
        Keith A. Pitt, OSB No. 973725
        *Of Attorneys for Defendant*
        *Walker Place, LLC*

## CERTIFICATE OF COMPLIANCE WITH L.R. 7-2(b)(2)

I certify that this brief complies with the applicable word-count limitation under L.R. 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains _____10,994_____ words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of authorities, signature block, and any certificates of counsel.

DATED this 22nd day of February 2016.

SLINDE NELSON STANFORD

By:____/ s / Keith A. Pitt_____
    Keith A. Pitt, OSB No. 973725
*Of Attorneys for Defendant*
*Walker Place, LLC*

**SLINDE NELSON STANFORD**
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** on:

### SEE ATTACHED SERVICE LIST

by the following indicated method(s):

☐     by **faxing** full, true, and correct copies thereof to said attorney to the fax number noted above, which is the last known fax number for said attorney, on the date set forth below.

☐     by **emailing** full, true, and correct copies thereof to said attorney to the email address noted above, which is the last known email address for said attorney, on the date set forth below.

☒     by notice of electronic filing using the CM/ECF system (LR 100.7(a)(2)).

☐     by causing full, true and correct copies thereof to be **mailed** to the attorney(s) at the attorney(s) last-known office address(es) listed above on the date set forth below.

DATED this 22nd day of February, 2016.　　　　SLINDE NELSON STANFORD

By:＿＿＿/ s /  Keith A. Pitt＿＿＿＿＿
　　　Keith A. Pitt, OSB No. 973725
　　　*Of Attorneys for Defendant*
　　　*Walker Place, LLC*

**PAGE 33 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

### SERVICE LIST

Thomas V. Dulcich
Rebecca Boyette
Schwabe Williamson & Wyatt PC
1211 SW Fifth Avenue, Suite 1900
Portland, OR 97204
Tele: 503-222-9981
Fax: 503-796-2900
Email:  tdulcich@schwabe.com;
      cgray@schwabe.com;
      scrawford@schwabe.com;
      cbryan@schwabe.com
      rthompson@schwabe.com;
      kkasch@schwabe.com
*Of Attorneys for Ross Dress For Less, Inc.*

Lisa A. Kaner
Jeffrey M. Edelson
Molly K. Honore
Markowitz Herbold PC
1211 SW Fifth Avenue, Suite 3000
Portland, OR 97204-3730
Tele: 503-295-3085
Fax: 503-323-9105
Email:  LisaKaner@MarkowitzHerbold.com;
      TamiHall@MHGM.com
      JeffEdelson@MarkowitzHerbold.com;
      BrendaAnthony@MHGM.com
      MollyHonore@MarkowitzHerbold.com
*Of Attorneys MAKARIOS-OREGON, LLC*

Gregory D. Call *(Pro Hac Vice)*
Tracy E. Reichmuth *(Pro Hac Vice)*
Crowell & Moring LLP
275 Battery Street, 23rd Floor
San Francisco, CA 94111
Tele: 415-986-2800
Fax: 415-986-2827
Email:  gcall@crowell.com
      treichmuth@crowell.com
*Of Attorneys for Ross Dress For Less, Inc.*

**PAGE 34 - WALKER PLACE LLC'S RESPONSE TO PLAINTIFF'S
MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

SLINDE NELSON STANFORD
111 SW Fifth Avenue, Suite 1940
Portland, OR 97204
p. 503.417.7777; f. 503.417.4250