**Jeffrey M. Edelson, OSB No. 880407**
JeffEdelson@MarkowitzHerbold.com
**Molly K. Honoré, OSB No. 125250**
MollyHonore@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
Suite 3000 Pacwest Center
1211 SW Fifth Avenue
Portland, OR  97204-3730
Tel:  (503) 295-3085
Fax:  (503) 323-9105

     Of Attorneys for Defendant
     Makarios-Oregon, LLC

\

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **ROSS DRESS FOR LESS, INC.,** a Delaware corporation,<br><br>                   Plaintiff,<br><br>   v.<br><br>**MAKARIOS-OREGON, LLC**, an Oregon limited liability company; and **WALKER PLACE, LLC**, an Oregon limited liability company,<br><br>                Defendants. | CV No.: 3:14-cv-01971-SI<br><br>MAKARIOS-OREGON, LLC'S REPLY IN SUPPORT OF ITS MOTIONS FOR PARTIAL SUMMARY JUDGMENT |

## INTRODUCTION

This case is about a unique but otherwise straightforward lease that J.J. Newberry Co. and New York Life executed in 1956.  The Lease is for the Richmond Building, which is conjoined to the Failing Building.  Section 16.02 of the Lease requires the tenant to separate the two buildings by the end of the Lease, and to return the Richmond Building to the landlord as an "entirely independent and self-sufficient structure."  Section 16.01 requires the tenant to leave the Richmond Building in "good order, condition, and repair."  Ross, the current tenant, filed this lawsuit in an attempt to avoid those obligations.

Ross asks the Court to ignore the plain language of the Richmond Lease, arguing that the parties could not have understood the technical language they included in the contract. Ross says the parties intended the plain language to mean something entirely different, because a different landlord included different words in a different contract 10 years earlier. It also asks the Court to excuse Ross from performing its obligations under the Lease because a future tenant has not yet been obtained. Lastly, Ross wants the Court to absolve it of its end-of-lease obligations because it claims the landlord did not enforce separate provisions during the term of the Lease. These are not plausible interpretations of the Lease or plausible defenses to Ross's obligations. They are merely attempts to get a better deal than the one to which Ross agreed.

Ross is a sophisticated retail giant. The Court should bind Ross to the contracts it has signed and to the risks it assumes. Ross extracted as much value as it could from the Richmond Building. It significantly altered the basement and the permit record in the process. It trashed the premises, particularly the upper floors. It did so while paying the same bargain-basement rent year after year. Ross turned a blind-eye to its surrender obligations in favor of short-term decisions that maximized its immediate bottom line. And it now wants to avoid its obligations to put the building back in order because, essentially, Makarios-Oregon did not kick Ross out earlier for its bad behavior.

Fortunately, the Richmond Lease gives Makarios-Oregon some protection for its family asset. The Richmond Lease requires Ross to make the Richmond Building an entirely independent and self-sufficient structure from the Failing Building, through the construction of footings and a masonry curtain wall, and to surrender the building in good order, condition, and repair. Makarios-Oregon is not asking Ross to do anything other than live up to its end of the bargain. Makarios-Oregon is not asking for a better deal than it signed up for. The family only wants the deal it already has.

**ARGUMENT**

**I.     Overview of Makarios-Oregon's motions for partial summary judgment.**

Makarios-Oregon asks the Court to determine two issues on which there are no genuine disputes as to any material fact:

> Motion No. 1: Ross's surrender plans do not meet its obligation
>
> under Section 16.02 of the Richmond Lease to render the
>
> Richmond Building an "entirely independent and self-sufficient
>
> structure."
>
> Motion No. 2: Ross has anticipatorily breached its obligations
>
> under Section 16.01 of the Lease by refusing to fully restore
>
> unauthorized alterations to the basement of the Richmond Building
>
> at the end of Ross's tenancy.

In order to grant Motion No. 1, the Court merely needs to decide that the words "entirely independent and self-sufficient structure" and "footings and a masonry curtain wall" mean exactly what those words mean. Ross is obligated to construct the functional equivalent of footings and a masonry curtain wall to make the Richmond Building an entirely standalone structure. Ross's plan to separate the interior space of the Richmond Building from the Failing Building by merely installing stud and drywall partition walls is insufficient.

In order to grant Motion No. 2, the Court merely needs to decide that Ross's alterations to the basement of the Richmond Building violated Section 9.01 of the Lease. Moreover, the Lease's requirement that Ross return the building "in good order, condition, and repair" requires Ross to restore unauthorized alterations to the Richmond Building at the end of the Lease. The Court must also rule against Ross's defenses that Makarios-Oregon waived its right to require restoration, and is otherwise barred by the statute of limitations, or is equitably estopped from enforcing that right.

