IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ROSS DRESS FOR LESS, INC.**, | Case No. 3:14-cv-01971-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **MAKARIOS-OREGON, LLC**, and **WALKER PLACE, LLC**, | |
| Defendants. | |

Thomas V. Dulcich and Rebecca A. Boyette, SCHWABE WILLIAMSON & WYATT, PC, 1211 S.W. Fifth Avenue, Suite 1900, Portland, OR 97204; Gregory D. Call and Tracy E. Reichmuth, CROWELL & MORING, LLP, 275 Battery Street, 23rd Floor, San Francisco, CA 94111. Of Attorneys for Plaintiff.

Jeffrey M. Edelson and Molly K. Honoré, MARKOWITZ HERBOLD, PC, 1211 S.W. Fifth Avenue, Suite 3000, Portland, OR 97204. Of Attorneys for Defendant Makarios-Oregon, LLC.

Keith A. Pitt, Nicholas J. Slinde, and Phillip J. Nelson, SLINDE NELSON STANFORD, 111 S.W. Fifth Avenue, Suite 1940, Portland, OR 97204. Of Attorneys for Defendant Walker Place, LLC.

**Michael H. Simon, District Judge.**

Plaintiff Ross Dress For Less, Inc. ("Ross" or "Plaintiff") brings this declaratory action

against its two downtown Portland landlords, Defendant Makarios-Oregon, LLC ("Makarios")

and Walker Place, LLC ("Walker Place") (collectively "Defendants"). Ross seeks a judicial

PAGE 1 – OPINION AND ORDER

declaration that its proposed end-of-lease plans satisfy Ross's obligations under the relevant

leases. Makarios and Walker Place both assert counterclaims for a judicial declaration clarifying

the scope of Ross's end-of-lease obligations and breach of contract. Walker Place brings an

additional counterclaim for statutory waste under Oregon Revised Statutes ("ORS") § 105.805.

All three parties have filed motions for partial summary judgment. For the reasons that follow,

each party's motion is GRANTED IN PART AND DENIED IN PART.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view

the evidence in the light most favorable to the non-movant and draw all reasonable inferences in

the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257

(9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling

on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of

the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252,

255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

Where parties file cross-motions for summary judgment, the court "evaluate[s] each

motion separately, giving the non-moving party in each instance the benefit of all reasonable

inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006)

(quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665,

674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND

The events in this case date back to the mid-1900s and involve longstanding landlord-tenant relationships in Portland, Oregon's historic downtown. In 1946, J.J. Newberry Co., Incorporated ("Newberry"), a national retail chain of "five-and-dime" department stores, set in motion plans to open its largest store nationwide in downtown Portland. In preparation for the opening of this store, Newberry entered into a lease (the "1946 Failing Lease") that allowed the department store chain to renovate an existing downtown building (the "Failing Building," located at 620 S.W. Fifth Avenue) and also construct a new building (the "Richmond Building," adjacently located at 618 S.W. Fifth Avenue) on the neighboring property.[1] After the completion of construction, the Richmond Building's columns and floors aligned exactly with those of the Failing Building, as designed, and the two buildings shared conjoined retail spaces in the

---

[1] The two properties were under common ownership at the time. Mary F. Failing, Henry Cabell, and trustees of the will of Henriette Ellison Failing (collectively the "Failing Landlords") were the original lessors of 618 and 620 S.W. Fifth Avenue to Newberry.

basement and on the first and second floors. Newberry opened this Fifth Avenue space for business in 1953.

**A.  Newberry's Tenancy**

### 1.  Requirements to Separate the Failing Building from the Richmond Building

Behind the scenes of the grand opening and ongoing operation of Newberry's downtown department store was a rather unique landlord-tenant arrangement. The arrangement—from its very beginning in 1946 up to the present day—requires, among other things, that the tenants of the Failing Building and Richmond Building separate the buildings when the tenancies end. Before the completion of the Richmond Building, the 1946 Failing Lease provided that the Richmond Building "shall be so constructed that by the installation of partition walls between it and the Failing Building, it can be used as a self contained [sic] building as regards plumbing, heating, wiring and vertical transportation."  Dkt. 61-3 at 18.

Ten years later, on August 31, 1956, the Failing Landlords and Newberry amended and restated the 1946 Failing Lease with a new lease (the "1956 Failing Lease"). This lease, among its many provisions, stated that at the termination of Newberry's tenancy in the Failing Building, Newberry would "at [Newberry's] sole cost and expense do and perform such work as shall be necessary to physically separate, and constitute entirely independent and self-sufficient, the [Failing Building] from the adjacent 'Richmond Building' premises." Dkt. 61-2 at 5. The lease, "[w]ithout limiting the generality of the foregoing," stated that this separation work must include:

> removal of the escalators and the closing in of the openings in the floors and walls of the Failing Building which accommodate the same; construction of footings and masonry curtain walls along the easterly boundary line of the demised premises; and such appropriate alterations, changes and relocations of portions of the plumbing, electric, and other systems and apparatuses as may be necessary to make the 'Failing Building' space independent of the

> 'Richmond Building.' The material used in said work shall
> conform to the material of said Failing Building, and the work
> shall be done in a good and workmanlike manner.

*Id.*

Also in August of 1956, the Failing Landlords deeded the Richmond Building to

Newberry. According to the deed (the "Newberry Deed"), "the foundations and footings" of the

Richmond Building and the Failing Building "shall be and remain common foundations and

footings for the mutual use and benefit of the parties hereto, their heirs, successors and assigns,

so long as said foundations and footings shall stand, and this agreement shall be deemed a

covenant running with the land." Dkt. 61-5 at 2. Notwithstanding the common foundations and

footings, the deed also granted to the parties an easement to enter each other's property,

exercisable at the time Newberry or its successors ceased to occupy the Richmond Building or

Newberry's leased space in the Failing Building,

> to the extent reasonably required to remove the escalators crossing
> the property line and properly close up the openings in the floors
> which accommodate such escalators, construct such good and
> sufficient masonry curtain walls along the property line between
> the Failing Building and the premises hereby conveyed as may be
> required to physically separate said structures, and make such
> alterations and changes in and to the electrical, plumbing and other
> systems and apparatuses as may be necessary to completely
> separate said buildings.

*Id.* at 3.

Newberry owned the Richmond Building for no more than a month. In September 1956,

Newberry entered into a "sale lease-back" transaction with New York Life Insurance Company

("New York Life"). On the same day, Newberry both deeded the Richmond Building to New

York Life and signed a lease (the "1956 Richmond Lease") with New York Life. Similar to the

Newberry deed, the deed to New York Life (the "New York Life Deed") required that the

foundations and footings of the Failing Building and Richmond Building remain in common "so

long as such foundations and footings shall stand." Dkt. 61-6 at 2. Further, the New York Life

Deed echoed the Newberry Deed's easement provision, granting New York Life an easement to

enter the Failing Building, exercisable at the time the grantor or its successors should cease to

occupy the Richmond Building or leased space in the Failing Building,

> to the extent reasonably required to remove the escalators crossing
> the property line and properly close up the openings in the floors
> which accommodate such escalators, construct such good and
> sufficient masonry curtain walls along the property line between
> said 'Failing Building' and [the Richmond Building] as may be
> required to physically separate said structures, and make such
> alterations and changes in and to the electrical, plumbing and other
> systems and apparatuses as may be necessary to completely
> separate said buildings.

Dkt. 61-6 at 2.

The 1956 Richmond Lease to Newberry also contained a provision for separating the

Richmond Building from the Failing Building. In § 16.02, that lease stated:

> The Tenant agrees that, prior to the expiration of this lease or, in
> the event of termination of this lease for any reason whatsoever,
> promptly after such termination, the Tenant, at the Tenant's sole
> cost and expense, shall make such alterations to the building then
> erected on the demised premises as shall be necessary to constitute
> such building an entirely independent and self-sufficient structure.
> Such alterations shall include, without in any way limiting the
> generality of the foregoing, the removal of escalators, the
> construction of footings and a masonry curtain wall along the
> westerly boundary line of the demised premises, the removal of
> any facing encroaching upon adjoining premises, the removal of
> signs, the relocation of plumbing, drain pipes, sprinklers, electrical
> wiring, lighting fixtures and exhaust ducts, the installation of a new
> soil connection to the city sewer, a new steam connection and new
> electrical service conduits and equipment and provision for a new
> toilet and restroom. The provisions of this Section 16.02 shall
> survive the expiration or any termination of this lease.

Dkt. 61-1 at 43-44.

### 2. Other Requirements of the 1956 Failing and Richmond Leases

#### a. 1956 Failing Lease

Among its other provisions, the 1956 Failing Lease contained requirements generally relating to the condition in which Newberry covenanted to return the premises at the lease's end. Newberry agreed that when the lease expired, Newberry would "surrender the premises to the Lessors or those having their estate therein in the same condition as that in which the Lessee is, by the terms of this lease, obligated to put the premises, reasonable use and wear thereof, and damage due to fire, alone excepted." Dkt. 61-2 at 10. Relating to the condition in which Newberry was obligated to put the premises, Newberry agreed to "at its own cost and expense keep the leased premises in good condition and repair." *Id.* at 9. Newberry also agreed "[n]ot to commit or suffer any strip or waste of the leased premises." *Id.* at 10. The lease further required Newberry to comply with, "at its own expense," all relevant federal, state, and city "laws, ordinances, rules and regulations . . . pertaining to the leased premises, occasioned by or affecting the use of the leased premises by Lessee." *Id.* at 10-11. Newberry did not, however, accept responsibility for compliance "in so far as such laws, ordinances, rules and regulations may require structural changes in or additions or improvements to the foundation, exterior walls, roof or sidewalks thereof." *Id.* at 11.

The Failing Lease's original term was for 36 years, expiring in February 1987. Dkt. 61-2 at 4. The lease was amended on or about September 30, 1983; February 21, 1990; March 1, 1996; October 20, 2006; and May 6, 2009, giving the tenant the option to extend the lease up to January 31, 2043. Dkts. 1-4 at 1-2; Dkt. 1-6 at1.[2]

---

[2] Newberry and Walker Place's predecessors in interest agreed to the 1983 and 1990 amendments. Ross and Walker Place's immediate predecessors in interest agreed to the 1996 and 2006 amendments. Ross and Walker Place agreed to the 2009 amendment.

### b. 1956 Richmond Lease

The 1956 Richmond Lease also contained provisions relating to the condition in which

Newberry promised to return the building. In § 16.01, that lease stated:

> The Tenant shall, upon the expiration or termination of this lease
> for any reason whatsoever, surrender to the Landlord the buildings,
> structures and building equipment then upon the demised premises,
> together with all alterations and replacements thereof then on the
> demised premises, in good order, condition and repair, except for
> reasonable wear and tear; provided, however, that if the Tenant
> shall have made any alteration or alterations adapting the
> buildings, structures and building equipment upon the demised
> premises for multiple occupancy, then, in such event, prior to the
> expiration or termination of this lease, the Tenant, at the
> Landlord's request, shall restore said buildings, structures and
> building equipment to the order and condition which existed prior
> to such alteration or alterations.