There are no genuine disputes as to any material facts on these issues, and Makarios-Oregon is entitled to judgment as a matter of law.  Regarding <u>Motion No. 1</u>, the following facts are undisputed:

- The Richmond Building was completed in 1953, and was affixed to the existing Failing Building at the basement, first, and second floors.  (Makarios-Oregon's Mot. for Partial Summ. J. ("Mot."), Ex. 3; Pl. Ross Dress for Less, Inc.'s Opp'n to Def. Makarios-Oregon, LLC's Mots. for Partial Summ. J. ("Ross's Opp'n") 3.)

- Newberry and New York Life executed the Richmond Lease in 1956.  The only other contract between Newberry and New York Life is the Second Deed, also executed in 1956, in which Newberry transferred the Richmond Building to New York Life.  (Mot., Exs. 2, 9; Ross's Opp'n 5-6.)

- Section 16.02 requires Ross to, among other things, construct footings and a masonry curtain wall along the property line between the Richmond and Failing Building.  (Mot., Ex. 2.)

- Both parties agree that a curtain wall is a non-load bearing exterior wall affixed to the outside of a building's structure.  Ross's engineer, Kevin Kaplan, describes a curtain wall as "an exterior non-structural element that keeps the weather out and the occupants in."  (Decl. of Kevin Kaplan in Opp'n to Defs.' Mot. for Partial Summ. J. ("Kaplan Decl.") ¶ 7.)  He explains that a "curtain wall is attached to the building structure, but does not carry the floor or roof loads of the building."  (*Id.* ¶ 5.)

- Ross proposes to construct stud and drywall "demising walls" in the basement, first, and second floors.  (Kaplan Decl. ¶10.)  Ross does not want to sever the floors and ceilings that connect the Richmond Building to the Failing Building at the basement, first, and second floors.

Regarding <u>Motion No. 2</u>, the following facts are undisputed:

- Ross altered the basement of the Richmond Building in 1996, after it took over the Richmond Lease out of Newberry's bankruptcy.  (Ross's Opp'n 8-9.)

- In connection with those alterations, Ross removed one staircase between the basement and first floor and filled in a second.  It also filed plans with the City of Portland stating that portions of the basement were "vacant, no occupancy, no storage, separate permit required for occupancy."  (*Id.*)

- Ross never asked for its landlord's approval before filing the plans with the City and undertaking the renovations in the Richmond Building.  (*Id.* 10; Mot., Ex. 22.)

- William Calomiris—Makarios-Oregon's immediate predecessor and Ross's landlord in 1996 and 1997—notified Ross that Ross had altered the structure of the building, and changed the character of the basement in violation of Section 9.01 of the Lease.  Despite the landlord's objection, Ross retained its alterations and has benefitted from them for the past 20 years.  (Mot., Ex. 24; Ross's Opp'n 10.)

- In 2004, the City of Portland enacted Title 24.  Title 24 removes a historic building's grandfathered exemption from complying with current seismic regulations if occupancy in the building is increased by 150 occupants.  (Decl. William S. Bailey, AIA in Support of Makarios-Oregon, LLC's Mot. For Partial Summ. J. ("Bailey Decl.") ¶ 14.)

- Before Ross altered the basement in 1996, the basement's occupancy was 195 occupants.  After the City of Portland approved Ross's permits, the occupancy load of the basement was reduced to 34—a decrease of 161 occupants. (Mot., Ex. 30, p. 4.)

Ross clutters the record with additional facts to distract the Court from the ways it has repudiated its obligations under Sections 16.01 and 16.02.  None of those facts are relevant to the

issues before the Court.  The Court may decide Makarios-Oregon's Motions Nos. 1 and 2 in

Makarios-Oregon's favor, as a matter of law, based on the undisputed facts set forth above.

**II.    The Court should grant Makarios-Oregon's first motion for partial summary judgment because Section 16.02 unambiguously requires Ross to make the Richmond Building an entirely independent and self-sufficient structure through the construction of a masonry curtain wall or its functional equivalent.**

Makarios-Oregon offers the only plausible construction of the separation requirements in

Section 16.02 that gives meaning to the words actually used in the Richmond Lease.  In its own

motion for partial summary judgment, and in its opposition to Makarios-Oregon's motions, Ross

argues that Section 16.02 requires it to "close up holes, place simple walls along the property

line, and separate the utilities."  (Ross's Opp'n 1.)  But nowhere in Section 16.02 does the Lease

only require "simple walls."  Instead, Section 16.02 unambiguously requires Ross to construct

"footings and a masonry curtain wall."  Ross's argument that "footings and a masonry curtain

wall" means the same thing as "simple walls" is false.