Dkt. 61-1 at 42.[3]

Newberry also agreed to several other key provisions in the 1956 Richmond Lease. In

§ 4.01, Newberry agreed that it would not, without the landlord's prior permission, use the

Richmond Building "for any purpose other than mercantile purposes." *Id.* at 10. Next, in § 4.02,

Newberry agreed that it would, "at no expense whatsoever to the Landlord," ensure that the

condition of the Richmond Building  complied "with all laws and ordinances and the orders,

rules, regulations and requirements of all federal, state, county and municipal governments, and

appropriate departments, commissions, boards and officers thereof." Dkt. 61-1 at 10. Newberry

would ensure compliance with all laws, ordinances, rules, and regulations, both "foreseen and

unforeseen, ordinary as well as extraordinary, and whether or not the same shall presently be

within the contemplation of the parties hereto or shall involve any change of governmental

---

[3] "Demise," as used in real estate transactions, means "[t]he conveyance of an estate usu.
for a term of years, a lease <the demise of the land for one year>." *Black's Law Dictionary* 524
(10th ed. 2014).

policy or require structural or extraordinary repairs, alterations or additions." *Id.* Moreover, Newberry agreed to ensure compliance "irrespective of the cost thereof." *Id.*

Additionally, § 7.01 obligated Newberry to "at no expense whatsoever to the Landlord, take good care of the demised premises . . . and . . . not do or suffer any waste with respect thereto." Dkt. 61-1 at 16-17. This requirement meant that Newberry agreed to "promptly make all repairs, interior and exterior, structural and non-structural, ordinary as well as extraordinary, foreseen as well as unforeseen, necessary to keep said buildings and improvements in good and lawful order and condition." *Id.* at 17. As used in the lease, "repairs" means "replacements, restoration and/or renewals when necessary." *Id.* The section further required Newberry to "keep and maintain all portions of the demised premises, including, without limitation, all building equipment, heating plant and system, air conditioning plant and system, and the sidewalks adjoining the same, in a clean and orderly condition." *Id.*

Finally, in § 9.01, the 1956 Richmond Lease required Newberry to "make no structural alterations to the building or buildings now or hereafter erected upon the demised premises." *Id.* at 21. Section 9.01 further required Newberry to refrain from "mak[ing] any other alterations which would change the character of said building or buildings, or which would weaken or impair the structural integrity, or lessen the value of said building or buildings, without the prior written consent of the Landlord, which consent shall not be unreasonably withheld." *Id.*

The Richmond Lease's original term was for 30 years, expiring in September 1986. The Richmond Lease provided, however, that Newberry had the option to exercise three ten-year extensions, with the last extension expiring on September 30, 2016. Dkt. 61-1 at 3.

**B.  Ross's Tenancy**

In 1992, Newberry's parent company, McCrory Corporation, filed for bankruptcy. Ultimately, financial difficulties led to the shuttering of Newberry's downtown Portland store.

But with Newberry's closing, a new era for the Failing Building and Richmond Building began. In the bankruptcy proceeding, the bankruptcy court authorized the assignment to Ross of both the 1946 Failing Lease, as amended by the 1956 Failing Lease, and the 1956 Richmond Lease. Ross planned to use the space to open its own department store.

On March 1, 1996, Ross entered into a Sixth Amendment to the Failing Lease ("Sixth Amendment"). Ross affirmed that it had assumed all of Newberry's existing obligations, "including specifically, but not by way of limitation, the obligation to physically separate and restore the premises at the expiration or upon termination of the Lease, as described in the paragraph entitled 'Severance' on page 3 of the August 31, 1956 amendment and restatement of the Lease." Dkt. 61-4 at 2. The Sixth Amendment also gave Ross the right to remodel the Failing Building after obtaining written approval of the plans from the landlord. "In altering or remodeling the leased premises," Ross agreed that it would "not injure or change the general structural character of the leased premises or the building of which the premises are a part" and that Ross would do all work "in full compliance with all federal, state and municipal laws and regulations." *Id.* at 4. Ross further agreed that it would "bear any responsibility for costs and expenses associated with any modifications to the building which, as a result of Lessee's work or other activities in the building, may be required by federal, state or local laws." *Id.* at 4. Such laws included but were "not limited to the Americans with Disabilities Act, seismic laws, fire and life safety laws, environmental or hazardous material laws and regulations." *Id.*

In June 1996, Ross submitted its remodel plans to the City of Portland. As part of the plans, Ross proposed removing one staircase and infilling[4] another staircase between the first

---

[4] The Director of Construction, John Haskins, stated that the opening where the grand staircase in the Failing Building once allowed access from the first floor to the basement was filled in so that the staircase was not accessible. Dkt. 56-1 at 18. He emphasized that the

floors and the basements of the Failing Building and Richmond Building because Ross did not

plan to use the basement space for retail. *See* Dkt. 56-2 at 3. In its plans submitted to the City,

Ross designated the unused area in the basements as "VANCANT NO OCCUPANCY – NO

STORAGE SEPARATE PERMIT REQUIRED FOR OCCUPANCY." Dkt. 61-14 at 2. The

"vacant" designation meant that Ross would not have to meet certain code obligations required

for occupancy. Parts of the basements of the two buildings remained accessible by elevators and

a small staircase for storage and office space. *See* Dkt. 56-2 at 2-4. The City of Portland

approved Ross's plans, and the Ross store opened for business on October 17, 1996.

Walker Place purchased the Failing Building on December 1, 2006, and is the current

landlord of that building. Members of the Calomiris family acquired the Richmond Building in

1986, and in July 2011, some of the family members organized Makarios. Makarios now serves

as the landlord of the Richmond Building. Both Walker Place and Makarios contend that neither

they nor their predecessors in interest gave Ross written approval to reduce the allowable

occupancy of the basement space.

Ross currently operates a "dd's Discounts" in the space that it took over from Newberry.

Although Ross asserts that it retains the right to extend its lease of the Failing Building, the

current term expires on September 30, 2016. Ross no longer has any options to extend the

1956 Richmond Lease, which also expires on September 30, 2016. In preparation for the

expiration of its leases, Ross hired a design team to plan how Ross would "separate" the Failing

Building and Richmond Building from each other.

---

"staircase is there" and restoring it to use "would be just probably a question of removing the
infill." *Id.* at 19. The plans specified that the grand staircase would be filled in to "match adjacent
surface." Dkt. 56-2 at 3. In its brief, Makarios describes the remodel of the grand staircase as
"cover[ing] the [staircase] with new floor framing." Dkt. 57 at 10.

To meet its surrender obligations, Ross proposes to "physically separate the basements, first floors and second floors of [the Failing Building and Richmond Building] by erecting a dividing wall and taking steps necessary to separate various building systems." Dkt. 1 ¶ 1. According to Ross, it has no obligation to undertake additional renovations of the buildings. Walker Place and Makarios respond that: (1) Ross's plans to separate the buildings do not render the buildings "entirely independent and self-sufficient" because, in part, the plans do not sever the connections between the buildings or add necessary lateral support; and (2) to comply with its surrender obligations, Ross must restore the basement space to its pre-1996 occupancy capacity.

## C.  The May 2015 State Court Forcible Entry and Detainer ("FED") Action

In May 2015, Makarios filed an FED eviction action against Ross in state court (captioned *Makarios-Oregon, LLC v. Ross Dress-For-Less, Inc.*, Multnomah County Circuit Court, Case No. 15LT04763). In its complaint, Makarios alleged that Ross breached its obligations to maintain the premises in good order and repair as required by § 7.01 of the 1956 Richmond Lease. The case was tried before Multnomah County Circuit Judge Jerry B. Hodson, and the trial lasted more than six days. At trial, Makarios presented evidence of the condition of the Richmond Building and the changes that Ross made as part of its 1996 renovations.

On July 29, 2015, Judge Hodson denied all of Makarios's claims in a decision that he read into the record. Judge Hodson ruled that Makarios failed to meet its burden of proving that Ross breached its obligations under the 1956 Richmond Lease. As he explained, Judge Hodson found that: (1) the parties' course of dealing over 20 years established that they understood that the vacant floors "would be kept in this condition" (Dkt. 61-28 at 13); (2) the parties' course of dealing established that they understood the elevators and staircases would be kept in their

current condition; (3) the roof was in good condition; (4) the building envelope was in good

condition; (5) there was insufficient evidence regarding any issues with the windows; (6) there

was insufficient evidence of spalling that needed repair; (7) the doctrine of laches, estoppel, and

waiver barred Makarios's claims; and (8) Ross did not show that Makarios had "unclean hands."

Dkt. 61-28 at 10-17. Other than the continuation of conditions that existed in May 2015 and

some maintenance performed by Ross, Makarios and its experts have not identified any

significant changes to the Richmond Building that occurred after Judge Hodson's decision.

## DISCUSSION[5]

### A.  Separation of the Failing Building from the Richmond Building

Arguing that the relevant leases do not require Ross to eliminate shared lateral (*i.e.*,

horizontal) forces or create a new "joint"[6] between the Failing Building and Richmond Building,

Ross moves for partial summary judgment on its claim for declaratory relief and Defendants'

---

[5] Ross raises several objections to the evidence submitted by Defendants. First, Ross objects to the unsworn statements of Walker Place's experts William Bailey and Mark Hennigh. *See* Dkt. 78 at 23-24. Walker Place responded by resubmitting the reports with attestations. Second, Ross objects to paragraph three of Brandon Anderson's Declaration and paragraphs 13-14 of William Bailey's Declaration on the grounds that these paragraphs are speculative and not based on personal knowledge. *See* Dkt. 86 at 10 n.4. Third, Ross objects to Brandon Anderson's Declaration regarding market rent as not helpful to the trier of fact. *See id.* at 18 n.8. Fourth, Ross objects to the email attached to Keith Pitt's Declaration as Exhibit C (Dkt. 75-3) as irrelevant and inadmissible hearsay. *See* Dkt. 86 at 19. The Court considers Ross's second, third, and fourth objections to be primarily duplicative of the summary judgment standard. *See Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) (noting that "objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself"). To the extent Ross's fourth objection raises hearsay issues, the Court overrules the objection because the Court considers the evidence only for purposes of the email's effect on Ross. The Court has reviewed the evidence and the parties' arguments under the appropriate summary judgment standard. The Court does not consider inadmissible evidence in deciding these cross-motions for summary judgment.