Ross's interpretation would require the Court to rewrite the Lease.  It wants the Court to

use a contract between different parties 10 years earlier as a template to contradict the plain

language of this Lease.  This rewrite would distort the conclusions of all of the experts, including

Ross's own expert, regarding the meaning of "curtain wall."  Section 16.02 is capable of only

one plausible interpretation.  The Court should enforce the unambiguous language of the Lease,

require Ross to fulfill its separation obligations, and grant Makarios-Oregon's first motion.

**A.    The Court must assume the parties to the Lease intended construction of "footings and a masonry curtain wall."**

Ross argues the Court should not apply the plain meaning of "footings and a masonry

curtain wall," because the parties to the Lease were not architects, contractors, or engineers, and

would have therefore only used terms accessible to landlords and tenants.  But if two

sophisticated parties like New York Life and Newberry actually did not understand the meaning

of "footings and a masonry curtain wall," or intended those terms to mean simply a demising or

partition wall, they would have used any number of terms to express "simple walls."  Instead,

they used very specific and defined technical language to describe the wall the tenant must

construct at the end of the Lease. The Court should presume that Newberry and New York Life understood the language of the contract they signed. *Noorzai v. Dabella Exteriors, LLC*, 3:15-CV-00045-PK, 2015 WL 5037669, at *6 (D. Or. 2015) ("[a] person who has voluntarily signed a document is presumed to be familiar with its contents" (applying Oregon law)). The parties to the Lease intended the tenant to construct footings and a masonry curtain wall.

**B.      The parties' experts agree that a "curtain wall" is a non-load bearing, exterior wall, affixed to the building's structure.**

The parties' experts agree on the meaning of "curtain wall." Ross incorrectly argues that Makarios-Oregon's experts construed the language of the Lease to obviate the need for a curtain wall or its functional equivalent. Ross relies on the draft reports of Makarios-Oregon's structural engineer, Chris Thompson, and architect, William Bailey, to conclude that those experts agreed that Ross's proposed plans were sufficient. But as Mr. Thompson made clear to Ross in his deposition, Mr. Thompson's initial report was not based on the language of Section 16.02:

> Q: Okay. So you wrote [your draft report] without access to the lease itself; is that fair?
>
> A: To the best of my recollection, yes.

(Decl. of Molly K. Honoré in Supp. of Makarios-Oregon's Reply ("Honoré Reply Decl."), Ex. 45 at 101:11-13.) Without the context of the Lease language requiring footings and a masonry curtain wall, Mr. Thompson determined Ross's proposal would adequately separate the interior spaces:

> A: If I'm not concerning myself with making the two buildings independent and self-sufficient structures, as per the terms [ ] of the lease, which we did not have at this point and were not aware of that requirement, if you don't need to do that, then light gauge metal studs would be something that could be used.

(*Id*. at 100:20-25.)

After Mr. Thompson and Mr. Bailey consulted the express language of the Lease, they revised their *draft* opinions and issued their final expert reports. In both reports the experts apply

Page 7 -      **MAKARIOS-OREGON, LLC'S REPLY IN SUPPORT OF ITS MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

the actual Lease language and determine Ross's proposal does not meet the requirements of Section 16.02:

- "Proposed metal stud and drywall assemblies are not equivalent [to footings and masonry curtain walls.] . . . The term 'curtain wall' indicates that the masonry is to continue past the structure and provide a continuous vertical wall where the floors have been removed". (Mot., Ex. 30 at 2.)

- "The design provided by Ross and referred to by [Kevin] Kaplan is not a curtain wall. It is a demising wall appropriate to separate interior spaces. The design does not meet the requirements of the lease." (Honoré Reply Decl., Ex. 46.)

Ross's assertion that Makarios-Oregon's plan for separating the buildings "cannot be accomplished with any kind of curtain wall" is not supported by anything in the record. Ross does not—and cannot—offer any evidence or expert opinion that its proposal satisfies the requirements of the Lease to construct footings and a masonry curtain wall. Ross's own expert certainly does not give that opinion. Instead, he describes a curtain wall as "an exterior non-structural element that keeps the weather out and the occupants in." (Kaplan Decl. ¶ 7.) He explains that a "curtain wall is attached to the building structure, but does not carry the floor or roof loads of the building." (*Id*. ¶ 5.) By his own definitions, Mr. Kaplan's interior stud and drywall "demising" walls are not curtain walls.