[6] Makarios defines "joint" as "a minimum 12 inch air gap . . . between the buildings." Dkt. 57 at 14.

counterclaims for declaratory relief and breach of contract. Defendants move for partial summary judgment on Ross's declaratory judgment claim on the grounds that Ross's plans do not comply with Ross's obligations under the severance provision of the 1956 Failing Lease and § 16.02 of the 1956 Richmond Lease to render each building "entirely independent and self-sufficient." At the heart of the parties' dispute is the meaning of the phrase "entirely independent and self-sufficient," found in both the 1956 Failing Lease and 1956 Richmond Lease.

### 1.  Contract Interpretation Under Oregon Law

In this case based on diversity jurisdiction, Oregon's substantive law governs. *See Getlin v. Maryland Cas. Co.*, 196 F.2d 249, 250 (9th Cir. 1952) ("This case is in federal court by diversity of citizenship only. The law of the state in which the court sits must apply."); *Snook v. St. Paul Fire & Marine Ins. Co.*, 220 F. Supp. 314, 316-17 (D. Or. 1963) ("This being a diversity case, jurisdiction is grounded on that fact and the [insurance] policy must be interpreted and construed in accordance with the Laws of Oregon, the place where the contract was made.").

Because the resolution of the parties' dispute turns upon the interpretation of a phrase in the parties' leases, ordinary principles of contract interpretation apply. *Harold Schnitzer Props. v. Tradewell Grp., Inc.*, 104 Or. App. 19, 23 (1990) ("Oregon treats a commercial lease as a contract and, in the absence of a provision in the lease to the contrary, ordinary contract principles apply."). Under Oregon law, the "central issue" in interpreting a lease is "the intent of the parties *at the time of the execution of the lease*." *Stark St. Properties., Inc. v. Teufel*, 277 Or. 649, 658 (1977) (emphasis added). In addition, the Ninth Circuit recently confirmed that the "'fundamental goal of contract interpretation is to give effect to the mutual intent of the parties *as it existed at the time of contracting*.' This fundamental axiom is widely accepted and uncontested." *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v.*

*California*, --- F.3d ---, 2015 WL 9245245, at *6 (9th Cir. Dec. 18, 2015) (citation omitted) (emphasis in original).

The leading Oregon case on contract interpretation is *Yogman v. Parrott*, 325 Or. 358 (1997). In *Yogman*, the Oregon Supreme Court established a three-step process for interpreting a disputed contractual provision. First, the court must determine whether, as a matter of law, the relevant provision is ambiguous. *Id.* at 361. A contractual provision is ambiguous if it can "reasonably be given more than one plausible interpretation." *Williams v. RJ Reynolds Tobacco Co.*, 351 Or. 368, 379 (2011). "The court must, if possible, construe the contract so as to give effect to all of its provisions." *Id.* Further, when construing a contract provision, the court is "not to insert what has been omitted, or to omit what has been inserted." ORS § 42.230; *see also Yogman*, 325 Or. at 361 (citing ORS § 42.230 at step one of the analysis).

The analysis ends if the meaning of the provision is clear from the text and context of the contract. *Williams*, 351 Or. at 379-80. The court then applies the contractual term to the facts. *See Yogman*, 325 Or. at 361. If the provision is ambiguous, however, the court proceeds to the second step. *Id.* at 363. At the second step, the trier of fact examines extrinsic evidence of the contracting parties' intent and construes the contractual provision consistent with that intent, if such a resolution can be determined. *Id.* Oregon follows the objective theory of contracts, and relevant evidence at step two may include actual "manifestations of intent, as evidenced by the parties' communications and acts." *Holdner v. Holdner*, 176 Or. App. 111, 120 (2001) (quotation marks omitted). If, after examining extrinsic evidence, the contract is still ambiguous, the court applies appropriate maxims of construction at the third step. *Yogman*, 326 Or. at 364.

Oregon courts have generally held that summary judgment is inappropriate when the trial court finds an ambiguity at step one of the *Yogman* analysis. *See, e.g., Dial Temp. Help Serv.,*

*Inc. v. DLF Int'l Seeds, Inc.*, 255 Or. App. 609, 611 (2013) (the "general rule" is that the meaning of a contract may be disposed of by way of summary judgment only if its terms are unambiguous); *PGF Care Ctr., Inc. v. Wolfe*, 208 Or. App. 145, 151 (2006) ("Disputes over the meaning of a contract provision may not be disposed of by summary judgment if the provision is ambiguous."). The courts have, however, clarified that "it [is] not the ambiguity of the contract that render[s] summary judgment inappropriate, but that the ambiguity represent[s] a dispute over a genuine issue of material fact." *Dial*, 255 Or. App. at 611.

There exists "at least two circumstances in which the 'general rule' [that summary judgment is inappropriate at *Yogman* step two] does not apply." *Id.* at 612. *Yogman* itself recognizes the first of these circumstances. Summary judgment may be appropriate after step one of the *Yogman* analysis if "[t]he parties agree that no additional evidence of the contracting parties' intent is available beyond what is in the summary judgment record." *Yogman*, 325 Or. at 364. In other words, summary judgment is appropriate if "despite the ambiguity, no genuine issue of material fact remain[s] to be tried." *Dial*, 255 Or. App. at 612. The second circumstance arises when "the party that b[ears] the burden of presenting evidence to establish the existence of a genuine issue of material fact has failed to do so." *Id.* In this circumstance, "there is no relevant extrinsic evidence to resolve the ambiguity," and the court may properly interpret the ambiguous provision as a matter of law. *Madson v. W. Or. Conference Ass'n of Seventh-Day Adventists*, 209 Or. App. 380, 389 n.3 (2006).

## 2. *Yogman* Step One: Whether the Lease Provisions Have More Than One Plausible Interpretation

Applying step one of the *Yogman* analysis, the Court first considers whether the lease provisions are open to more than one reasonable interpretation. Both 1956 leases call for making the buildings "entirely independent and self-sufficient." According to the leases, separating the

buildings shall include, but is not limited to, construction of "footings" and "masonry curtain wall(s)" along the boundary between the properties.

Ross argues that the plain meaning of the leases establish that "entirely independent and self-sufficient" does not include sawing though the buildings and creating a physical gap between them. Ross emphasizes that the leases never mention eliminating shared lateral or seismic forces, cutting portions of the buildings, severing floor diaphragms or joists, removing or replacing structural support, or moving or building walls away from the property line in order to achieve separation.

Defendants respond that the plain meaning of "entirely independent and self-sufficient" is that at the end of the leases, Ross must ensure that the buildings become their own structures, entirely free from one another, in addition to ensuring that the buildings have separate and self-sufficient systems. According to Defendants, ensuring that the buildings become separate structures requires severing the buildings' connections and providing necessary lateral support that complies with current seismic regulations. In support of their argument, Defendants cite dictionary definitions of "independent," "self-sufficient," and "structure" from 14 years ago. *See* Dkt. 57 at 18. Because these definitions do not date back to 1956, however, they are of lesser help in determining what the parties intended 60 years ago.

The Court looks first to the context in which the phrase "entirely independent and self-sufficient" appears in the 1956 leases. The 1956 Failing Lease states that the tenant must do whatever "shall be necessary to physically separate, and constitute entirely independent and self-sufficient, the [Failing Building] from the adjacent 'Richmond Building' premises." Dkt. 61-2 at 5. The non-exclusive list of work that must be done includes:

> removal of the escalators and the closing in of the openings in the
> floors and walls of the Failing Building which accommodate the

> same; construction of footings and masonry curtain walls along the easterly boundary line of the demised premises; and such appropriate alterations, changes and relocations of portions of the plumbing, electric, and other systems and apparatuses as may be necessary to make the "Failing Building" space independent of the "Richmond Building".

*Id.*

The 1956 Richmond Lease similarly requires whatever work "shall be necessary to constitute [the Richmond Building] an entirely independent and self-sufficient structure." Dkt. 61-1 at 43. The non-exclusive list of work that must be done resembles the list in the 1956 Failing Lease, stating:

> the removal of escalators, the construction of footings and a masonry curtain wall along the westerly boundary line of the demised premises, the removal of any facing encroaching upon adjoining premises, the removal of signs, the relocation of plumbing, drain pipes, sprinklers, electrical wiring, lighting fixtures and exhaust ducts, the installation of a new soil connection to the city sewer, a new steam connection and new electrical service conduits and equipment and provision for a new toilet and rest room.

*Id.* at 43-44.

Although the list of work that must be done in order to make the buildings "entirely independent and self-sufficient" is explicitly "non-exhaustive," the examples given indicate the type of work that the parties envisioned would be necessary to "separate" the buildings. The examples primarily concern the buildings' systems, such as the plumbing and electrical systems. Some of the items are mainly cosmetic in nature, such as "the closing in of the openings in the floors and walls" and "the removal of signs." The 1956 Failing Lease also states that the "space" of the two buildings must be "independent."

To understand what the parties intended in 1956, the Court looks to the definitions of the terms they used as those terms were defined at or around the time of contracting. A dictionary

from 1934 defines "independent" as "[n]ot subject to control by others; not subordinate; self-governing; sovereign; free; as, an *independent* state." *Webster's Second New Int'l Dictionary* 1262 (unabridged ed. 1934) (emphasis in original). "Self-sufficient" was defined as "[a]ble to accomplish one's own aims or ends, or to gratify one's own desires, without external aid or co-operation." *Id.* at 2272. "Structure" meant "[s]omething constructed or built, as a building, a dam, a bridge; . . . an edifice." *Id.* at 2501.

The text and context of the leases and the terms used by the parties establish that the parties intended both the Failing Building and the Richmond Building to allow separate owners to exercise all the ordinary incidents of separate ownership. Such incidents of ownership would require separate heating, plumbing, and electrical systems, separate ingress and egress, and access to each floor via the building's own stairways and elevators. The requirement to have a masonry curtain wall or walls indicates that each building must have its own functional space such that one building's boundary clearly ends and the other building's boundary clearly begins. Nothing in the leases suggests that in 1956, the parties would have understood "entirely independent and self-sufficient" also to mean that each building would have its own lateral (horizontal) support or could no longer "touch" the other building.

In addition, in § 9.01, the 1956 Richmond Lease required Newberry to "make no structural alterations to the building or buildings now or hereafter erected upon the demised premises." Dkt.61-1 at 21. The creation of a "joint," or gap, which Makarios says is required, would be a "structural alteration" to the building in conflict with this prohibition. Attempting to give effect to all of the lease's provisions thus further supports Ross's interpretation as the only plausible reading of the disputed term in the context of the lease as a whole.

Thus, the Court finds that the separation provisions of the leases are unambiguous and have only one plausible interpretation. According to the leases, Ross must "separate" the buildings such that different owners may separately exercise complete control over each building. The term "entirely independent and self-sufficient" does not mean that that Ross must create a "joint" or gap between the buildings, must ensure that the Richmond Building and the Failing Building do not "touch," or must add lateral (horizontal) support sufficient to comply with current seismic regulations applicable to new construction.