Mr. Kaplan's testimony that "exterior finishes can be added to steel stud demising walls as easily as with typical masonry (CMU) construction" (*id.* ¶4) does not turn those walls into the functional equivalent of a curtain wall. Ross's proposal requires the Richmond Building to remain connected to the Failing Building at the basement, first, and second floors. Those floors and ceilings each share a contiguous concrete pour between the buildings. Whether an exterior finish can be added to the drywall sheets Ross proposes to construct to separate the interior spaces is therefore meaningless, given the context. If the shared space is capped by continuous ceilings and floors, when would the separating walls ever be exposed to the exterior elements? The only way those demising walls would need exterior finishes is if the floors and ceilings were severed, and a joint constructed to step the exterior wall back from the property line, and an

exterior wall (i.e., "curtain wall") constructed to finish the Richmond Building along the property line. Ross's proposal does not comply with the terms of the lease.

**C.    No relevant extrinsic evidence contradicts the plain language of Section 16.02.**

The requirement in Section 16.02 to construct footings and a masonry curtain wall cannot be contradicted by language in the 1946 Failing Lease requiring Newberry to construct the new Richmond Building in such a way that it *could* be divided by "partition walls." That 1946 Failing Lease was not executed by Newberry and New York Life, so it cannot be evidence of New York Life's intent under the 1956 Richmond Lease. Further, it is extrinsic evidence offered by Ross to negate the express term in the Richmond Lease, and is therefore barred by the parol evidence rule. ORS 41.740. Ross cannot turn a "masonry curtain wall" into "simple walls" or "partition walls" by relying on the 1946 Failing Lease. New York Life contracted for a specific wall at the termination of the Richmond Lease, and Makarios-Oregon succeeded to those rights. Ross must now live up to Newberry's original obligation under the Lease.

**D.    In order to construct a curtain wall or its functional equivalent, Ross must sever the shared floor and ceiling connections, and perform all construction in compliance with 2016 state and city building codes.**

The requirement in Section 16.02 of footings and a masonry curtain wall shows that separation means the two buildings must be independent and self-sufficient structures, capable of standing entirely on their own, encased in a finished exterior wall. Therefore, separation necessarily requires severing the Richmond Building's lateral connections to the Failing Building. Ross has not revealed any expert who has examined the impact of that construction project. Only Makarios-Oregon, through Mr. Bailey and Mr. Thompson, have offered opinions on that scope of work. And Mr. Bailey and Mr. Thompson agree that in order to comply with current state and city building codes ("Code"), Ross must construct a 12-inch gap between the buildings for seismic drift. (Bailey Decl. ¶ 18.)

Whether the parties anticipated this specific change in Code when they executed the Lease in 1956 does not matter. Section 4.02 of the Lease expressly places the risk of Code changes onto Ross, "at no expense whatsoever to the Landlord." Ross has this risk regardless of

whether those changes are "foreseen or unforeseen, ordinary as well as extraordinary . . . or require structural or extraordinary repairs, alterations or additions and irrespective of the cost thereof". (Section 4.02, Mot., Ex. 2 at 9.)

Ross wants to excuse its obligation to separate the buildings in compliance with Code—and shift that burden back onto its landlord—because, it argues, in 1956 the parties could not have intended such a significant and expensive project. But Section 4.02 clearly articulates the parties' intent: if the Code changes, and compliance with the terms of the Lease requires "extraordinary" structural alterations, the tenant bears the risk of the increased expense. Not the landlord. Ross got its benefits under the Lease—twenty years of rent at $0.58 per square foot. (Decl. of Molly K. Honoré in Support of Makarios-Oregon, LLC's Resp. in Opp'n to Ross's Mot. For Partial Summ. J., Ex. 43.) It now must fulfill its obligations to make the Richmond Building an entirely independent and self-sufficient structure, regardless of cost.

III.    **The Court should grant Makarios-Oregon's second motion for partial summary judgment because restoration of the basement is required under Section 16.01 for Ross to surrender the building in "good order, condition, and repair."**

Ross violated Section 9.01 of the Lease by altering the basement of the Richmond Building without the landlord's authorization. Its alterations so fundamentally changed the basement that Makarios-Oregon cannot now use the basement of its own building as a retail space without spending millions of dollars in seismic upgrades. Section 16.01 gives Makarios-Oregon a separate and independent right to require Ross to rectify its misuse of the premises upon surrender of the building at the end of the Lease. Ross attempts to avoid its restoration duty by arguing (1) Makarios-Oregon should have kicked Ross out earlier for its bad behavior, or (2) its duties under the contract are abated until Makarios-Oregon identifies a future tenant. Both arguments are incorrect. The Court should require Ross to remove its physical alterations to the basement and restore occupancy from 34 to 195 occupants, and to ensure its restorations comply with 2016 Code as required under Section 4.02 of the Lease.