The Court, therefore, has no need to reach step two of the *Yogman* analysis. Moreover, even if the separation provision was ambiguous and the Court needed to proceed to step two of *Yogman*, consideration of the undisputed extrinsic evidence presented by the parties would yield the same result. The Court turns to that issue next.

### 3. *Yogman* Step Two: Whether the Undisputed Extrinsic Evidence Also Establishes the Parties' Intent

At step two, the Court looks to extrinsic evidence to understand what the parties meant by "entirely independent and self-sufficient" structures. Under the general rule, any ambiguity found at step one would make summary judgment inappropriate, but here, the parties agree that summary judgment is the proper vehicle for resolving their dispute because the extrinsic evidence is undisputed. In such circumstances, a court may examine the extrinsic evidence in a summary judgment proceeding to construe a contractual provision as a matter of law. *See Dial*, 255 Or. App. at 611-612.

The parties agree that the 1942 Building Code of the City of Portland ("1942 Code") governed the construction of the Richmond Building and was in effect at the time the 1956 leases were signed. Defendants' expert witness William Bailey testified that the 1942 Code "was primarily based on structural loads or vertical loads." Dkt. 61-34 at 48. That meant that buildings

were usually designed to withstand gravity loads rather than back-and-forth, lateral (horizontal) seismic loads. *Id.* According to Mr. Bailey, the two buildings are currently "independent" for purposes of vertical, gravity loads. *Id.* at 47. Mr. Bailey further acknowledged that in 1956, it was very common for buildings in Portland to "abut up against each other." *Id.* at 49.

In addition, the 1942 Code provides definitions for several types of walls. The 1942 Code defines "curtain wall" as "a wall running between columns which carries its own weight but no other loads and extends through more than one story." Dkt. 60-4 at 6. That Code also distinguishes a "curtain wall" from several other types of walls, including a "division wall" that "divides a building into parts for fire protection or other purposes"; a "filler wall" that is "built between columns of piers carrying no loads of the structure, the weight of which is carried in each story by means connected to columns or piers"; and a "party wall" that "separates 2 or more buildings or is a wall built to be used jointly by separate buildings." *Id.* The only definition of a "wall" that mentions lateral forces is a "retaining wall," which is "subjected to lateral pressure other than that of the wind." *Id.* These definitions indicate that a "curtain wall" is different from a "party wall," which is shared within or among one or more buildings. Nothing in the 1942 Code, however, indicates that a "curtain wall" must be an exterior wall that is exposed to the outside elements or that such a curtain wall could not abut up against the curtain wall of another building that is adjacent. Thus, a single "party" wall might be insufficient, but two abutting curtain walls would suffice.

The Newberry and New York Life Deeds also help establish some of the historical understanding that informed the 1956 leases. Both parties to the 1956 Failing Lease negotiated the Newberry Deed. Both parties to the 1956 Richmond Lease negotiated the New York Life Deed. Because the deeds were negotiated at approximately the same time that the parties

negotiated the leases, the deeds provide some guidance as to what the parties intended by "entirely independent and self-sufficient." The deeds call for the buildings eventually to be "physically separate[d]" and provide for the construction of "masonry curtain walls along the property line" between the buildings. Dkt. 61-5 at 3; Dkt. 61-6 at 2. Despite this requirement, both deeds also provide for "common" footings and foundations "so long as [said] foundations and footings shall stand." Dkt. 61-5 at 2; Dkt. 61-6 at 2. Thus, the deeds confirm that the parties did not envision separating the buildings' foundations or footings or creating a joint or gap between them.

Moreover, the 1946 Failing Lease, signed by the original Failing Landlords and Newberry before the construction of the Richmond Building, also sheds light on what the parties intended and envisioned for the two buildings. The 1946 Failing Lease allowed Newberry to demolish the old building on the Richmond property. The lease also set forth requirements for the new Richmond Building's construction. The lease required Newberry to construct the Richmond Building so "that by the installation of partition walls between it and the Failing Building, it can be used as a self contained [sic] building as regards plumbing, heating, wiring and vertical transportation" Dkt. 61-3 at 18. The 1946 Failing Lease is not a definitive indication of what the Failing Landlords and Newberry meant ten years later when they negotiated the 1956 Failing Lease, nor does the 1946 Failing Lease establish precisely what Newberry intended when it negotiated the 1956 Richmond Lease with New York Life. The 1946 Lease does, however, show that when Newberry undertook construction of the Richmond Building, Newberry intended for the building to one day have independent systems, stairways, and elevators. In contrast, there is no indication that Newberry intended that eventually it would have to move the Richmond Building away from the Failing Building so that the building façades no longer touched.

Thus, the extrinsic evidence confirms that the parties intended, at the time of the expiration of the relevant leases, for each building to have at least one "masonry curtain wall" along its property line and to have independent systems for critical building services such as heating, electricity, plumbing, access, and vertical movement (*e.g.*, stairways or elevators). At the time of contracting, the parties also intended to ensure that the buildings, at the time of the end of the leases, would remain independent of each other for vertical support. In 1956, however, building codes contained no requirement relating to lateral or seismic forces, and the parties would have found it acceptable for the curtain walls of each building simply to abut up against and adjacent to each other. The parties would not have intended for there to be a "joint" or gap between the buildings or expected that the lessee would be required to make such structural alterations as would be needed to create such a joint or gap between the buildings upon their return at the expiration of the leases.

Accordingly, the Court grants Ross's motion for partial summary judgment on its claim for declaratory relief in so far as Ross asks the Court to determine that the leases do not require the elimination of shared lateral forces or the creation of a new "joint" or gap between the buildings.[7] The Court denies Defendants' motions for partial summary judgment on their claims for declaratory relief to the contrary.

---

[7] Nothing in this Opinion and Order, however, restricts the City of Portland from imposing additional requirements or conditions when Ross submits its plans for separating the buildings for City approval. If the City determines that Ross must construct a "joint" or gap between the buildings in order to comply with current City requirements, then Ross, as required under the leases, must do whatever "shall be necessary" to physically separate the buildings. Dkt. 61-2 at 5; Dkt. 61-1 at 43. Additionally, the Court expresses no opinion at this time on whether the precise specifications in Ross's separation plans comply with the obligations imposed by the leases. In their motions for partial summary judgment, the parties ask the Court only to determine whether Ross's plans were inadequate on the grounds that Ross does not intend to make the buildings independent for purposes of lateral support or to construct a "joint" or gap between the buildings. At this time, the Court finds that Ross's plans do not violate the

**B.  Interior Condition of the Buildings at the End of the Leases**

Ross also moves for partial summary judgment on its request for declaratory relief, and against Defendants' related counterclaims, to the extent that Defendants demand that Ross must restore the "historical occupancy" capabilities of the Failing Building and Richmond Building basements by performing seismic upgrades that are not legally required, given the current lack of use of the basements. Ross argues that: (1) the relevant statutes of limitation bar Defendants' claims; (2) the Sixth Amendment to the Failing Lease and the 1956 Richmond Lease authorized Ross to perform the remodel of the basements; and (3) Defendants' assertion that a future use of the basements will require seismic upgrade is speculative. Ross further argues that the judgment entered in the May 2015 FED action filed by Makarios bars Makarios's counterclaims regarding the condition of the Richmond Building under both claim and issue preclusion.

Defendants move for partial summary judgment on related issues. Walker Place moves for partial summary judgment on its counterclaims based on Ross's removal of the "historical occupancy" capability of the Failing Building basement and Ross's alleged refusal to restore the occupancy capability of the basement at the end of the tenancy. Similarly, Makarios moves for partial summary judgment on its counterclaim for anticipatory breach of contract on the grounds that Ross has disavowed its alleged obligation under § 16.01 of the 1956 Richmond Lease fully to restore unauthorized alterations to the Richmond Building basement at the end of the tenancy.

Central to Defendants' claims is Chapter 24.85, Seismic Design Requirements for Existing Buildings, of the Portland City Code ("Title 24"), added to the Code in 2004. *See* Dkt. 60-6. Title 24 establishes baseline occupancies for all buildings based on the permit drawings on record with the City in 2004. If, after 2004, the baseline occupancy increases by 150

---

leases with regard to lateral or seismic force issues because the leases allow delivery of separate buildings with adjacent masonry curtain walls that physically touch each other.

occupants or more, Title 24 requires seismic upgrades so that historical buildings meet current code standards. Because the 1996 remodel to the Failing Building and Richmond Building basements decreased the allowed occupancy by more than 150, restoring the basements to the pre-1996 occupancy capacities would require substantial seismic upgrades. Defendants argue that Ross is contractually obligated under the leases to complete these upgrades at its own expense before surrendering the buildings.

    **1.** **Defendants' Breach of Contract Claims and Related Requests for Declaratory Relief**

        **a.** **Whether the Statute of Limitations Bars Defendants' Claims**

The parties dispute whether the relevant statute of limitations bars Defendants' breach of contract claims arising out of the 1996 basement remodel and any other events that occurred more than six years ago. ORS § 12.080(1) requires, in relevant part, that any "action upon a contract or liability, express or implied, . . . shall be commenced within six years." Indisputably, the decrease in the occupancy capacity of the Failing Building and Richmond Building basements occurred more than six years ago. Accordingly, Ross argues that the applicable statute of limitations bars Defendants' claims to the extent that they are based on events that occurred more than six years ago.

Defendants respond that they are not bringing claims based on Ross's obligations or any alleged breach during the term of the lease. On the basement occupancy issue, Walker Place is not suing on Ross's covenant to keep the leased premises in good repair, and Makarios is not suing to enforce Ross's obligations under § 7.01, § 7.02, § 9.01, or § 9.02. The statute of limitations would bar those claims.

Instead, Defendants argue that the applicable leases also obligate Ross to return the buildings at the expiration of the leases in good condition and that Ross cannot breach this

obligation until the leases expire. Defendants point to several lease provisions that they argue should be enforced at the lease's end. Specifically, under the 1956 Failing Lease, Ross is obligated to "surrender the premises to the Lessors or those having their estate therein in the same condition as that in which the Lessee is, by the terms of this lease, obligated to put the premises, reasonable use and wear thereof, and damage due to fire, alone excepted." Dkt. 61-2 at 10. The "same condition" in which Ross is obligated to keep the premises during the lease is "good condition and repair." *Id.* Similarly, § 16.01 of the 1956 Richmond Lease requires Ross to surrender the building "in good order, condition and repair, except for reasonable wear and tear." Dkt. 61-1 at 42.