**A.    There is no genuine dispute of material fact that Ross downgraded the occupancy in the basement from 195 to 34 occupants—a decrease in 161 occupants.**

Ross does not offer any evidence to refute William Bailey's calculations of occupancy. Instead, Ross argues that Mr. Bailey's calculations are "conclusory" and "argumentative." (Ross's Opp'n at 27.)  But Makarios-Oregon offered Mr. Bailey's expert calculations in Mr. Bailey's initial expert report, exchanged with Ross on November 9, 2015.  (Mot., Ex. 30.)  Ross did not produce any expert to rebut Mr. Bailey's occupancy calculations.  Ross cannot create a genuine issue of material fact by just claiming Mr. Bailey is wrong, without otherwise producing any evidence supporting Ross's assertion.  *Latif v. Holder*, 28 F. Supp. 3d 1134, 1146-1147 (D. Or. 2014) ("The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue. . . .  A mere disagreement or bald assertion that a genuine dispute as to a material fact exists will not preclude the grant of summary judgment.") (internal citations omitted); *Teamsters Local Union No. 117 v. Wash. Dept. of Corrections*, 789 F.3d 979, 994 (9th Cir. 2015) ("Argument without evidence is hollow rhetoric that cannot defeat summary judgment.")  There is no genuine issue of material fact as to Ross's removal of occupancy from the basement.

**B.    Ross's changes to the basement were unauthorized alterations that changed the structure of the building and changed its character.**

Ross incorrectly argues that its changes to the basement were not "structural" because they did not impact the "structural frame" of the building.  (Ross's Opp'n at 24.)  To support this contention, Ross cites the 1942 Building Code.  Unlike "Curtain Wall," "structural" and "frame" are not defined terms in the 1942 Building Code.  Instead, Ross identifies provisions of the Code that merely use the undefined term "structural frame."  But even if one could extrapolate a meaning of the word "frame" or "structural frame" from the 1942 Code, it would clearly encompass work Ross performed on the Richmond Building.  For example, in discussing "Class VI, Ordinary Construction," the 1942 Code refers to "the interior structural frame, *including the floors* and roof slab, shall be of wood, iron, or steel."  (Ex. 31 at 9) (emphasis added.)  Thus, as one would expect, the contextual use of the word "frame" recognizes that even the structural

frame of a building includes its floors. Here, Ross altered the floors, and therefore the structural frame, of the Richmond Building when it removed one staircase and reconstructed the floor to eliminate the holes which were left behind, and filled in the floor above a second staircase.

The changes to the basement also altered the character of the building. Ross is correct that the Richmond Building has always had office and storage space since it opened. But that office and storage space was in its upper floors—floors that Ross was in possession of, and easily could have used without changing the basement. The unique character of the retail space in the Richmond Building was its open three retail floors at the basement, first, and second floors. Ross altered that character by completely reconfiguring the basement and stripping its retail use. And Ross completed those alterations without even notifying its landlord of its plans, let alone obtaining written approval as required under Section 9.01.

### C.    Section 16.01 requires Ross to restore the basement.

Ross does not refute the body of case law that equates "good order, condition, and repair" in Section 16.01 with an obligation of the tenant to remove unauthorized alterations and to restore the building to its prior condition. See, e.g., Ayen v. Schmidt, 141 N.Y.S. 938, 941 (N.Y. App. Term 1913) (tenant who altered the premises without the consent of the landlord obligated to restore the premises at the end of the lease "in as good condition as he had received them"); Tobin v. Gluck, Nos. 07-CV-1605 (MKB), 11-CV-3985 (MKB), 2015 WL 5793299, at *15 (E.D.N.Y. Sep. 30, 2015) ("[t]he requirement to surrender the premises in good order and condition does not create an obligation to remove properly authorized and properly constructed alterations and to restore the premises to the conditions originally existing at the commencement of the lease")(internal quotations removed); Akron Meats, Inc. v. 1418 Kitchens, Inc., 553 N.Y.S.2d 355, 357 (N.Y. App. Div. 1990) ("the express obligation imposed by a lease to leave premises in good condition has long been interpreted to require the tenant not only to keep the premises in as good condition as when it enters, but to put, keep, and leave the premises in a state of good repair").