Defendants argue that Ross cannot return the buildings in "good condition" or "good order, condition and repair" if Ross is in breach of the leases. According to Defendants, Ross breached the leases by failing to get the landlords' prior approval before remodeling the basements, including removing one staircase and filling in a second staircase, and using the basement for other than "mercantile purposes." After Ross breached these lease provisions, argue Defendants, Ross cannot return the buildings in the condition required under the leases without first restoring the buildings to the condition they were in before the breaches. Defendants contend that the right to enforce this obligation to restore the buildings only accrued when Ross, by filing this action in 2014, indicated its intent to surrender the buildings as they are, thereby anticipatorily breaching the return provision of the leases.

Oregon courts have held that "[a] cause of action for breach of contract accrues when the contract is breached." *Kantor v. Boise Cascade Corp.*, 75 Or. App. 698, 703 (1985). Oregon courts have not directly addressed the statute of limitations for surrender obligations. The most analogous case is *Kantor*. The court in *Kantor* considered a case in which an employee brought a

breach of contract action against his former employer to collect pension benefits. The employee
had worked for the employer continuously from 1938 to 1982 with the exception of ten months
in 1966. *Id.* at 700. In 1974 and 1976, the employer indicated that it would calculate the
employee's pension benefits from the date of his rehire in 1966. *Id.* at 700-01. When the
employee retired and received pension benefits based on his rehire date, he sued the employer.
*Id.* The employer argued that because six years had passed since it had notified the employee that
it would not credit his continuous service from his original hire date, the statute of limitations
had expired. *Id.* at 702. But the court rejected the employer's argument. *Id.* at 703.

　　The *Kantor* court analyzed what the parties had agreed to and what performance was
actually required under the contract. According to the court, performance did not consist of
"[m]erely crediting plaintiff with continuous service in the abstract" but rather was "pay[ing]
plaintiff his benefits to complete [the employer's] performance, which was not due to begin until
plaintiff retired and became eligible to receive payments." *Id.* The court noted that "the law is
settled that the plaintiff has the election to bring his claim for anticipatory breach at the time it
occurs or he may elect to wait until time for performance." *Id.* at 704 (quoting *Davis v. Ala.
Power Co.*, 383 F. Supp 880, 893 (N.D. Ala. 1974)) (quotation marks omitted).

　　*Kantor* suggests that in the case of surrender obligations, a lessor may wait until the end
of a tenancy, when performance under the surrender obligation comes due, to require a tenant to
remedy a condition that arose more than six years ago. Other courts across the country have
addressed the issue more directly. In many jurisdictions, it is well established that a duty to
surrender premises in "good condition" accrues only upon the actual or anticipatory breach of
that duty at the lease's end.  *See, e.g.*, *Cote v. A. J. Bayless Mkts., Inc.*, 128 Ariz. 438, 443 (1981)
(holding that a "covenant to surrender the premises in good repair at the end of the term could

not be breached until the term ended"); *Primock v. Jew*, 680 P.2d 1347, 1348 (Colo. App. 1984) ("The covenant to surrender the premises in good condition cannot be breached until the end of the term. Therefore, no action will lie against lessee until that time."); *City Hotel Co. v. Aumont Hotel Co.*, 107 S.W.2d 1094, 1095 (Tex. Civ. App. 1937) ("[O]n a covenant to leave the premises in as good condition as he found them, no action will lie against the lessee until the end of the term, for obvious reasons."). Accordingly, the statute of limitations has not run on Defendants' claims for breach of Ross's surrender obligations, even to the extent that the claims depend on events that occurred more than six years ago.

> ### b.  Whether Ross's Remodel of the Basements Breached the Surrender Obligations

Courts generally do not read an obligation to restore alterations into clauses concerning surrender duties, at least when a lease allows the alterations or a landlord has impliedly consented to those alterations. For example, in *Fairway Outdoor Advert. v. Edwards*, 197 N.C. App. 650 (2009), a plaintiff leased property and erected a billboard on the land by installing an underground foundation. At the end of the lease, the plaintiff removed the above-ground sign but left the underground foundation, which the landlord then demanded the plaintiff remove. In the absence of a lease provision requiring the lessee to restore the premises to the pre-leased condition, the court followed "the general rule . . . that in absence of a specific lease provision directing otherwise, a tenant has the right, but not the obligation, to restore the leased property to its original condition." *Id.* at 660. In support of its holding, the court cited *Corpus Juris Secundum*, which states, "The lessee is not required to remove improvements made by him or her with the consent of the landlord or under authority of the lease, unless the lease so provides. . . ." *Id.* (quoting 52A C.J.S. *Landlord and Tenant* § 884 (2003)).

In *Coleman v. Regions Bank*, 364 Ark. 59 (2005), the Supreme Court of Arkansas decided a case in which a bank leased two adjacent parcels of land from two different landlords. The leases allowed the bank to construct a building on each parcel and "to make such alterations in and to the building as the Bank deemed necessary, provided that such alterations were not injurious to the leased premises." *Id.* at 61. The leases further "required the Bank, upon termination, to deliver the building, except for bank fixtures, equipment, and bank vaults, in good condition, reasonable wear and tear excepted." *Id.* The bank constructed a two-story structure on each property and connected the structures so that the buildings were "integrated." *Id.* At the expiration of the leases, the landlords demanded that the bank remove the connection between the two buildings and alleged that the bank breached the "good condition" clause by merging the buildings. *Id.* at 62. Looking to decisions in other jurisdictions, the Supreme Court of Arkansas concluded that "[t]he weight of authority in this country regarding 'good condition' clauses and the removal of permanent improvements is such that a lessee is not required to remove improvements made with the consent of the lessor or under the authority of the contract." *Id.* at 70. Accordingly, the court held that the bank did not breach the "good condition" clause of the leases by failing to restore alterations because the alterations were done with the direct or implicit approval of the landlords and pursuant to the leases. *Id.* at 70-71.

In *Lamonica v. Bosenberg*, 73 N.M. 452 (1964), a tenant remodeled residential apartments to serve as his professional offices. At the end of the lease, the landlord demanded that the tenant restore the premises to their former condition. *Id.* at 454. The lease was silent on whether a duty to restore existed. *Id.* Because the landlord knew that the apartments were being remodeled and "made no protest," the court found that the landlord had impliedly consented to

the alterations and therefore that "the tenant has no implied obligation to restore the leased premises at the end of the term." *Id.* at 455.

The Eighth Circuit considered a landlord-tenant dispute in *Ten-Six Olive, Inc. v. Curby*, 208 F.2d 117 (8th Cir. 1953). There, previous tenants had erected partition walls in the leased building. At the end of the lease, the landlord demanded that the current tenant remove the partition walls to comply with the "good condition" provision in the lease. *Id.* at 120. The evidence established that the landlord maintained offices adjacent to the leased property, watched the changes being made to the property, was allowed access to the building, and never objected to these changes. Based upon this evidence, the court concluded that the failure to object constituted a waiver of the consent provision regarding alterations. *Id.* at 122. The court further found that the "good condition" clause did not require the removal of alterations: "The 'good condition' clause provided that the premises should be surrendered in as good condition as received, ordinary wear and tear excepted. It did not provide they should be returned in the same condition, or like condition." *Id.*

Here, Defendants maintain that the leases did not give Ross permission to make the 1996 alterations to the basement. The leases permit Ross to alter or improve the buildings, but only within certain constraints. The Sixth Amendment to the 1956 Failing Lease gives Ross permission to "remodel the leased premises and to make other alterations in the leased premises" but only "after said plans have been approved in writing by Lessor." Dkt. 61-4 at 3-4. The Sixth Amendment also prohibits Ross from "injur[ing] or chang[ing] the general structural character of the leased premises or the building of which the premises are a part" and requires Ross to do all work "in full compliance with all federal, state and municipal laws and regulations." *Id.* at 4. Ross further agreed that it "will bear any responsibility for costs and expenses associated with

any modifications to the building which, as a result of Lessee's work or other activities in the building, may be required by federal, state or local laws," such as "seismic laws." *Id.*

Section 16.01 of the Richmond Lease provides that if Ross has "made any alteration or alterations adapting the buildings, structures and building equipment upon the demised premises for multiple occupancy," Ross will, before the lease expires, "restore said buildings, structures and building equipment to the order and condition which existed prior to such alteration or alterations." Dkt. 61-1 at 42. Under § 4.01 of the 1956 Richmond Lease, Ross may not use "the demised premises . . . for any purpose other than mercantile purposes" without the landlord's prior approval. Dkt. 61-1 at 10. Section 9.01 prohibits Ross from making any "structural alterations to the building or buildings now or hereafter erected upon the demised premises." *Id.* at 21. Further, § 9.01 requires Ross to refrain from "mak[ing] any other alterations which would change the character of said buildings, or which would weaken or impair the structural integrity, or lessen the value of said building or buildings, without the prior written consent of the Landlord." *Id.*

A genuine dispute of material fact exists as to whether the leases prohibit Ross from altering the basements in the way that it did. Although Walker Place makes no argument that laws currently require any changes to the basement, the Failing Lease prohibited Ross from injuring or changing the general structural character of the building. Ross's own expert has acknowledged that changes to staircases or flooring can be "structural." Dkt. 68-4 at 15-16. Similarly, although Makarios's expert concedes that Ross did not adapt the building for "multiple occupancy," Dkt. 61-33 at 6, the Richmond Lease prohibited Ross from making structural alterations to the building, altering the building's character, or lessening the building's

value. Arguably, reducing the allowable occupancy of the basement and removing staircases altered the character of the building or led to a long-term diminution in value.

There is, however, no genuine dispute of material fact that Defendants impliedly consented to these alterations. Plans for the remodel were publicly on file with the City. Makarios concedes that it had knowledge of the remodel, at least by 1997. In fact, a letter dated February 6, 1997, indicates that a set of plans and "a copy of the Certificate of Occupancy dated 12/12/96" were sent to the Calomiris family's attorney. Dkt. 63-20. Additionally, on April 14, 1997, the attorney for the Calomiris family, Makarios's predecessor in interest, notified Ross that he had accompanied a member of the Calomiris family on a tour of the Richmond Building. One of the purposes of the tour was "to determine if any alterations made by Ross Stores in connection with its build out of the Premises changed the character of the Building, weakened or impaired the structural integrity of the Building or lessened the value of the Building." Dkt. 63-21 at 1. The letter stated that Ross had violated § 9.01 of the 1956 Richmond Lease. Some of the listed unauthorized alterations were the removal of the staircase and elimination of the basement's retail use. According to the Calomiris family, "This conversion of the basement changes the character of the Building and probably lessens its value due to the elimination of a significant amount of useable square footage space in the Building for retail sales." *Id.* at 2. Ross responded the changes to the basement did not constitute structural changes and did not decease the value of the building. Dkt. 64-1.