The unambiguous meaning of Section 16.01—and specifically, "good order"—requires Ross to put the building in the required condition under the circumstances of the Lease. Ross did not obtain landlord approval for its alteration of the basement, which removed mercantile use from the basement, altered its structure, and changed its character. The basement is not in "good order" under the Lease until those alterations are removed and the basement is restored to its prior condition.

**D.      Section 16.01 gives Makarios-Oregon a distinct right, exercisable at the termination of the Lease, to require Ross to clean up its mess in the basement and restore occupancy.**

Ross's obligation to surrender the Richmond Building in "good order, condition, and repair" under Section 16.01 is distinct from its duty under Section 7.01 to, throughout the term of the Lease, "take good care of the demised premises" and make all repairs "necessary to keep said buildings and improvements in good and lawful order and condition."

Those sections contain some overlap. For example, if Ross refuses to service the elevator and it falls into a state of disrepair, then Ross will have violated its duty under Section 7.01 to "take good care of the premises." And if that condition is still in a state of disrepair at surrender, Ross will violate Section 16.01 because the building will not be in "good order, condition, and repair." However, although those sections may both be impacted by the same condition of the building, they impose different obligations on Ross because they operate at different moments in time. Section 7.01 imposes duties on Ross during the life of the Lease. Section 16.01 imposes duties on Ross at surrender. Those obligations, and the corresponding rights they grant to the landlord, are separate and distinct.

Section 16.01 exists to provide the landlord with an alternative remedy when the tenant breaches Section 7.01, but the landlord chooses to allow the tenant to ride out the term of the Lease (or otherwise waives that right). If the tenant completely complied with Section 7.01 and never did anything to violate its duty to keep the building in "good and lawful order and condition," there would be no need to have a separate provision in the Lease requiring the tenant

to surrender the premises in "good order, condition, and repair." If there is no breach of Section 7.01, then the alternative remedy in Section 16.01 is meaningless.

Section 16.01 therefore only comes into play when the tenant *breaches* Section 7.01 or other provisions during the life of the Lease. Once the tenant breaches Section 7.01—or, in this case, Section 9.01—the landlord can choose to immediately evict the tenant or require removal of unauthorized alterations, or it can waive that right and wait until the end of the Lease. If the landlord chooses to wait until the end of the Lease then, and only then, does Section 16.01 have a purpose. Section 16.01 revives the tenant's obligation to rectify its misuse of the premises and put the building back in compliance with the terms of the Lease.

The Court must construe the Lease to give effect to every word and phrase in the contract. *Hardin v. Dimension Lumber Co.*, 140 Or. 385, 389 (1932); *Oregon Bank v. Nautilus Crane & Equip. Corp.*, 68 Or. App. 131, 146 (1984) (rejecting a party's interpretation of a contract that would render one provision of the contract meaningless, because "a construction of an agreement that renders any part of it meaningless should be avoided"). Ross's interpretation of Section 7.01 and Section 16.01—that a breach and waiver of Section 7.01 necessarily waives the landlord's right to enforce Section 16.01—renders Section 16.01 meaningless.

Courts construing similar provisions in leases find that ongoing repair and maintenance covenants, like Section 7.01, are separate and distinct from end-of-lease surrender obligations like Section 16.01. In *Cote v. A.J. Bayless Markets, Inc.* 626 P.2d 602, 606-07 (Ariz. App. 1981), the court described the differences between the two provisions. A covenant to keep in repair "requires the tenant to keep the premises in repair at all times during the term." *Id.* If the tenant permits the premises to get out of repair at any time, "the lessor, upon that breach, may sue during the term as for injury to the reversion." *Id.* Whereas, with a covenant to leave the premises in as good condition as the lessee found them, "no action will lie against the lessee until the end of the term, for obvious reasons." *Id.*

The landlord's right to enforce the breach of the surrender provision therefore accrues at the end of the lease—and not before—because the lessee remains in possession of the property

and "could have restored (the damaged property) up to that time." *Id*. at 607 (quoting *Knutsen v. Cinque*, 99 N.Y.S. 911, 912 (N.Y. App. 1906). The tenant breaches Section 16.01 by not restoring the property at the time of surrender.

### E. Nothing bars Makarios-Oregon from enforcing its rights under 16.01.

Ross's obligation under Section 16.01 is separate and distinct from its duties under Section 7.01. Makarios-Oregon is not precluded or time-barred from pursuing a claim for breach because its Section 16.01 claim did not accrue until Ross repudiated its surrender obligations in this action.