In 1998, the Calomiris's attorney again notified Ross that Ross needed to make repairs to the Failing Building because the Calomiris family "has a very serious concern regarding the repair and maintenance of the Building, its condition and whether it is structurally sound." Dkt. 61-18 at 4. The letter stated that if Ross did not cure the lease violations, "the landlord will

pursue its remedies under the Lease." *Id.* Ross replied that it had hired structural engineers to evaluate the building and that it "is in excellent conditions structurally." Dkt. 61-19 at 3. Although the Calomiris family identified the basement alterations as contract breaches in 1997 and the general condition of the building as a contract breach in 1998, there is no evidence that the Calomiris family or its successor in interest took any further steps to remedy those alleged breaches. In fact, when the time came to renew Ross's lease in 2006, the landlord allowed Ross to do so. *See* Dkt. 64-4.

Walker Place argues that it had no knowledge of the basement remodel. On March 1, 2006, however, Ross and Walker Place's predecessor in interest entered into a Sixth Amendment to the 1956 Failing Lease. The Sixth Amendment specified that Ross "takes the leased premises in the condition existing as of the date of this Agreement, with all deficiencies, as is." Dkt. 1-4 at 2. The Sixth Amendment stated that the Lessor makes "no agreement or promise to alter, repair, or improve the leased premises" *Id*. It also said nothing regarding Ross's affirmative obligation to alter, repair, or improve the premises. *Id.*

In October 2006, Ross and Walker Place's predecessor in interest entered into a Seventh Amendment to the 1956 Failing Lease without any objection from the landlord. The Seventh Amendment stated, "Lease in Full Force and Effect." Dkt. 1-5 at 1. In addition, before Walker Place's purchase of the Failing Building in December 2006, Walker Place undertook a due diligence process. As part of that process, Waterleaf Architects and Tim Rippey Consulting Engineers analyzed the building for Walker Place, and an appraisal was done. Walker Place also hired an attorney to do a "lease review" in 2006. Dkt. 61-42 at 10. After all of this due diligence, Walker Place undertook structural repairs to the building but at no point notified Ross that Ross would be required to restore the occupancy capacity of the basement to pre-1996 levels. On

May 6, 2009, Ross and Walker Place entered into an Eighth Amendment to the Failing Lease. Again, the amendment stated, "Lease in Full Force and Effect." Dkt. 1-6 at 4. The amendment made no mention of the condition of the basement or its historical occupancy capacity.

Defendants have had access to the buildings and actually conducted inspections. Despite knowledge of the basement's condition and the publicly-filed plans for the basement, Defendants included no mention of the basement in the several amendments that renewed the leases for the two buildings. Although Makarios objected to the condition of the building in 1997 and 1998, Makarios submits no evidence that it ever communicated to Ross that Ross's responses to the landlord's concerns were inadequate, especially in 2006 when Ross renewed its lease. Similarly, Walker Place submits no evidence that it or its predecessors ever objected to the alterations to the basement. *See Walker v. Rednalloh Co.*, 299 Mass. 591, 598 (1938) ("[A]lterations having been made with the knowledge of the lessors, who interposed no objection thereto, must be taken to have been consented to by them."). Defendants' and their predecessors' continued acquiescence to the condition of the basements, Defendants' renewal or amendment of the leases in 2006, and Walker Place's renewal or amendment of the Failing Lease in 2009 constitutes at least implied consent to all earlier alterations made as of the dates of the lease renewals or amendments. Because Defendants impliedly consented to the alterations, restoration of the basements is not included in the "good condition" clauses of the leases. To the extent that Defendants argue the alterations breach the surrender obligations of the leases, Ross's motion for partial summary judgment is granted.

### 2. Walker Place's Statutory Waste Claim

#### a. Whether the Statute of Limitations Bars Walker Place's Claim

ORS § 12.080(3) requires, in relevant part, that any "action for waste or trespass upon or for interference with or injury to any interest of another in real property . . . shall be commenced

within six years." Indisputably, the decrease in the occupancy capacity of the Failing Building and Richmond Building basements occurred more than six years ago. Ross argues that Walker Place learned about the overall condition of the basement in 2006 when Walker Place commissioned a report by T.M. Rippey Consulting Engineers. *See* Dkt. 70-1 at 35. Accordingly, Ross argues that the applicable statute of limitations bars Walker Place's waste claim based on events that Walker Place discovered more than six years ago.

As with the breach of contract claim, Walker Place argues that it is not suing to enforce Ross's obligations during the lease. Rather, Walker Place argues it is suing to enforce Ross's obligations to "surrender the premises to the Lessors or those having their estate therein in the same condition as that in which the Lessee is, by the terms of this lease, obligated to put the premises, reasonable use and wear thereof, and damage due to fire, alone excepted." Dkt. 61-2 at 10. The "same condition" in which Ross is obligated to keep the premises during the lease included keeping the premises free from "strip or waste." *Id.* According to Walker Place, Ross is now in breach of the surrender obligation by indicating its intent to surrender the basement in a state of "waste."

Walker Place's claim for waste is subject to ORS § 12.080(3), and the discovery rule applies. *Riverview Condo. Ass'n v. Cypress Ventures, Inc.*, 266 Or. App. 574, 600 (2014). Under the discovery rule, the statute of limitations runs "from the earlier of two possible events: '(1) the date of the plaintiff's actual discovery of injury; or (2) the date when a person exercising reasonable care should have discovered the injury, including learning facts that an inquiry would have disclosed.'" *Id.* at 601 (emphasis omitted) (quoting *Greene v. Legacy Emanuel Hosp.*, 335 Or. 115, 123 (2002)). A plaintiff discovers an injury "when a plaintiff knows or should have known of the existence of three elements: '(1) harm; (2) causation; and (3) tortious conduct.'" *Id.*

(quoting *Gaston v. Parsons*, 318 Or. 247, 255 (1994)). For determining the time of discovery, courts apply "an objective standard—how a reasonable person of ordinary prudence would have acted in the same or a similar situation." *Kaseberg v. Davis Wright Tremaine, LLP*, 351 Or. 270, 278 (2011).

As noted above, surrender obligations do not arise until the lease's end. *See Taylor v. Detroit Diesel Realty, Inc.*, 2014 WL 1794582, at *6 (S.D. Miss. May 6, 2014) ("[The tenant's] duty to surrender the Premises in good condition and repair did not arise until the conclusion of the lease . . . ."). Ross agreed that it would not "commit or suffer any strip or waste of the leased premises" and that it would return the building "in the same condition as that in which the Lessee is, by the terms of this lease, obligated to put the premises, reasonable use and wear thereof, and damage due to fire, alone excepted." Dkt. 61-2 at 10. Walker Place could only discover that Ross intended to return the Failing Building in an alleged state of "waste," in breach of its obligations, when Ross made clear the conditions in which it intended to surrender the premises. Ross only made this clear by filing this lawsuit 2014. Therefore, the six-year statute of limitations on Walker Place's statutory waste claim has not yet expired under the discovery rule.

### b.  Whether Ross's Remodel of the Failing Building Basement Is Waste

Walker Place brings its statutory waste claim under ORS § 105.805. That statute provides, "If a guardian, conservator or tenant in severalty, or in common, for life or for years of real property commits waste thereon, any person injured thereby may maintain an action at law for damages against the guardian, conservator or tenant." As explained by Oregon courts, "Waste occurs when the person in possession of the land, by act or omission, causes the property's value to decrease *as the result of abuse or destruction*, thereby causing injury to the property and the holders of the legal interests in it." *Whistler v. Hyder*, 129 Or. App. 344, 349 (1994) (emphasis added). Other Oregon courts similarly define "waste" as "a spoil or destruction in houses,

gardens, trees or other corporeal hereditaments, to the disherison of him that hath the remainder or reversion." *Lytle v. Payette-Or. Slope Irr. Dist.*, 175 Or. 276, 288 (1944) (citation and quotation marks omitted).[8]

In considering claims alleging waste, Oregon courts also assess "the circumstance of whether or not the act, either of commission or omission, results in injury to the reversioner or the remainderman." *In re Stout's Estate*, 151 Or. 411, 422 (1935); *see also United States v. Bostwick*, 94 U.S. 53, 65-66 (1876) ("[I]n every lease there is, unless excluded by the operation of some express covenant or agreement, an implied obligation on the part of the lessee to so use the property as not unnecessarily to injury it."). Importantly, however, the risk of "depreciation and obsolescence must be borne by the remainderman." *In re Stout's Estate*, 151 Or. at 423. For example:

> The expense of modern improvements in buildings, such as water closets, bathrooms, changes in furnaces, should not be charged to the life tenant's estate, when the same are not installed during her lifetime, and consequently are not of benefit to her in the use of the buildings. The expense, so far as the record shows, of changing the intake of the furnace from outside to inside the house was for the purpose of making the same conform to modern usage, and the expense thereof should not be charged to the life tenant's estate.

*Id.* (citation omitted).

Here, Walker Place does not contend that in 1996, at the time Ross made alterations to the Failing Building and changed the historical occupancy of the building, Ross committed

---

[8] An Oregon court has found that "waste," rather than "the justifiable result of ongoing repairs that were increasing the property's value," occurred when a defendant left construction debris outside of a house for a month. *Blunier v. Staggs*, 250 Or. App. 215, 220-21 (2012). In contrast, another Oregon court found that a leaking roof and sewer problems in a leased premises were not "waste" because the issues did not result from "abuse or destruction," the tenants did not cause the damage, and, despite a lease provision that required tenants to repair and maintain the leased premises, the landlords had notice that the tenants could not afford to make the needed repairs and failed to mitigate their damages. *Schlabach v. Tollenaar*, 195 Or. App. 672, 675-78 (2004).

"abuse or destruction" that diminished the value of the building. The alterations, such as the rezoning and removal of staircases, were easily reversible at that time. The alterations only became an issue in 2004 when the City of Portland issued and implemented Title 24. At that point, increasing the basement occupancy capacity to its historical levels became an expensive proposition because such an increase would require, for the first time, seismic upgrades.

Walker Place points to a provision of the Sixth Amendment in support of its argument that Ross must restore the basement to its pre-1996 state and make all necessary seismic upgrades. The Sixth Amendment requires Ross to "bear any responsibility for costs and expenses associated with any modifications to the building which, as a result of Lessee's work or other activities in the building, may be required by federal, state or local laws." Dkt. 61-4 at 4. Walker Place does not contend, however, that Ross has affirmatively triggered a need to make seismic upgrades or that the current state of the building fails to comply with all applicable laws. Similar to the facts of *In re Stout's Estate*, any upgrading of the basement's occupancy level would not be of any benefit to the tenant and would be "for the purpose of making the [the premises] conform to modern usage." 151 Or. at 423. It is not, therefore, Ross's responsibility to make these upgrades to ensure that historical basement occupancy capabilities can be restored.