#### 1. Makarios-Oregon is not precluded in this action from pursuing claims under Section 16.01.

As discussed in more detail in Makarios-Oregon's Opposition to Ross's Motion for Partial Summary Judgment ("Makarios-Oregon's Opposition"), the FED action resolved only whether Makarios-Oregon was entitled to evict Ross during the term of the Lease for violations of Section 7.01. For various reasons, the state trial court answered "no." The state court did not—and could not—consider any breaches of Section 16.01 in reaching its decision because there was still life left in the Lease at the time of the FED action. In other words, the state court would not have been asked to evict the tenant for not performing obligations that had not yet arisen. Nor did the state court consider whether Makarios-Oregon would be barred in the future from enforcing Ross's surrender obligations under Section 16.01.

#### 2. Makarios-Oregon has not waived its right to enforce Section 16.01.

Makarios-Oregon has likewise not waived its right to enforce Ross's end-of-lease obligations. Ross argues that Makarios-Oregon waived its right under Section 16.01 by failing to object to Ross's alterations to the basement. First, as noted in Makarios-Oregon's Opposition, Makarios-Oregon's predecessor *did* object to Ross's alterations in 1996. (Mot., Ex. 24.) It did not remain silent. Second, the landlord's failure to immediately enforce its rights under Section 7.01 cannot constitute a waiver of its separate right to require restoration at the end of the Lease. As noted in *Cote* and *Knutsen*, Ross could have restored the basement at any time prior to surrender. Makarios-Oregon's predecessor put Ross on notice that the condition of the basement

violated the Lease.  A waiver "requires the intentional relinquishment of a known right, manifested in an unequivocal manner."  *McMillan v. Follansbee*, 194 Or. App. 145, 153 (2004). Ross has not produced any evidence that Makarios-Oregon unequivocally waived its end-of-lease right to require restoration of the basement.  Ross gambled, based on its landlord's unwillingness to sue immediately under Section 7.01 in 1997, that the landlord would not exercise its separate and distinct right to require restoration of the basement at the end of the Lease.  Ross lost that bet, and now it's time to clean up its mess.

### 3. Makarios-Oregon's right to require restoration of the basement under Section 16.01 is not barred by any statute of limitations.

As stated in *Cote* and *Knutsen*, the landlord's right under Section 16.01 to demand surrender of the building in "good order, condition, and repair" "d[oes] not accrue until the expiration of the lease, for the [lessee] could have restored (the damaged property) up to that time."  *Cote*, 626 P.2d at 607 (quoting *Knutsen*, 99 N.Y.S. at 912.)  Oregon's six-year statute of limitations does not begin to run until a complete cause of action accrues.  ORS 12.080(1); *Zurcher v. Booth*, 80 Or. 335, 338 (1916).  The cause of action under Section 16.01 accrued when Ross's time to restore ran out, and not earlier.

### 4. Ross cannot estop Makarios-Oregon from enforcing Section 16.01.

Finally, Ross cannot rely on an equitable estoppel defense to excuse it from complying with the Lease.  Ross plays fast and loose with Oregon law on estoppel.  The doctrine of estoppel precludes a party from asserting a right it otherwise might have, due to its acts or conduct, or silence when it had a duty to speak.  *Day v. Advanced M & D Sales, Inc.*, 336 Or. 511, 518 (2004).  Although Ross acknowledges the overarching theory of estoppel, it does not articulate the basic elements of estoppel.  As stated in *Day*, equitable estoppel has five elements:

> To constitute estoppel by conduct there must (1) be a false representation; (2) it must be made with knowledge of the facts; (3) the other party must have been ignorant of the truth; (4) it must have been made with the intention that it should be acted upon by the other party; (5) the other party must have been induced to act upon it.

*Day*, 336 Or. at 518.  When applied to estoppel by silence, the equitable theory requires that the estopped party engaged in a "guilty silence when honesty demands that he speak the truth of the matter for which the situation calls."  *Hess v. Seeger*, 55 Or. App. 746, 761-62 (1982).

But what truth was Makarios-Oregon—or its predecessor—supposed to speak, that it did not otherwise say?  It notified Ross in 1997 that Ross's alterations violated the Lease:

> A number of alterations made by Ross Stores changed the character of the Building and possibly also lessened the value of the Building.  In particular, a number of stairways on the south side of the Premises were removed on several floors.  The removal of such stairways both changes the character of the Building and lessens the residual value of the Building.  Without such stairways, the Building no longer has the circulation between floors that will be necessary in releasing the Building.

> A similar concern is raised by the dramatic change Ross Stores made to the basement of the Building.  Instead of retaining the use of the basement for retail sales, Ross Stores converted the basement into a stock room, lounger, manager's office, cash office, and employee bathrooms.  This conversion of the basement changes the character of the Building and probably lessens its value due to the elimination of a significant amount of useable square footage space in the Building for retail sales.