Walker Place attempts to read into the agreements a requirement that if Ross makes any alterations to the building that later, as a result of subsequent changes in the law or technology, decrease the value of the property, Ross must restore the premises to their former value no matter the cost to Ross. Under the 1956 Failing Lease and all amendments, however, Ross never agreed to bear the risk of such depreciation or obsolescence. If the parties wanted to shift that risk, they could have done so through an express provision in the lease. Ross made alterations to the property that complied with all applicable laws in 1996, and the property currently is in full

PAGE 38 – OPINION AND ORDER

compliance with all applicable laws. Ross's actions do not meet the definition of "waste" because at the time Ross made the alterations, the alterations did not constitute "abuse or destruction." Nothing in the lease requires Ross to make the premises suitable for a higher occupancy level than what currently exists.

### 3.  Whether Claim and Issue Preclusion Apply

Ross argues that the May 2015 FED litigation precludes the claims and issues brought by Makarios before this Court. It is settled law "that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). In Oregon, the doctrine of claim preclusion prevents "a party who has litigated a claim against another from further litigation on that same claim on any ground or theory of relief that the party could have litigated in the first instance." *G.B. v. Morey*, 229 Or. App. 605, 608 (2009). Relatedly, "[i]ssue preclusion arises in a subsequent proceeding when an issue of ultimate fact has been determined by a valid and final determination in a prior proceeding." *Nelson v. Emerald People's Util. Dist.*, 318 Or. 99, 103 (1993). Claims and issues brought in an FED action may serve to bar a party's subsequent claims. *Perkins v. Conradi*, 153 Or. App. 273, 276, *opinion adhered to as modified on reconsideration*, 154 Or. App. 439 (1998) (holding that an adjudication that the plaintiff owned a specific part of a plot of land in an FED action precluded his later claim for declaratory judgment that he owned the entire plot).

### a.  Claim Preclusion

Makarios argues that claim preclusion does not apply to its breach of contract claims before this Court because Makarios brought the FED case under § 7.01 of the 1957 Richmond Lease—relating to the covenant to make repairs—whereas Makarios brings its breach of contract claims in this case under § 16.01—relating to Ross's surrender obligations. According to

Makarios, Ross's repair duties under § 7.01 do not arise from the same operative facts as claims related to Ross's repair duties when it surrenders the buildings at the lease's end. Additionally, Makarios argues that it could not have litigated issues relating to Ross's surrender obligations because those obligations did not become due until Ross indicated it would not comply with those obligations at the termination of its tenancy.

Oregon courts define a "claim" for the purposes of claim preclusion as "a group of facts which entitled plaintiff to relief." *Troutman v. Erlandson*, 287 Or. 187, 201 (1979). To decide "whether a group of facts is part of the same claim," Oregon courts "inquire whether the "transactions were 'related in time, space, origin, or motivation, [and] whether they form a convenient unit,' as well as whether they were 'substantially of the same sort and similarly motivated.'" *G.B.*, 229 Or. App. at 608-09 (quoting *McAmis Indus. v. M. Cutter Co.*, 161 Or. App. 631, 637-38 (1999)) (alteration in original).

The parties cite no Oregon case directly on point, and the Court was unable to locate any. As discussed above, however, courts in many other jurisdictions have distinguished between a covenant to keep leased premises in repair and a covenant to surrender the premises at the end of the lease in good condition. *See, e.g.*, *Cote*, 128 Ariz. at 443 (holding that a "covenant to surrender the premises in good repair at the end of the term could not be breached until the term ended"); *Primock*, 680 P.2d at 1348; *City Hotel*, 107 S.W.2d at 1095.

Makarios sought to enforce a right of immediate possession when it brought the FED action against Ross under § 7.01 of the 1956 Richmond Lease. *Schroeder v. Woody*, 166 Or. 93, 95 (1941) ("The proceeding in an action of forcible entry and detainer is possessory only . . . ."). Makarios did not seek to enforce the covenant to surrender the Richmond Building in good condition under § 16.01, an action that calls for separate evidence regarding the conditions in

which the tenant actually intends to return the premises. Because Makarios brings separate

claims in the current action, the FED action does not bar those claims on claim preclusion

grounds.

### b.  Issue Preclusion

Issue preclusion bars parties from re-litigating issues when five conditions are met:

> 1. The issue in the two proceedings is identical. 2. The issue was
> actually litigated and was essential to a final decision on the merits
> in the prior proceeding. 3. The party sought to be precluded has
> had a full and fair opportunity to be heard on that issue. 4. The
> party sought to be precluded was a party or was in privity with a
> party to the prior proceeding. 5. The prior proceeding was the type
> of proceeding to which this court will give preclusive effect.

*Nelson*, 318 Or. at 104 (citations omitted). At summary judgment, a court may find, as a matter

of law, that issue preclusion bars a party's claims "only if it can be conclusively determined from

the record that 'all the *Nelson* requirements [are] satisfied.'" *Johnson & Lechman-SU, P.C., v.*

*Sternberg*, 272 Or. App. 243, 246 (2015) (quoting *Barackman v. Anderson*, 338 Or. 365, 372

(2005)) (alteration in original).

Makarios argues that (1) Ross has not shown that its duties under § 7.01 and § 16.01 are

identical; (2) issue preclusion should not apply because Ross has not shown that the § 16.01

surrender duties were actually litigated and Judge Hodson did not indicate which of the

alternative reasons for his decision was essential to his ruling; and (3) Makarios did not have a

full and fair opportunity to be heard on the § 16.01 issues.

In his ruling, Jodge Hodson specifically indicated that Ross's surrender obligations were

not essential to his final decision. He stated: "The tenant is required to maintain, in clean and

orderly condition, the premises, and not entirely relevant to this proceeding but intermixed with

it is the obligation to return the building at the end of the lease in good order, reasonable wear

and tear excepted." Dkt. 61-28 at 10-11. When discussing the notice of default that Makarios

sent Ross, Judge Hodson explained that Makarios "should have separated out the items that the landlord believed were repair obligations under Section 7 from the separation or surrender obligations under Section 16." *Id.* at 15. Judge Hodson's explanation of why the notice was deficient suggests that he did not consider Ross's §16.01 obligations an appropriate issue for the FED case. Judge Hodson further stated that "from [his] perspective, all of the other complaints that [he] may not have specifically addressed were either immaterial or were, in fact addressed with due diligence or were related to the surrender obligations." *Id.* Again, his statement indicates that Judge Hodson did not specifically rule on Ross's surrender duties.

An FED action is a property claim grounded in equity. *See Schroeder*, 166 Or. at 95. The action does not allow a party to seek damages. *See Lindsey v. Normet*, 405 U.S. 56, 63 (1972) (stating that in an action under Oregon's FED statute, "[t]he only award that a plaintiff may recover is restitution of possession"). When a landlord brings an FED action, the court has "[t]he objective of achieving rapid and peaceful settlement of possessory disputes." *Id.* at 72. Such speedy resolution of possessory disputes "is desirable to prevent subjecting the landlord to undeserved economic loss and the tenant to unmerited harassment and dispossession when his lease or rental agreement gives him the right to peaceful and undisturbed possession of the property." *Id.* at 73. In service of these goals, an FED action may not fully address issues relevant to damages. In light of Judge Hodson's statements and the purpose of an FED action as opposed to this action to enforce surrender obligations, the Court cannot say that Ross's duties under § 16.01 of the Richmond Lease were actually litigated or essential to the final judgment in the FED proceeding. Therefore, issue preclusion does not apply.

## C. Vent Stack and Sidewalk Vaults

Ross argues that Walker Place's counterclaims are partially based on the mistaken idea that Ross had an obligation to maintain areas not within the "premises" as defined by the 1956

Failing Lease. Walker Place alleges that sections of the vent stack are in disrepair and that areas of the sidewalk vault are leaking and causing corrosion. Ross responds that it had no duty to keep the vent stack in good repair because the sections of the vent stack at issue are located on the third-floor exterior of the Failing Building, which Ross contends is outside the scope of the leased premises. Ross also argues that it had no obligation to keep the sidewalk vaults in good repair because the vaults are under the sidewalk rather than under the Failing Building and thus, according to Ross, also outside of the scope of the leased premises.

The 1956 Failing Lease obligates the tenant to "surrender the premises to the Lessors or those having their estate therein in the same condition as that in which the Lessee is, by the terms of this lease, obligated to put the premises, reasonable use and wear thereof, and damage due to fire, alone excepted." Dkt. 61-2 at 10. The lease defines the "premises" as "certain space in the building known as the Failing Building." *Id.* at 3. The lease further defines the "premises" as:

> All of the first or ground floor of said building except the building entrance, elevator lobby, elevators and main stairway; all of the basement under said building except the space occupied by the heating plant and necessary space now used by Lessors in the operation and management of said building, (reserving to the Lessors, their agents and employees the right to the use of the stairway between first floor and basement of said building); and all of the second floor of said building except the portion thereof used for elevators and stairways.

*Id.* The lease also specifies:

> The Lessors do not warrant to the Lessee a continued use of the open space under the sidewalks adjoining the leased premises, but the Lessee shall have the use of this space and shall enjoy all the rights to such space as would accrue to the Lessors had they remained in full possession of the premises.

*Id.* at 11-12.

Because the vent stack is not "in" the Failing Building and the sidewalk vaults are not "under said building," Ross argues that it has no obligation to maintain them. Ross also argues

that the provision concerning the "space under the sidewalks" establishes that although Ross had the option to make "use" of the space, the provision did not obligate Ross to maintain the space. Walker Place responds that the Court should look to the historic use of the vent stack and sidewalk vaults. Walker Place further responds that by giving Ross "the use of this space" and the ability to "enjoy all the rights to such space as would accrue to the Lessors," the lease implied an obligation to maintain the space as the owner would.

The Court again applies Oregon contract law and the three-step analysis of *Yogman*, 325 Or. 358. At step one, the Court considers whether the lease provisions are open to more than one reasonable interpretation. The use of "certain space in the building" does suggest that Ross is not obligated to maintain space outside the building, but "[a]ll of the first or ground floor" and "all of the second floor" could include exterior aspects of the building connected to those floors that contribute to the use and enjoyment of these spaces. Similarly, "the basement under said building" could include space under the sidewalk that is accessible through the basement. Additionally, conveyance of the right to use the sidewalk vaults as the Lessors would might imply an obligation to maintain the vaults. Both parties' interpretations of the 1956 Failing Lease are plausible, rendering the precise boundaries of the term "premises" ambiguous.