> With respect to each of these alterations, Ross Stores should have sought the landlord's written consent prior to commencing with such alterations.  The failure to do so constitutes a breach under the Lease.

(Mot., Ex. 24.)  Makarios-Oregon did not "lie in wait" until the end of the Lease.  It put Ross on notice in 1997 and gave it 19 years to restore the altered property.  Ross chose to enjoy the benefit of the store configuration it chose and took no action to reverse it.

Ross offers no evidence that Makarios-Oregon had early access to information about the 2004 changes to the City Code that it withheld from Ross.  Neither party anticipated the Code changes.  Only Ross, the tenant, bore the risk under Section 4.02 that laws could change.  Section 4.02 requires Ross to perform its obligations under the Lease in a manner to cause compliance with all current laws, "at no expense whatsoever to the Landlord," regardless of whether those laws are:

**Page 17 -      MAKARIOS-OREGON, LLC'S REPLY IN SUPPORT OF ITS MOTIONS
                          FOR PARTIAL SUMMARY JUDGMENT**

> foreseen or unforeseen, ordinary as well as extraordinary, and whether or not the same shall presently be within the contemplation of the parties hereto or shall involve any change of governmental policy or require structural or extraordinary repairs, alterations or additions and irrespective of the cost thereof.

(Section 4.02, Mot., Ex. 2 at 9.)  Ross rolled the dice.  It turned a blind-eye to its surrender obligations in favor of the here-and-now, and the immediate benefit it obtained from closing off the basement and stripping occupancy.  Ross's nearsightedness is Ross's million-dollar problem, which Ross must now fix.

Equitable estoppel arises "by operation of law to prevent an injustice."  *Fast v. DeRaeve*, 78 Or. App. 97, 100 (1986).  The only injustice here is Ross's unilateral decision to strip mercantile occupancy to the basement and its subsequent refusal to put it back the way it was.

**IV.    Ross cannot avoid its contractual obligations to Makarios-Oregon merely because Makarios-Oregon has not identified a future tenant.**

As stated in Makarios-Oregon's Opposition, Ross cannot avoid its contractual obligations under the Richmond Lease just because Makarios-Oregon has not yet identified a future tenant for the space.  So far, in 70 pages of briefing, Ross has cited no case law supporting its peculiar theory of contract interpretation.  A party's clear duties under a contract do not vary depending on unknown or speculative future events.  The Richmond Lease requires the tenant to do concrete acts to put the Richmond Building into a specific, bargained-for condition.  It requires Ross to make the Richmond Building an entirely independent and self-sufficient structure from the Failing Building.  And it requires Ross to restore unauthorized alterations that stripped occupancy and retail use of the basement.

## CONCLUSION

When Ross and Makarios-Oregon stepped into the shoes of the tenant and landlord under this Lease, it appeared to be a win-win for both parties.  Ross got access to thousands of square feet of retail, office, and storage space in the heart of downtown Portland, at $0.58 per square foot, with minimal oversight from its landlord.  Makarios-Oregon obtained a valuable long-term asset for its family business, with a seemingly sophisticated retail tenant that understood the

intricacies and complexities of the unique, triple-net Richmond Lease. Throughout its 20-year tenancy, Ross squeezed every last penny out of the building. Now that the Lease is at an end, Ross wants to walk away from its surrender obligations and leave Makarios-Oregon to pick up the pieces. But Ross knew the deal when it purchased the Lease. It assumed the risk that the passage of time and change in building Code would impact its obligations under the Lease. Instead of stepping up to meet its end-of-lease obligations, Ross instead filed this action, seeking a declaration from the Court to excuse it from complying with its clear contractual duties.

"It is not the function of the court to relieve a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than had originally been anticipated." 1 Willison on Contracts § 1:1 (4th ed.). Ross's attempts to avoid its obligations are either cleverly shrewd, or the bullying behavior of a retail giant to cover up its failed assessment of the risks under its contract. Either way, a ruling in Ross's favor would water down the sacred nature of contracts.

Makarios-Oregon respectfully requests the Court apply the clear and unequivocal language of the contract and grant Makarios-Oregon's motions for partial summary judgment.

DATED this 7th day of March, 2016.

MARKOWITZ HERBOLD PC


By:    *s/ Molly K. Honoré*

Jeffrey M. Edelson, OSB No. 880407
JeffEdelson@MarkowitzHerbold.com
Molly K. Honoré, OSB No. 125250
MollyHonore@MarkowitzHerbold.com
(503) 295-3085
Of Attorneys for Defendant Makarios-
Oregon, LLC

MAKARO\492468_8