As discussed above, when a contractual provision is ambiguous, ascertaining its meaning at steps two and three of the *Yogman* analysis is a question of fact generally not appropriate for summary judgment. *See Dial*, 255 Or. App. at 611; *Madson*, 209 Or. App. at 389 n.3. Here, the parties dispute the extrinsic evidence concerning the historic use of the vent stack and the sidewalk vaults. For example, Ross argues that the testimony of Walker Place's principal, Brandon Anderson, concerning Newberry's operations is speculative and not based on personal knowledge. Because the parties dispute the extrinsic evidence on this issue, the trier of fact must

resolve the question whether the obligation to surrender the Failing Building "premises" in good condition extends to the vent stack, the sidewalk vaults, both, or neither. Ross's motion for partial summary judgment on this issue is denied.

**D.  Ross's Affirmative Defenses**

Walker Place also asks the Court to grant summary judgment against Ross's affirmative defenses of waiver, laches, estoppel, unclean hands, and prior breach of the duty of good faith.[9] Walker Place argues that Ross has no evidence to support these affirmative defenses. Makarios joins in Walker Place's motion with respect to Ross's affirmative defenses of waiver, laches, estoppel, and unclean hands.[10]

**1.  Waiver**

In response to Walker Place's waiver arguments, Ross argues that it has presented evidence of an implied waiver, including evidence that the landlords knew about the conditions of the building and continued to renew Ross's lease. Ross also cites case law establishing that non-waiver clauses, such as the non-waiver clause Walker Place identifies in the 1956 Failing Lease, may be "ineffective and do not prevent the promisor from waiving the conditions of the contract through his conduct." *Soltis v. Liles*, 275 Or. 537, 543 (1976).

In general, a waiver requires "the intentional relinquishment or abandonment of a known right." *Ionian Corp. v. Country Mut. Ins. Corp.*, 88 F. Supp. 3d 1187, 1199 (D. Or.  2015). A party's conduct may imply a waiver, but there must be a "clear, unequivocal, or decisive act."

---

[9] Ross concedes that "failure to state a claim" is not an affirmative defense and therefore does not object to dismissing it. *See Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) ("A defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense."). Ross's affirmative defense of failure to state a claim is dismissed.

[10] Walker Place also moves for summary judgment on Ross's affirmative defense that the relevant statutes of limitation have expired. Ross's arguments concerning statutes of limitation are addressed in Part B.1.a and B.2.a, above.

*Brown v. Portland Sch. Dist. No. 1*, 291 Or. 77, 84 (1981) (quoting *Waterway Terminals v. P. S. Lord*, 242 Or. 1, 26-27 (1965)) (quotation marks omitted); *see also Bank of E. Or. v. Griffith*, 101 Or. App. 528, 536 (1990) ("[T]he intention to waive must clearly appear; it will not be inferred, except from a clear and unequivocal act manifesting an intent to waive.").

Here, Ross has presented evidence that Walker Place renewed Ross's leases despite Walker Place's knowledge of the Failing Building's condition after the 2006 lease appraisal. Additionally, there is evidence that Makarios and Makarios's predecessors renewed Ross's lease despite knowing of the Richmond Building's condition as early as 1997. These actions could arguably have indicated that Defendants would not enforce the surrender obligation requiring Ross to surrender the buildings in good repair with regard to these issues. Construing the facts in the light most favorable to Ross, the non-moving party, the Court concludes that a genuine dispute of material fact exists regarding Ross's affirmative defense of waiver. Walker Place's motion for partial summary judgment against Ross's affirmative defense of waiver, joined by Makarios, is denied.

### 2.  Laches

In response to Walker Place's laches argument, Ross argues that Defendants have unreasonably delayed bringing claims that they knew about for at least six years and possibly as long as 20 years. According to Ross, it has been prejudiced by Defendants' delay in bringing claims related to the 1996 renovations and other conditions of the building because Ross could have undertaken repairs before Title 24 was passed in 2004 or when other construction work occurred in 2006.

"Laches is an equitable time limitation on a party's right to bring suit, resting on the maxim that one who seeks the help of a court of equity must not sleep on his rights." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002) (citations and quotation

marks omitted). The doctrine of laches will prevent a party from bringing an equitable claim if the party (1) has actual or inquiry notice of a claim; (2) unreasonably delays in bringing the claim; and (3) causes "substantial prejudice" to the defendant. *Hilterbrand v. Carter*, 175 Or. App. 335, 342-43 (2001). "Inquiry notice" exists when the plaintiff "had knowledge of facts which would have put a duty to inquire on a person of ordinary intelligence." *Nyman v. City of Eugene*, 32 Or. App. 307, 320 (1979).

The only equitable claims remaining against which Ross could assert the affirmative defense of laches concern Ross's duty to separate the buildings and restore the leased premises to good or mercantile condition. *See* Dkt. 18 ¶ 80; Dkt. 19 ¶ 10. Ross has presented no evidence that Defendants unreasonably delayed in bringing their declaratory relief claims concerning any of Ross's surrender obligations. Further, Defendants could not bring their claims relating to the obligation to separate the buildings and return them in a good state of repair until the end of the lease. Walker Place's motion for partial summary judgment against Ross's affirmative defense of laches, joined by Makarios, is granted.

### 3. Estoppel

Ross presents essentially the same arguments in support of its estoppel defense as it presents to support its laches defense. "Estoppel is an equitable doctrine invoked to avoid injustice in particular cases." *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 59 (1984). To establish an affirmative defense of equitable estoppel or estoppel by conduct, the defendant must show:

> (1) a false representation, (2) made with knowledge of the facts, and (3) the other party must have been ignorant of the truth; (4) it must have been made with the intention that it should be acted upon by the other party; and (5) the other party must have been induced to act upon it. Estoppel protects only those who materially change their position in reliance on another's acts or

> representations. There must be a right to rely, and the reliance must
> be reasonable.

*Hess v. Seeger*, 55 Or. App. 746, 760-61 (1982) (citations omitted). Estoppel may occur by silence when a party has a "duty to speak," but the party invoking the doctrine must still "show that he was entitled to rely upon such conduct, action or silence, that he acted thereupon and would be prejudiced if the doctrine of estoppel were not applied." *Marshall v. Wilson*, 175 Or. 506, 518 (1944); *see generally Dunkin' Donuts Inc. v. Panagakos*, 5 F. Supp. 2d 57, 61 (D. Mass. 1998) ("While waiver is determined by a party's actual intent with respect to its contractual rights, estoppel, as an instrument of equity, has the power to extinguish a party's contractual rights . . . so long as the party's conduct was sufficiently misleading to cause detrimental reliance by a third party.").

As with laches, the only equitable claims remaining against which Ross could assert estoppel concern Ross's duty to separate the buildings and restore the leased premises to good condition. Ross has presented no evidence that Defendants made false representations, remained silent in the face of a duty to speak, or induced Ross to draw up the plans for separation in a particular way or keep the building in particular state of repair. Absent evidence that Defendants' conduct was sufficiently misleading to cause detrimental reliance by Ross, Ross cannot establish an affirmative defense of estoppel. Walker Place's motion for partial summary judgment against Ross's affirmative defense of estoppel, joined by Makarios, is granted.

### 4. Unclean Hands

Concerning Walker Place's arguments about unclean hands, Ross contends that Walker Place behaved improperly by delaying bringing its claims in order to extract millions of dollars from Ross at the very end of the Lease term. A court may deny equitable relief to a party who is "guilty of improper conduct no matter how improper the [other party's] behavior may have

PAGE 48 – OPINION AND ORDER

been." *Welsh v. Case*, 180 Or. App. 370, 385 (2002) (quoting *Merimac Co. v. Portland Timber*, 259 Or. 573, 580 (1971)) (alteration in original) (quotation marks omitted). In order for a court to apply the doctrine of unclean hands, "the misconduct must be serious enough to justify a court's denying relief on an otherwise valid claim," for "[e]ven equity does not require saintliness." *N. Pac. Lumber Co. v. Oliver*, 286 Or. 639, 651 (1979). Ross has not presented any evidence of the kind of intentional misconduct that would justify the Court in denying Defendants relief on an otherwise valid claim. Walker Place has established that there is no genuine issue of material fact with regard to this affirmative defense. Walker Place's motion for partial summary judgment against Ross's affirmative defense of "unclean hands," joined by Makarios, is granted.

### 5.   Prior Breach of Contract by Breaching the Implied Duty of Good Faith

Finally, Ross argues that Walker Place breached its duty of good faith by "lull[ing] Ross into thinking all was well with the condition of the basement and 1996 renovations." Dkt. 78 at 40. In Oregon, the implied duty of good faith "serves to effectuate the objectively reasonable expectations of the parties." *Klamath Off-Project Water Users, Inc. v. Pacificorp*, 237 Or. App. 434, 445 (2010). The implied duty of good faith cannot contradict express contractual terms to which the parties agree. *See, e.g.*, *U.S. Nat. Bank of Or. v. Boge*, 311 Or. 550, 567 (1991) ("The obligation of good faith does not vary the substantive terms of the bargain . . . nor does it provide a remedy for an unpleasantly motivated act that is expressly permitted by contract or statute."). Ross has not presented evidence that Walker Place's behavior contravenes the reasonable expectations of the parties. The express terms of the 1956 Failing Lease permit Walker Place to enforce surrender obligations. Accordingly, there is no genuine issue of material fact concerning whether Walker Place breached the duty of good faith by waiting to bring its counterclaims until the end of the lease term. Walker Place's motion for partial summary judgment against Ross's affirmative defense of prior breach of the implied duty of good faith is granted.

**CONCLUSION**

Each party's motion is GRANTED IN PART AND DENIED IN PART. Regarding Ross's obligations physically to separate the Failing Building and Richmond Building, Ross's motions for partial summary judgment against Defendants (Dkts. 58-59) are granted and Makarios's motion for partial summary judgment (Dkt. 57), joined by Walker Place, is denied. Regarding Ross's obligation to restore the basements of the Failing Building and Richmond Building to their pre-1996 occupancy capacity, Ross's motions for partial summary judgment (Dkts. 58-59) are granted and Walker Place's motion for partial summary judgment (Dkt. 55) and Makarios's motion for partial summary judgment (Dkt. 57) are denied. Regarding whether the relevant statutes of limitation bar Defendants' claims based on Ross's surrender obligations, Ross's motion for partial summary judgment (Dkt. 58) is denied and Walker Place's motion for partial summary judgment against that affirmative defense (Dkt. 55), joined by Makarios, is granted. Regarding Ross's obligations to maintain areas not within the "premises," Ross's motion for partial summary judgment (Dkt. 58) is denied. Regarding Ross's remaining affirmative defenses, Walker Place's motion for summary judgment (Dkt. 55), joined in part by Makarios, is granted as to failure to state a claim, laches, estoppel, unclean hands, and prior breach of contract by breaching the implied duty of good faith; it is denied, however, as to Ross's affirmative defense of waiver.

**IT IS SO ORDERED**.

DATED this 25th day of March, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge