**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **ROSS DRESS FOR LESS, INC.**, | Case No. 3:14-cv-1971-SI |
| Plaintiff, | **FINDINGS OF FACT AND** |
| | **CONCLUSIONS OF LAW** |
| v. | |
| **MAKARIOS-OREGON, LLC**, and **WALKER PLACE, LLC**, | |
| Defendants. | |

Thomas V. Dulcich and Rebecca A. Boyette, SCHWABE WILLIAMSON & WYATT, PC, 1211 S.W. Fifth Avenue, Suite 1900, Portland, OR 97204; Gregory D. Call and Tracy E. Reichmuth, CROWELL & MORING, LLP, 275 Battery Street, 23rd Floor, San Francisco, CA 94111. Of Attorneys for Plaintiff.

Jeffrey M. Edelson and Molly K. Honoré, MARKOWITZ HERBOLD, PC, 1211 S.W. Fifth Avenue, Suite 3000, Portland, OR 97204. Of Attorneys for Defendant Makarios-Oregon, LLC.

Darian A. Stanford and Keith A. Pitt, SLINDE NELSON STANFORD, 111 S.W. Fifth Avenue, Suite 1940, Portland, OR 97204. Of Attorneys for Defendant Walker Place, LLC.

**Michael H. Simon, District Judge.**

This case involves a dispute over a lessee's obligations upon the expiration of two

leases—negotiated with two separate landlords for two conjoined buildings—that have spanned

more than 50 years. Plaintiff Ross Dress For Less, Inc. ("Ross" or "Plaintiff") is the successor in

PAGE 1 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

interest to the original lessee. Defendant Makarios-Oregon, LLC ("Makarios") and Walker Place, LLC ("Walker Place") (collectively "Defendants") are the successors in interest to the original lessors. Ross brings this action against Defendants, seeking a judicial declaration that Ross's proposed end-of-lease plans satisfy Ross's obligations under the relevant leases. Makarios and Walker Place both assert counterclaims for a judicial declaration clarifying the extent of Ross's end-of-lease obligations and breach of contract. The parties agreed to bifurcate their declaratory actions ("Phase I") from Defendants' breach of contract claims for damages ("Phase II").

To address the matters at issue in Phase I, the Court held a bench trial from May 2 to May 13, 2016. Having weighed and evaluated all of the evidence in the same manner that it would instruct a jury to do and having fully considered the legal arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a) and DENIES IN PART AND GRANTS IN PART all three parties' requests for declaratory relief.

### FINDINGS OF FACT

The Court finds the following facts by a preponderance of the evidence.

**A. Stipulated Facts**

**1. Ross**

1.      Ross is a Virginia corporation that operates discount retail department stores across the country.

2.      Ross is currently a tenant in two attached buildings in downtown Portland located at 618 SW Fifth Avenue (the "Richmond Building") and 620 SW Fifth Avenue (the "Failing Building").

3.      Ross leases a portion of the Failing Building (specifically, the basement, first, and second floors) and the entirety of the Richmond Building.

PAGE 2 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

4.      Ross operated a "Ross Dress for Less" store at the location from 1996 until the summer of 2014. Ross has operated a "dd's Discounts" store at the location from the summer of 2014 through the present.

**2.  The Richmond Building**

5.      The Richmond Building is owned by defendant Makarios. Makarios is an Oregon limited liability company, owned by members of the Calomiris family.

6.      The Richmond Building was constructed in its present form between 1951 and 1953 and consists of five floors and a mezzanine.

7.      Persons related to Makarios purchased the Richmond Building from New York Life Insurance Company ("New York Life") in approximately 1986.[1]

8.      New York Life owned the Richmond Building from approximately 1956 to 1986. J.J. Newberry Company ("Newberry"), the original lessee, owned the Richmond Building for a brief period in 1956.

9.      From completion of construction in 1953 until the transfer of ownership to Newberry, the Richmond Building was owned by a series of related entities that the parties refer to as the "Failings."

10.     The predecessor to the Richmond Building (also known as the "Richmond Building") was also owned by the Failings from its original construction until it was razed sometime before 1951.

---

[1] Members of the Calomiris family acquired the Richmond Building in 1986. In approximately 2011, Makarios, organized by members of the Calomiris family, acquired the building.

PAGE 3 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

### 3. The Failing Building

11.     The Failing Building, which is also sometimes referred to as the "620 Building," is owned by defendant Walker Place, an Oregon LLC.

12.     The Failing Building was originally constructed in approximately 1907 as a six-story building. An additional six floors were added in 1913.

13.     The Failing Building today consists of twelve floors and is listed on the National Register of Historic Buildings.

14.     The Failings owned the Failing Building from 1907 until 1976, when it was purchased by Henry A. Miller, who operated the building as "Pacific 620."

15.     On February 1, 1997, Pacific 620 sold the Failing Building to 620 Associates.

16.     Walker Place purchased the Richmond Building from 620 Associates on December 1, 2006.

### 4. Newberry

17.     Newberry was a national retail chain operating "variety" stores across the country. It operated a store in downtown Portland, Oregon, from 1927 to 1996.

18.     Newberry's parent corporation, McCrory Corporation, filed for Chapter 11 bankruptcy in 1992, which resulted in Newberry's closure of the Portland store in 1996.

19.     Newberry and Ross negotiated the terms of a Lease Assignment and Assumption Agreement ("Assignment"), dated January 25, 1996, assigning Ross all of Newberry's rights and obligations under the respective leases. The bankruptcy court then approved the assignment.

### 5. The Leases

20.     On August 20, 1946, at a time when the Failings owned both the Failing Building and the original Richmond Building, the Failings entered into a lease with Newberry (the "1946 Lease").

PAGE 4 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

21.     The 1946 Lease (Ex. 8 and Ex. 301A)[2] called for Newberry to raze the original Richmond Building and construct a new Richmond Building consistent with various design mandates.

22.     Newberry razed the original Richmond Building sometime before 1951 and oversaw the construction of the new Richmond Building, which was completed and dedicated in 1953.

23.     The basement, first, and second floors of the Failing Building connected seamlessly with the basement, first, and second floors of the adjacent new Richmond Building. Those combined floors spanning the buildings created Newberry's retail space.

24.     The 1946 Lease was amended twice, in ways not related to this lawsuit. The first amendment occurred on April 5, 1954 (Ex. 532), and the second took place on June 23, 1955 (Ex. 533).

25.     In August 1956, the Failings sold the new Richmond Building to Newberry (Ex. 107). In September 1956, Newberry sold the Richmond Building to New York Life (Ex. 108).[3]

26.     Newberry entered into a lease for the Richmond Building with New York Life on September 24, 1956 (the "1956 Richmond Lease," Ex. 1 and Ex. 301C).

---

[2] Exhibits received in evidence at trial are referred to as "Ex." followed by the number of the exhibit and, if applicable, a specific page number. Docket entries in the court record are referred to as "Dkt."

[3] The parties stipulated that the sale to New York Life occurred in October 1956. The undisputed evidence, including Exhibit 108, establishes, however, that the sale occurred in September 1956. The Court therefore assumes that the parties' stipulation included a scrivener's error.

27.     On August 31, 1956, approximately a month before the 1956 Richmond Lease, the Failings entered into a new lease with Newberry for the Failing Building (the "1956 Failing Lease," Ex. 91 and Ex. 301B).

28.     The 1956 Failing Lease was amended five additional times: on September 30, 1983 (the "Fourth Amendment," Ex. 92 and Ex. 301D); on February 21, 1990 (the "Fifth Amendment," Ex. 93 and Ex. 301E); on March 1, 1996 (the "Sixth Amendment," Ex. 94 and Ex. 301F); on October 20, 2006 (the "Seventh Amendment," Ex. 95 and Ex. 301G); and on May 6, 2009 (the "Eighth Amendment," Ex. 96 and Ex. 301H).

29.     The Fourth Amendment in 1983 and the Fifth Amendment in 1990 were between the Failings and Newberry.

30.     The Sixth Amendment in 1996 was between Pacific 620 and Ross.

31.     The Seventh Amendment in 2006 was between 620 Associates and Ross.

32.     The Eighth Amendment in 2009 was between Walker Place and Ross.

33.     Both the 1956 Richmond Lease and the 1956 Failing Lease expire on September 30, 2016.

**B.  Facts the Court Finds Established at Trial[4]**

**1.  The Richmond Building Construction and Failing Building Remodel**

34.     To accomplish the connection between the Richmond Building and the Failing Building at the basement, first, and second floors, Newberry perfectly aligned the Richmond Building's floor structure with the existing floor structure of the Failing Building at those levels.

---

[4] The Court's findings of fact regarding the physical appearance, layout, and conditions of the Richmond Building and the Failing Building are based on, in addition to the evidence received at trial, a judicial site visit to the two buildings that took place on May 10, 2016. Representatives and counsel for the three parties were present for the entirety of the judicial site visit and documented the visit with photographs.

After aligning the floors, Newberry poured new concrete slab floors that cross from one building to the next and span the gap between the buildings' steel framing. The concrete slabs are four to six inches thick on each floor.

35.     In contrast to the basement, first, and second floors of the Richmond Building, the third, fourth, fifth, and mezzanine floors of the Richmond Building are not connected to the Failing Building. The third floor of the Richmond Building directly touches, or abuts, the Failing Building. At the fourth floor and above, however, the Richmond Building "steps back" from the Failing Building. Thus, although the buildings abut at the northwest stair tower all the way to roofline of the Richmond Building, the Richmond Building does not abut against the Failing Building along most of the fourth, fifth, and mezzanine floors.

36.     At the basement, first, and second floors of the buildings, there are six columns on each side of the property line. At the basement level, the columns in the Richmond Building are separated from the columns in the Failing Building by 28 inches. On the first and second floors, the columns on each side of the property line are separated by 19 inches. The twelve columns on each floor are encased in concrete "fireproofing" such that the columns of the buildings are connected and the space between the two sets of columns is not visible.[5]

37.     Newberry built escalators between the basement, first, and second floors of the two buildings. The escalators—including escalator beams also encased in concrete fireproofing—crossed the property line. If the beams, which still cross the property line today, were to be severed, the beams would require additional support in each building.

---

[5] The stated distances between the columns are per the 1951 plans. Because the columns are encased in concrete fireproofing, the actual distances between the columns cannot be confirmed without destructive testing. No such destructive testing has taken place.

38.    At the end of construction, the Richmond Building had three elevators (two freight elevators and one passenger elevator) serving all of the floors, including the basement. As part of the 1951-53 construction, Newberry did not add or remove any elevators in the Failing Building. The Failing Building continued to have a separate lobby and elevator bank, with service to the basement and office space on the third floors and above, which Newberry did not lease. The Failing Building did not have its own set of elevators for service between Newberry's retail floors.

39.    Several staircases, including a "Grand Staircase" in the Failing Building, connected the basement, first, and second floors of the Richmond Building and the Failing Building.

40.    Both buildings had restrooms that customers could access in the basements and on the second floors. There were also restrooms on the third, fourth, and fifth floors of the Richmond Building.

41.    Both before and after the 1951 construction, the Failing Building did not have its own loading door or street loading area. Retail loading occurred through the Richmond Building.

42.    On the Failing Building side, the basement extended under the sidewalk. Newberry had access to the area under the sidewalks, referred to as the "sidewalk vaults."

43.    Also on the Failing Building side, Newberry had access to a steel exhaust stack, referred to as the "vent stack," that predates the 1951 construction. The vent stack is supported by the second floor of the Failing Building and penetrates the second floor ceiling. Where the vent stack penetrates the second floor ceiling, the first and second floors of the Failing Building jut out from the rest of the building such that part of the Failing Building's second floor has its own roof that is exposed to the elements. The vent stack extends through this second floor roof

and continues up the southeast corner of exterior façade, past the parapet on the twelfth floor. Newberry used the vent stack to vent exhaust from restrooms and the hood of a lunch counter in the store. The Failing Building landlord could not have sealed off, severed, or otherwise decommissioned the upper levels of the vent stack without interfering with Newberry's use of the vent stack. No other tenant in the Failing Building used the vent stack.

44.     The Richmond Building's exterior walls directly abut against the adjacent Caplan Building, a building on the same block that was built in approximately 1910. The Failing Building's exterior walls directly abut against the adjacent Kress Building, another building on the same block that predates the construction of the Richmond Building.

### 2.  The Leases and Deeds

#### a.  The Richmond Building

45.     In August 1956, the Failing Landlords deeded the Richmond Building to Newberry. According to the deed (the "Newberry Deed"), "the foundations and footings" of the Richmond Building and the Failing Building "shall be and remain common foundations and footings for the mutual use and benefit of the parties hereto, their heirs, successors and assigns, so long as said foundations and footings shall stand, and this agreement shall be deemed a covenant running with the land."[6]

46.     Notwithstanding the common foundations and footings, the Newberry Deed also created an easement allowing the parties to enter each other's property, exercisable at the time Newberry or its successors ceased to occupy the Richmond Building or Newberry's leased space in the Failing Building,

> to the extent reasonably required to remove the escalators crossing
> the property line and properly close up the openings in the floors

---

[6] Ex. 107 at 1.

> which accommodate such escalators, construct such good and
> sufficient masonry curtain walls along the property line between
> the Failing Building and the premises hereby conveyed as may be
> required to physically separate said structures, and make such
> alterations and changes in and to the electrical, plumbing and other
> systems and apparatuses as may be necessary to completely
> separate said buildings.[7]

47.    In September 1956, Newberry entered into a "sale lease-back" transaction with New York Life. On the same day, Newberry both deeded the Richmond Building to New York Life and signed the 1956 Richmond Lease with New York Life.

48.    Similar to the Newberry deed, the deed to New York Life (the "New York Life Deed") required that the foundations and footings of the Richmond Building and the Failing Building remain in common "so long as such foundations and footings shall stand."[8]

49.    Further, the New York Life Deed echoed the Newberry Deed's easement provision, granting New York Life an easement to enter the Failing Building, exercisable at the time the grantor or its successors should cease to occupy the Richmond Building or leased space in the Failing Building,

> to the extent reasonably required to remove the escalators crossing
> the property line and properly close up the openings in the floors
> which accommodate such escalators, construct such good and
> sufficient masonry curtain walls along the property line between
> said 'Failing Building' and [the Richmond Building] as may be
> required to physically separate said structures, and make such
> alterations and changes in and to the electrical, plumbing and other
> systems and apparatuses as may be necessary to completely
> separate said buildings.[9]

---

[7] Ex. 107 at 2.

[8] Ex. 108 at 1.

[9] Ex. 108 at 1.

50.     The 1956 Richmond Lease to Newberry also contained a provision for separating

the Richmond Building from the Failing Building at the end of the lease. In § 16.02, the 1956

Richmond Lease states:

> The Tenant [Newberry] agrees that, prior to the expiration of this
> lease or, in the event of termination of this lease for any reason
> whatsoever, promptly after such termination, *the Tenant, at the
> Tenant's sole cost and expense, shall make such alterations to
> the building then erected on the demised premises as shall be
> necessary to constitute such building an entirely independent and
> self-sufficient structure. Such alterations shall include*, without
> in any way limiting the generality of the foregoing, the removal of
> escalators, *the construction of footings and a masonry curtain
> wall* along the westerly boundary line of the demised premises, the
> removal of any facing encroaching upon adjoining premises, the
> removal of signs, the relocation of plumbing, drain pipes,
> sprinklers, electrical wiring, lighting fixtures and exhaust ducts, the
> installation of a new soil connection to the city sewer, a new steam
> connection and new electrical service conduits and equipment and
> provision for a new toilet and rest room. The provisions of this
> Section 16.02 shall survive the expiration or any termination of
> this lease.[10]

51.     Additionally, the 1956 Richmond Lease contained provisions relating to the

condition in which Newberry promised to return the building. In § 16.01, the lease states:

> *The Tenant shall, upon the expiration or termination of this
> lease* for any reason whatsoever, *surrender to the Landlord the
> buildings*, structures and building equipment then upon the
> demised premises, together with all alterations and replacements
> thereof then on the demised premises, *in good order, condition
> and repair, except for reasonable wear and tear*; provided,
> however, that if the Tenant shall have made any alteration or
> alterations adapting the buildings, structures and building
> equipment upon the demised premises for multiple occupancy,
> then, in such event, prior to the expiration or termination of this
> lease, the Tenant, at the Landlord's request, shall restore said
> buildings, structures and building equipment to the order and
> condition which existed prior to such alteration or alterations.[11]

---

[10] Ex. 1 at 42-43 (emphasis added).

[11] Ex. 1 at 41 (emphasis added).

PAGE 11 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

52.     Newberry also agreed to several other provisions in the 1956 Richmond Lease that are relevant to this lawsuit. In § 4.01, Newberry agreed that it would not, without the landlord's prior permission, use the Richmond Building "for any purpose other than mercantile purposes."[12]

53.     In § 4.02, Newberry agreed that it would, "throughout the demised term, and at no expense whatsoever to the Landlord," ensure that the condition of the Richmond Building complied "with all laws and ordinances and the orders, rules, regulations and requirements of all federal, state, county and municipal governments, and appropriate departments, commissions, boards and officers thereof."[13] Newberry agreed to ensure compliance with all laws, ordinances, rules, and regulations, both "foreseen and unforeseen, ordinary as well as extraordinary, and whether or not the same shall presently be within the contemplation of the parties hereto or shall involve any change of governmental policy or require structural or extraordinary repairs, alterations or additions."[14] Moreover, Newberry agreed to ensure compliance "irrespective of the cost thereof."[15]

54.     Section 7.01 obligated Newberry to, "throughout the demised term, at no expense whatsoever to the Landlord, take good care of the demised premises . . . and . . . not do or suffer any waste with respect thereto."[16] This requirement meant that Newberry agreed to "promptly make all repairs, interior and exterior, structural and non-structural, ordinary as well as

---

[12] Ex. 1 at 9.

[13] Ex. 1 at 9.

[14] Ex. 1 at 9.

[15] Ex. 1 at 9.

[16] Ex. 1 at 15-16.

extraordinary, foreseen as well as unforeseen, necessary to keep said buildings and improvements in good and lawful order and condition."[17] The lease expressly defines "'repairs' as applied to building equipment" as including "replacements, restoration and/or renewals when necessary."[18] The section further requires Newberry to "keep and maintain all portions of the demised premises, including, without limitation, all building equipment, heating plant and system, air conditioning plant and system, and the sidewalks adjoining the same, in a clean and orderly condition, free of accumulation of dirt, rubbish, snow and ice."[19]

55.    In § 9.01, the 1956 Richmond Lease requires Newberry to "make no structural alterations to the building or buildings now or hereafter erected upon the demised premises."[20] Section 9.01 further requires Newberry to refrain from "mak[ing] any other alterations which would change the character of said building or buildings, or which would weaken or impair the structural integrity, or lessen the value of said building or buildings, without the prior written consent of the Landlord, which consent shall not be unreasonably withheld."[21]

56.    The 1956 Richmond Lease is a "triple-net lease," meaning that the tenant is responsible for taxes, insurance, and all other expenses for the operation, repair, and maintenance of the leased premises.

57.    The Richmond Lease's original term was for 30 years, expiring in September 1986. The Richmond Lease provided, however, that Newberry had the option to

---

[17] Ex. 1 at 16.

[18] Ex. 1 at 16.

[19] Ex. 1 at 16.

[20] Ex. 1 at 20.

[21] Ex. 1 at 20.

exercise three ten-year extensions, with the term of the last extension expiring on September 30, 2016. Newberry and its successors could exercise these renewal options provided that the tenant "shall not be in default, at the time when any such option shall be exercised by the Tenant hereunder, or at the expiration of the current term of the lease."[22]

### b. The Failing Building

58.     The 1946 Failing Lease provided that the Richmond Building "shall be so constructed that by the installation of partition walls between it and the Failing Building, it can be used as a self contained [sic] building as regards plumbing, heating, wiring and vertical transportation."[23]

59.     On August 31, 1956, the Failing landlords and Newberry amended and restated the 1946 Failing Lease with the 1956 Failing Lease. This latter lease, among its many provisions, stated that at the termination of Newberry's tenancy in the Failing Building, Newberry would "at [Newberry's] sole cost and expense *do and perform such work as shall be necessary to physically separate, and constitute entirely independent and self-sufficient, the [Failing Building] from the adjacent 'Richmond Building' premises*."[24] The lease, "[w]ithout limiting the generality of the foregoing," stated that this work must include:

> removal of the escalators and the closing in of the openings in the floors and walls of the Failing Building which accommodate the same; construction of footings and masonry curtain walls along the easterly boundary line of the demised premises; and such appropriate alterations, changes and relocations of portions of the plumbing, electric, and other systems and apparatuses as may be necessary to make the 'Failing Building' space independent of the 'Richmond Building'. The material used in said work shall

---

[22] § 21.01 of the 1956 Richmond Lease, Ex. 1 at 46.

[23] Ex. 8 at 17.

[24] Ex. 301B at 4 (emphasis added).

conform to the material of said Failing Building, and the work
shall be done in a good and workmanlike manner.[25]

60.    Among its other provisions, the 1956 Failing Lease contained requirements relating to the condition in which Newberry covenanted to return the premises at the end of the lease. Newberry agreed, among other things, to "at its own cost and expense keep the leased premises in good condition and repair" during the term of the lease and, at the expiration of the term of the lease, to "surrender the premises to the Lessors . . . in the same condition as that in which the Lessee is, by the terms of this lease, obligated to put the premises, reasonable use and wear thereof, . . . excepted."[26] Newberry also agreed "[n]ot to commit or suffer any strip or waste of the leased premises."[27]

61.    The 1956 Failing Lease further required Newberry to comply with, "at its own expense," all relevant federal, state, and city "laws, ordinances, rules and regulations . . . pertaining to the leased premises, occasioned by or affecting the use of the leased premises by Lessee."[28] Under the lease, however, Newberry was not responsible for compliance "in so far as such laws, ordinances, rules and regulations may require structural changes in or additions or improvements to the foundation, exterior walls, roof or sidewalks thereof."[29] The lease prohibited Newberry from making alterations that "change the general structural character of the building."[30]

---

[25] Ex. 301B at 4.

[26] Ex. 301B at 8-9.

[27] Ex. 301B at 9.

[28] Ex. 301B at 9-10.

[29] Ex. 301B at 10.

[30] Ex. 301B at 6.

PAGE 15 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

62.     Under the Premises Clause of the Failing Lease, Newberry leased "certain space in the building," defined as:

> All of the first or ground floor of [the Failing Building] except the building entrance, elevator lobby, elevators and main stairway; all of the basement under said building except the space occupied by the heating plant and necessary space now used by Lessors in the operation and management of said building . . . ; and all of the second floor of said building except the portion thereof used for elevators and stairways.[31]

63.     The "heating plant" for the Failing Building is not located in the sidewalk vaults.

64.      The 1956 Failing Lase also specifies:

> The Lessors do not warrant to the Lessee a continued use of the open space under the sidewalks adjoining the leased premises, but the Lessee shall have the use of this space and shall enjoy all the rights to such space as would accrue to the Lessors had they remained in full possession of the premises.[32]

65.     The 1956 Failing Lease is a "triple-net lease," meaning that the tenant is responsible for taxes, insurance, and all other expenses for the operation, repair, and maintenance of the leased premises.

66.     The 1956 Failing Lease's original term was for 36 years, expiring in February 1987. The lease was amended on or about September 30, 1983; February 21, 1990; March 1, 1996; October 20, 2006; and May 6, 2009, giving the tenant the option to extend the lease up to January 31, 2043. The current term is set to expire on September 30, 2016, and Ross does not seek to extend the lease beyond that date.

---

[31] Ex. 301B at 2.

[32] Ex. 301B at 10-11.

### 3. Ross's Tenancy

#### a. Ross's Acquisition of the Leasehold Rights and Obligations

67.     Newberry and Ross negotiated the terms of the Assignment, dated

January 25, 1996, and submitted that Assignment to the bankruptcy court for approval on

February 9, 1996.

68.     The Assignment provided that Ross would assume from Newberry "all of

Assignor's leasehold estate and right, title, interest and obligations in, to and under [the 1946

Failing Lease as restated by the 1956 Failing Lease] and [1956 Richmond Lease] and [the

Failing Building] and [the Richmond Building] in their respective existing 'AS IS' physical

conditions."[33]

69.     Under the Assignment, Ross, as the Assignee, retained the right to void the

Assignment on or before February 15, 1996, if Newberry did not satisfy a number of conditions

before closing the transaction. One of the conditions was "[i]nspection and approval by Assignee

of the physical condition of [the premises] including, without limitation, structural matters,

mechanical and utility systems, roof and drainage systems and environmental consideration."[34]

70.     Another condition in the Assignment was the receipt by Ross of "[a]n estoppel

certificate, in a form satisfactory to Assignee, executed by each landlord/lessor in form

reasonably satisfactory to Assignee, verifying, among other things, that there are no defaults

under the respective Lease by Assignee and no circumstances which, if uncorrected, would

become a default, other than defaults which will be cured by Assignor at the close of escrow as a

---

[33] Ex. 8 at 2 (emphasis in original).

[34] Ex. 8 at 5.

PAGE 17 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

result of this Assignment."[35] Such certificates are commonly used in the industry to effect waivers of lease rights.

71.     Newberry never obtained and, thus, never provided to Ross any estoppel certificate from the landlords of either the Richmond Building or Failing Building as discussed in the Assignment. Ross did not insist on receiving any estoppel certificate and accepted the rights and obligations of the Assignment despite the failure of this condition.

72.     Ross took no steps to void the Assignment. On February 15, 1996, the bankruptcy court approved the Assignment.

73.     On March 1, 1996, Ross entered into a Sixth Amendment to the Failing Lease. Ross affirmed that it had assumed all of Newberry's existing obligations, "***including specifically, but not by way of limitation, the obligation to physically separate and restore the premises at the expiration or upon termination of the Lease***, as described in the paragraph entitled 'Severance' on page 3 of the August 31, 1956 amendment and restatement of the Lease."[36]

74.     The Sixth Amendment also gave Ross the right to remodel the Failing Building after obtaining written approval of the plans from the landlord. "In altering or remodeling the leased premises," Ross agreed that it would "not injure or change the general structural character of the leased premises or the building of which the premises are a part" and that Ross would do all work "in full compliance with all federal, state and municipal laws and regulations."[37] Ross further agreed that it would "bear any responsibility for costs and expenses associated with any modifications to the building which, as a result of Lessee's work or other activities in the

---

[35] Ex. 8 at 6.

[36] Ex. 94 at 1 (emphasis added).

[37] Ex. 94 at 3.

PAGE 18 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

building, may be required by federal, state or local laws."[38] Such laws included but were "not limited to the Americans with Disabilities Act, seismic laws, fire and life safety laws, environmental or hazardous material laws and regulations."[39]

### b. Ross's Modifications to and Use of the Buildings

75.    In June 1996, Ross submitted remodel plans to the City of Portland ("the City"). Ross proposed renovating the two buildings' first and second floors to make the new Ross store look consistent with Ross's other retail stores. Ross did not propose any renovations or repairs to the upper floors of the Richmond Building. Plans for the remodel were publicly on file with the City.

76.    As part of the remodel plans, Ross proposed removing one staircase and covering the Grand Staircase between the first floor and the basement of the buildings. Ross wanted to remove or close these staircases because Ross did not plan to use the basement space for retail purposes.

77.    In its plans submitted to the City, Ross designated the unused area in the basements as "VACANT NO OCCUPANCY – NO STORAGE SEPARATE PERMIT REQUIRED FOR OCCUPANCY."[40] The "vacant" designation meant that Ross would not have to meet certain code obligations required for areas with occupancy.[41]

---

[38] Ex. 94 at 3.

[39] Ex. 94 at 3.

[40] Ex. 111 at 6 (emphasis in original).

[41] As discussed in the Court's Opinion and Order dated March 25, 2016 (Dkt. 99), in 2004, the City added Chapter 24.85, Seismic Design Requirements for Existing Buildings ("Title 24"), to the Portland City Code. *See* Dkt. 60-6. Title 24 establishes baseline occupancies for all buildings based on the permit drawings on record with the City in 2004. If, after 2004, the baseline occupancy increases by 150 occupants or more, Title 24 requires seismic upgrades so that historical buildings meet current code standards. Because the 1996 remodel to the Richmond

78.    The basements of the two buildings remained accessible by elevators and a small staircase for storage and office space.

79.    The City approved Ross's plans, and the Ross store opened for business on October 17, 1996.

80.    During Ross's tenancy, Ross elected to decommission or remove certain heating, ventilation, and air conditioning ("HVAC"), electrical, and plumbing systems and building equipment, particularly in the unused portions of the basements and in the third through mezzanine floors of the Richmond Building. In the spaces that no long had heating, Ross installed freeze-protection systems. These changes in the buildings were not shown in the plans submitted to the City in 1996.

81.    Ross left systems, equipment, and other elements of the buildings that were already decommissioned by Newberry or deteriorating (such as the restrooms on the unused floors of the Richmond Building) in their then-existing state. As of May 12, 2016, the portions of Failing Building leased by Ross had no working restrooms.

82.    Additionally, Ross decommissioned one of the freight elevators in the Richmond Building. As the other two elevators in the Richmond Building wore down from use, Ross used the decommissioned elevator for spare parts to repair the other two elevators.

83.    In 2004, with the knowledge and consent of the landlords, Ross removed most of the escalator structures that spanned the property line. Ross did not remove the escalator beams. These beams still cross the property line between the two buildings. Nothing in Ross's

---

Building and the Failing Building basements decreased the allowable occupancy by more than 150 occupants, restoring the basements to the pre-1996 occupancy capacities would require seismic upgrades.

PAGE 20 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

correspondence with the landlords indicates, one way or the other, whether the landlords expected that Ross would remove or sever the escalator beams at the expiration of the leases.

84.     During its tenancy, Ross did not use the portions of the basements that it specified as "vacant" in the plans submitted to the City. Ross did, however, occasionally use the sidewalk vaults of the Failing Building for storage. Ross had continuous access to the sidewalk vaults.

85.     Ross did not use the third floor and above of the Richmond Building. Nor did Ross use the vent stack in the Failing Building. Ross did, however, have unlimited access to all floors of the Richmond Building. Ross also had access to the vent stack on the second floor of the Failing Building, such that Ross could have chosen to make use of that apparatus.

86.     Separate gas meters for both buildings are located in the Richmond Building. The Failing Building does not have its own gas meter.

### c.  Ross's Communications with its Landlords Regarding Modifications and Lease Obligations

#### i.  Correspondence and Interactions with the Richmond Building Landlords

87.     On February 5, 1997, Ross sent a letter to the Calomiris family's representative, Bradley Miller. The letter stated that Ross had previously "overlooked" any requirement to send construction plans to the Richmond Building landlord.[42] The letter added that Ross was sending copies of the plans for the landlord's records. The letter also stated that Ross would provide copies of any certificate of occupancy when it became available. Makarios offers no evidence that Ross failed to send to Mr. Miller the construction plans in February 1997, and the Court finds that Mr. Miller, serving as the Calomiris family's agent, did receive Ross's construction plans in February 1997.

---

[42] Ex. 542 at 1.

88.    On April 14, 1997, Mr. Miller notified Ross that the Calomiris family believed that Ross had made unauthorized alterations to the Richmond Building basement that changed the character of the building and decreased the building's value. On April 23, 1997, Ross responded to Mr. Miller, stating that the changes to the basement did not constitute structural changes and did not decrease the value of the building.

89.    On April 17, 1998, Mr. Miller notified Ross that Ross needed to make repairs to the Richmond Building because the Calomiris family "has a very serious concern regarding the repair and maintenance of the Building, its condition and whether it is structurally sound."[43] The letter stated that if Ross did not cure the lease violations, "the landlord will pursue its remedies under the Lease."[44]

90.    On December 22, 1998, Ross replied that it had hired structural engineers to evaluate the building and that it "is in excellent conditions structurally."[45] Ross added that it "consider[ed] this matter to be closed."[46] Between 1998 and the commencement of this litigation, neither the Calomiris family nor Makarios notified Ross that any alterations to the Richmond Building basement would still need to be remedied at the lease's expiration or that the landlord considered the matter still open. When the time came to renew Ross's lease in 2006, the Calomiris family allowed Ross to do so and did not mention this subject.

---

[43] Ex. 45 at 3.

[44] Ex. 45 at 3.

[45] Ex. 46 at 2.

[46] Ex. 46 at 3.

## ii. Correspondence and Interactions with the Failing Building Landlords

91.    On June 20, 1996, Gary Brannan, Ross's director of real estate, sent a letter to Charles Fettig, the representative of the Failing Building landlord (Pacific 620 at the time). The letter stated that Ross's architect was delivering a set of plans to Mr. Fettig that day for the proposed remodel and alterations to the Failing Building. Mr. Brannan requested that Mr. Fettig contact the lessor and obtain approval of the plans. The letter further stated that Ross would deem such plans approved if Mr. Fettig did not notify Ross of a reasonable basis for withholding approval within ten days. The letter was faxed to Mr. Fettig, and a communication report confirms receipt.[47]

92.    On July 16, 1996, Mr. Fettig responded to Mr. Brannan. Mr. Fettig stated, "Enclosed are the construction drawings which have been approved by the ownership of the 620 Building."[48] The letter makes no mention of any plans that the landlord did not approve, indicating that Pacific 620 approved the entirety of the construction plans that Ross submitted to the City in June 1996. The Court draws the reasonable inference that the Failing Building landlord approved the entirety of Ross's submitted plans.

93.    Before Walker Place's purchase of the Failing Building in 2006, Walker Place undertook a due diligence process. As part of that process, Waterleaf Architects and T.M. Rippey Consulting Engineers analyzed the building for Walker Place. Walker Place also hired a property management group to do a "lease digest," analyzing the leases of all tenants in the Failing Building, including Ross.

---

[47] *See* Ex. 266.

[48] Ex. 267 at 1.

94.     After this due diligence process, Walker Place undertook structural repairs to the building. As part of the repairs, Walker Place installed a "shear wall" on the basement, first, and second floors of the Failing Building. The shear wall is a load-bearing wall that provides seismic support to the Failing Building. Because the concrete slab floors of the buildings are continuous and the columns of the buildings are connected, the shear wall in the Failing Building also provides some seismic support to the Richmond Building.

95.     At no time during the due diligence process or structural repairs did Walker Place notify Ross that Ross would be required to restore the occupancy capacity of the basement to pre-1996 levels.

96.     In October 2006, Ross and Walker Place's predecessor in interest entered into a Seventh Amendment to the 1956 Failing Lease. The Seventh Amendment stated, "Lease in Full Force and Effect."[49] On May 6, 2009, Ross and Walker Place entered into an Eighth Amendment to the Failing Lease. Again, the amendment stated, "Lease in Full Force and Effect."[50]

97.     On May 17, 2013, Brandon Anderson, the principal of Walker Place, sent a letter to Ross concerning Ross's separation obligations. The letter listed concrete masonry unit ("CMU") walls at the basement, first, and second floors as a separation requirement. The letter also discussed "[s]aw-cut[ting] and remov[ing] concrete slab-on-grade,"[51] which is the concrete floor at the basement level. This saw-cutting discussion was in the section of the letter in which Mr. Anderson discussed the installation of a new elevator pit. Mr. Anderson made no indication that he expected Ross to cut through the first and second floors in order to install a multi-story

---

[49] Ex. 95 at 1.

[50] Ex. 96 at 4.

[51] Ex. 11 at 4.

wall. The Court infers that Walker Place did not, in 2013, interpret the lease to require such a wall or even desire such a wall.

### 4.  Separating the Buildings

#### a.  Ross's Initial Separation Analysis

98.     In 2009, Ross began exploring how to comply with its separation obligations under the leases. A contractor, Camco Construction ("Camco"), began analyzing what types of walls Ross should construct. On March 16, 2009, Gen Grover of Camco sent an email to Ross's Vice President of Construction for the Portland area, Michael Post, stating, "I'm figuring double masonry walls because, if separated, one future owner may have the option to demolish 'his' building without the whole thing coming down."[52] Camco also came up with a list of work necessary to separate the Richmond Building from the Failing Building and an estimated cost for each work item.

99.     On June 11, 2012, Mr. Post forwarded the March 16, 2009 email from Mr. Grover to Ross's new Portland-area Vice President of Construction, Benjamin Wheeler. Mr. Post attached to the June 11, 2012 email the cost estimate that Camco had completed in 2009.

100.     On June 15, 2012, Dave Parry of Camco sent Mr. Wheeler an updated cost estimate for separating the Richmond Building from the Failing Building. The cost estimate included a masonry wall on both sides of the property line. The cost estimate also included a "saw cut" of the concrete slab floors and removal of the section of the slabs between the buildings. Camco estimated that cutting the concrete slabs would involve sawing through 400

---

[52] Ex. 547 at 1.

lateral feet of concrete. Both the sawing and removal of the concrete would cost an estimated $2,500.[53]

101.    On June 19, 2012, Mr. Wheeler responded to Mr. Parry that he "need[ed] creative ways (if they exist) to satisfy the lease but reduce the cost as much as possible."[54]

102.    On July 19, 2012, Mr. Wheeler sent his boss, John Haskins, an email summarizing the scope of work for separating the buildings. Mr. Wheeler stated that the work "include[d] reinstallation of masonry walls."[55]

103.    By the fall of 2013, Ross had stopped working with Camco in connection with the Richmond Building and Failing Building project. Instead, Ross hired MCG Architects ("MCG") to come up with construction plans for separating the buildings.

104.    On September 4, 2013, Mr. Wheeler emailed Brian Bowles at MCG. Mr. Wheeler explained that the Ross store in Portland "is specifically occupied in two separate buildings and we have a lease obligation to do a demising wall and utility split to return the space to two separate buildings."[56] Mr. Wheeler continued, "The wall is assumed to be a double masonry wall but [we] are open to not doing that if code allows."[57]

105.    On September 23, 2013, MCG completed a survey report describing an alternative to masonry walls. MCG proposed constructing metal stud gypsum walls.

---

[53] Ex. 548 at 1-2.

[54] Ex. 30 at 2.

[55] Ex. 551 at 1.

[56] Ex. 101 at 1.

[57] Ex. 101 at 1.

### b.  The Parties' Respective Separation Proposals

106.    MCG drew up a set of construction plans for Ross for separating the buildings. The plans include metal stud gypsum walls between the Richmond Building and the Failing Building instead of masonry walls. The plans do not include any provisions for severing the continuous concrete slab floors or removing or cutting the escalator beams. Ross submitted the plans to Defendants as Ross's proposal for separating the buildings.

107.    As an alternative to its metal stud gypsum walls, Ross now proposes metal stud gypsum walls with masonry veneer. A metal stud gypsum wall with a masonry veneer would not have masonry as the primary construction material.

108.    Defendants have proposed their own walls. Catena Consulting Engineers, an engineering firm hired by Defendants, came up with several options for separating the buildings. "Option A" is equivalent to the metal stud gypsum wall proposed by Ross but also involves severing the escalator beams that cross the property line. "Option B" calls for a masonry wall on both sides of the property line with severed escalator beams and a reinforced concrete shear wall that provides seismic support for the Richmond Building, similar to the shear wall in the Failing Building. "Option C" provides for the same features as Option B, but, in addition, Option C involves cutting through the concrete slab floors and columns, removing the concrete between the buildings, and thereby creating a 12- to 18-inch gap, or "seismic joint," between the Richmond Building and the Failing Building to ensure that the buildings meet current seismic code requirements. Options A, B, and C all call for three one-story walls at the basement, first, and second floor levels, rather than a single, continuous multi-story wall on both sides of the property line.

109.    In April 2016, Waterleaf Architects, the architecture firm hired by Defendants, came up with another option for separating the buildings. This option reflects the "best guess" of

PAGE 27 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

architect William Bailey, Defendants' expert, of what the parties to the 1956 leases meant by "masonry curtain walls." At trial, the parties referred to this option as the "1956 Fit" Option. The 1956 Fit Option entails cutting through the concrete slab floors and installing a single, multi-story masonry wall on both sides of the property line. Each wall would pass through the severed floors and would be positioned outside the steel framing of the buildings in the 19- to 28-inch gap between the buildings' columns.

110.    Mr. Bailey also discussed a "1956 Fit Plus" Option that would have all the features of the 1956 Fit Option plus severed escalator beams and a shear wall built in the Richmond Building. At trial, Defendants argued that the leases require this 1956 Fit Plus Option.

### c.    Comparison of the Proposals

111.    "Masonry" consists of modular block, such as brick or concrete masonry units (CMU), held together by mortar.

112.    Masonry walls have several advantages over light-weight, metal stud gypsum walls. First, masonry resists water intrusion better than gypsum board. The material on the outside of gypsum board is paper, which is subject to mold and decay. Masonry is not subject to such problems. Second, masonry is more secure than gypsum board. Unlike masonry, gypsum board can be penetrated with an inexpensive, hand-held jab saw. Third, masonry generally has superior acoustical properties to gypsum board, providing more sound-protection.

113.    Even when a metal stud gypsum wall receives a waterproofing finish, such as masonry veneer, that wall still does not have the same level of water resistance as a wall constructed entirely of masonry.

114.    Cutting the concrete slab floors is not a prohibitively expensive activity. Cutting the concrete floors could cost as little as $2,500. Such cutting could be done if and when either the Richmond Building or the Failing Building is demolished.

115.    Defendants' structural engineering expert, Christopher Thompson, testified that with the exception of separating the seismic loads of the buildings, cutting through the floors of the buildings offers no structural benefits.

116.    Both a multi-story, non-load-bearing, or non-structural, wall and a single-story, non-load-bearing wall may require footings where the wall reaches the grade, or the soil. "Footings" are features that support walls and keep the walls from sinking. A multi-story, non-load-bearing wall would require footings to support its weight. A series of single-story, non-load-bearing walls might or might not require footings depending on whether the walls are light enough for the floor plates to support the weight of the walls. Such a series of walls would require footings in the basement if the weight of the upper-story walls and construction design (such as the omission of deflection heads that prevent the structure above from putting a load on the non-structural wall) caused the weight to be transferred through the floor beams down to the wall in the basement. The installation of footings would require cutting the concrete slab floors at the basement level.

### d.  The Meaning of "Curtain Wall" in 1956

117.    In 1956, architects and engineers had the technology to construct both masonry and light-weight metal stud walls that are equivalent to modern metal stud gypsum walls. In 1956, architects and engineers also would have known the technology of veneers on the outside of walls.

118.    One of Ross's expert witnesses, Kevin Kaplan, testified that a curtain wall is an exterior wall that keeps the elements out of a building and the occupants in the building. Additionally, Mr. Kaplan testified that a curtain wall is a non-load-bearing wall. Another expert for Ross, Brian Bowles, also testified that a curtain wall is an exterior wall. Defendants' expert

witnesses, Mr. Bailey and Mr. Thompson, agreed that a curtain wall is an exterior, non-load-bearing wall.

119.    The 1942 Building Code of the City of Portland ("1942 Code") governed the construction of the Richmond Building and was in effect at the time the two 1956 leases were signed. The 1942 Code defines "curtain wall" as "a wall running between columns which carries its own weight but no other loads and extends through more than one story."[58]

120.    The Fifth Edition of *Architectural Graphic Standards* from 1956 depicts a curtain wall as an exterior outer-most wall extending through multiple stories. The curtain wall is wider at the base in order to accommodate the increasingly heavier load of the wall as it extends past multiple floors.[59]

121.    The *Architectural and Building Trades Dictionary*, published in 1950, defines "curtain wall" as "[a] thin wall, supported by the structural steel or concrete frame of the building, independent of the wall below."[60] This definition does not require that a curtain wall extend multiple stories.

122.    The *Dictionary of Architecture*, published in 1952, defines "curtain wall" as "a wall supporting no more than its own weight, the roof or floor above being carried by the framework of the structure."[61] This definition does not require that a curtain wall extend multiple stories.

---

[58] Ex. 169 at 6.

[59] Ex. 580 at 3.

[60] Ex. 279 at 4.

[61] Ex. 280 at 3.

PAGE 30 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

123.    The preponderance of the evidence supports the conclusion that in 1956, the term "curtain wall" meant simply an exterior, non-structural wall that supports only its own weight. In 1956, a curtain wall could either be multi-story or single story. Both types of curtain walls may require footings at the basement level.

### 5. The May 2015 State Court Forcible Entry and Detainer ("FED") Action

124.    In January 2015, Makarios served Ross with a notice of default, and in May 2015, Makarios commenced eviction proceedings in Oregon state court. Makarios's notice to Ross invoked Makarios's rights under § 7.01 of the 1956 Richmond Lease.

125.    The parties tried the case before Multnomah County Circuit Judge Jerry B. Hodson, and the trial lasted approximately six days. At trial, Makarios presented evidence of the condition of the Richmond Building.

126.    At the conclusion of trial on July 29, 2015, Judge Hodson determined that Makarios was not entitled to evict Ross and that Ross was entitled to retain possession of the Richmond Building until the end of the 1956 Richmond Lease.

### 6. Procedural Background

127.    Ross, Makarios, and Walker Place all filed motions for partial summary judgment in this case. The motions focused on Ross's separation obligations, including whether the severance provisions require "moving" the buildings apart and complying with current seismic codes, whether the judgment in the FED proceeding bars Makarios's § 16.01 claims based on issue or claim preclusion, whether Ross is obligated to restore allowable occupancy levels to the buildings' basements, and whether Ross has any evidence to support its affirmative defenses of waiver, laches, breach of contract, estoppel, and unclean hands.

128.    Regarding Ross's separation obligations, Defendants argued that the current Portland Building Code requires Ross to construct a seismic joint between the Richmond

PAGE 31 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Building and the Failing Building to ensure that the buildings meet current seismic requirements. According to Defendants, creating the joint would require Ross to sever and move existing columns and beams in the Richmond Building away from the Failing Building, such that when two masonry curtain walls are constructed in the space between the buildings, there is an additional 12 inches of space between the buildings.

129.    After hearing argument from the parties, the Court determined that the original parties to the 1956 leases intended that the buildings be separated by abutting masonry curtain walls that physically touch each other. The Court therefore granted Ross's motion on separation insofar as the leases do not require the elimination of shared lateral forces or the creation of a new joint or gap between the buildings.

130.    The Court ruled against Ross on its preclusion arguments. The Court held that the § 16.01 obligations are distinct from the § 7.01 obligations and therefore are not the same claim that Makarios pursued in the FED action. The Court also held that issue preclusion does not apply because the FED court did not rule on Ross's duties under § 16.01. Further, the Court determined that the FED action was limited to addressing the tenant's right to possession and did not fully address issues relevant to damages.

131.    The Court also determined that no statute of limitations bars Defendants' surrender claims because surrender obligations do not arise until the end of the respective leases.

132.    Additionally, the Court determined that Defendants consented to Ross's alterations to the basement that reduce the allowable level of occupancy and that such alterations do not constitute statutory waste.

133.    The Court ruled in favor of Defendants on all of Ross's affirmative defenses with the exception of waiver. The Court determined that Ross did not present evidence to support its

defenses of laches, estoppel, breach of contract, and unclean hands. In contrast, the Court held

that a genuine issue of material fact existed regarding Ross's affirmative defense of waiver.

134.    The parties proceeded to Phase I of the bifurcated trial to determine the extent of

Ross's obligations under the separation provisions of the 1956 leases, including, among other

things, (1) whether Ross's proposed walls are abutting masonry curtain walls with footings; and

(2) whether Ross correctly interprets the scope of its obligation to surrender the premises in

"good order, condition, and repair, except for reasonable wear and tear," as required by the

leases.

## CONCLUSIONS OF LAW[62]

### A.  Contract Interpretation Under Oregon Law

1.    In this case based on diversity jurisdiction, Oregon's substantive law governs. *See*

*Getlin v. Maryland Cas. Co.*, 196 F.2d 249, 250 (9th Cir. 1952) ("The case is in federal court by

diversity of citizenship only. The law of the state in which the court sits must apply."); *Snook v.*

*St. Paul Fire & Marine Ins. Co.*, 220 F. Supp. 314, 316-17 (D. Or. 1963) ("This being a diversity

case, jurisdiction is grounded on that fact and the [insurance] policy must be interpreted and

construed in accordance with the Laws of Oregon, the place where the contract was made.").

2.    Because the resolution of the parties' dispute turns upon the interpretation of a

phrase in the parties' leases, ordinary principles of contract interpretation apply. *Harold*

*Schnitzer Props. v. Tradewell Grp., Inc.*, 104 Or. App. 19, 23 (1990) ("Oregon treats a

commercial lease as a contract and, in the absence of a provision in the lease to the contrary,

---

[62] There can, at times, be a fine line between findings of fact and conclusions of law. A
court makes a conclusion of law whenever the trial court arrives at its conclusion by "the
selection and application of a rule of law to the established facts." *United States v. One Twin*
*Engine Beech Airplane*, 533 F.2d 1106, 1108 (9th Cir. 1976). "[T]he trial court's 'conclusions of
law' stand or fall according to legal rules." *Id.*

ordinary contract principles apply."). Under Oregon law, the "central issue" in interpreting a lease is "the intent of the parties *at the time of the execution of the lease*." *Stark St. Props., Inc. v. Teufel*, 277 Or. 649, 658 (1977) (emphasis added). In addition, the Ninth Circuit recently confirmed that the "'fundamental goal of contract interpretation is to give effect to the mutual intent of the parties *as it existed at the time of contracting*.' This fundamental axiom is widely accepted and uncontested." *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155, 1165 (9th Cir. 2015) (citation omitted) (emphasis in original).

3.      The leading Oregon case on contract interpretation is *Yogman v. Parrott*, 325 Or. 358 (1997). In *Yogman*, the Oregon Supreme Court established a three-step process for interpreting a disputed contractual provision. First, the court must determine whether, as a matter of law, the relevant provision is ambiguous. *Id.* at 361. A contractual provision is ambiguous if it can "reasonably be given more than one plausible interpretation." *Williams v. RJ Reynolds Tobacco Co.*, 351 Or. 368, 379 (2011). "The court must, if possible, construe the contract so as to give effect to all of its provisions." *Id.* Further, when construing a contract provision, the court is "not to insert what has been omitted, or to omit what has been inserted." Or. Rev. Stats. ("ORS") § 42.230; *see also Yogman*, 325 Or. at 361 (citing ORS § 42.230 at step one of the analysis).

4.      The analysis ends if the meaning of the provision is clear from the text and context of the contract. *Williams*, 351 Or. at 379-80. The court then applies the contractual term to the facts. *See Yogman*, 325 Or. at 361. If the provision is ambiguous, however, the court proceeds to the second step. *Id.* at 363. At the second step, the trier of fact examines extrinsic evidence of the contracting parties' intent and construes the contractual provision consistent with

that intent, if such a resolution can be determined. *Id.* Oregon follows the objective theory of contracts, and relevant evidence at step two may include actual "manifestations of intent, as evidenced by the parties' communications and acts." *Holdner v. Holdner*, 176 Or. App. 111, 120 (2001) (quotation marks omitted). If, after examining extrinsic evidence, the "provision remains ambiguous," the court applies appropriate maxims of construction at the third step. *Yogman*, 325 Or. at 364.

## B. Physical Separation of the Buildings at Surrender

### 1. Construction of "Masonry Curtain Walls"

5.    Both 1956 leases call for "masonry curtain walls" or "a masonry curtain wall" with footings at the time of separation. Both 1956 leases also call for making the buildings "entirely independent and self-sufficient." Ross argues that at the time of separation, the parties to the 1956 leases intended "masonry curtain wall" to mean a light-weight exterior wall, possibly covered with masonry veneer, that extends from the floor to the ceiling on each floor. Defendants argue that the parties intended exterior masonry walls, built entirely of brick or CMU, that are multi-story, extending continuously from the basement to the third floor.

6.    The Court begins at *Yogman* step one to determine whether the phrase "footings and masonry curtain wall(s)" is ambiguous. Other than calling for "entirely independent and self-sufficient" buildings, the leases offer no definition of the term "masonry curtain wall." The term "footings" also is left undefined. Because the text and context of the leases offer no further clarification of the meaning of "masonry curtain wall(s)" with footings and both sides offer reasonable interpretations, the Court finds that the lease provisions are ambiguous at *Yogman* step one.[63]

---

[63] In the Court's ruling at summary judgment, the parties called on the Court to interpret the terms "independent," "self-sufficient," and "structure" as used in the 1956 leases. To do so,

7.    The Court proceeds to step two of the *Yogman* analysis and examines extrinsic evidence of the original parties' intent. As discussed in the Court's Findings of Fact, the extrinsic evidence shows that in 1956, several different architectural definitions of "curtain wall" existed, such that a "curtain wall" could mean either a multi-story wall or several single-story walls. In 1956, however, a curtain wall had to be an exterior, non-structural wall that supports only its own weight. In the leases, although the original parties specified other types of work that they intended the tenant to do at separation, they did not specify what type of curtain wall they meant or wanted. Moreover, Defendants' course of dealing with Ross, as established through Catena's analysis, Mr. Bailey's reports, and Mr. Anderson's correspondence with Ross, indicates that Defendants did not understand the term "masonry curtain wall" in the leases to require a multi-story wall rather than a series of single-story walls, until litigation commenced.

8.    Defendants now argue that the original parties could not have intended a series of single-story walls because the leases call for a wall or walls with footings. According to Defendants, only a multi-story wall would require footings. As discussed in the Court's Findings of Fact, however, a series of single-story walls may require footings, which are elements of a building that support a wall at grade-level, depending on the weight and design of the walls. Further, regardless of whether a curtain wall is multi-story or one-story, footings provide additional support to the wall at the basement level.

9.    Defendants also argue that the leases require a single, multi-story wall for each building because the 1956 Richmond Lease requires a singular "masonry curtain wall."

---

the Court considered common dictionary definitions of the words from around the time the leases were signed at *Yogman* step one. *See* Dkt. 99 at 18-19. Here, because "footings" and "curtain wall" are more technical terms without ordinary meaning, the Court considers architectural dictionary definitions as extrinsic evidence at *Yogman* step two, rather than as part of the analysis of the text and context of the leases at *Yogman* step one.

According to Defendants, the use of the plural "walls" in the 1956 Failing Building Lease, which governed both properties at the time of execution, underscores that the tenant, Newberry, always understood that the Richmond Building and the Failing Building would each have its own curtain wall. In contrast, the 1956 Richmond Lease, executed after the 1956 Failing Lease and the sale of the Richmond Building to New York Life, concerned only one property and provides that the tenant must build *one* multi-story wall for an individual building. Defendants' argument is unpersuasive, however, because both the Newberry Deed and New York Life Deed use the plural term "curtain walls." Further, a wall system comprised of multiple floor-to-ceiling walls between two buildings could be described as a single "wall." Therefore, the Court concludes that the use of the singular term "curtain wall" in the 1956 Richmond Lease does not resolve the dispute.

10.    In light of the extrinsic evidence, the Court concludes that the parties intended a "masonry curtain wall" to be either a multi-story exterior, non-loadbearing wall *or* a series of single-story exterior, non-loadbearing walls on each floor, but constructed of masonry.[64] Use of the word "footings" indicates the parties' intent to ensure that the walls are sufficiently supported so as not to sink or put excessive weight on the buildings' framing. Footings can be used to support a series of single-story exterior, non-loadbearing walls at the basement level, and thus, the requirement that the tenant construct footings is consistent with either alternative. Because the Court concludes that the extrinsic evidence establishes that "curtain wall" includes both

---

[64] This definition is consistent with the definition relied upon by a New York court in *112 W. 34th St. Associates, LLC v. 112-1400 Trade Properties LLC*, 944 N.Y.S.2d 68 (N.Y. App. Div. 2012). There, the court used the following definition of curtain wall: "***a non-load bearing building wall, in skeleton frame construction attached and supported to the structure at every floor or other periodic locations***. Assemblies may include glass, metal, precast concrete or masonry elements arranged so as not to exert common action underload and to move independently of each other and the supporting structure." *Id.* at 73 (quoting NY City Building Code [Administrative Code of City of NY] § 1402.1) (emphasis added).

multi-story and single-story exterior walls with footings, the Court does not proceed to step three of *Yogman* to apply maxims of construction.

11.    The Court also examines extrinsic evidence regarding the meaning of "masonry." As discussed in the Court's Findings of Fact, "masonry" could mean brick, CMU, or brick veneer. Brick and CMU, however, are more weather-resistant, durable, secure, and sound-proof than even brick veneer. In light of the leases' specification that the buildings must be "entirely independent and self-sufficient," the Court concludes that the original parties intended the curtain walls to be constructed of the most weather-resistant, durable, secure, sound-proof material reasonably available, *i.e.*, masonry in the form of brick or CMU. A metal stud gypsum wall is not the modern equivalent of a masonry wall, nor is a metal stud gypsum wall with brick veneer. Moreover, Camco's initial separation analysis and Mr. Wheeler's emails indicate that Ross initially understood that a "masonry" wall meant a wall made entirely of masonry. The proposal for a gypsum wall was a cost-cutting measure that does not comply with the requirement for masonry curtain walls as provided for in the two leases. Based on this extrinsic evidence, the Court concludes that "masonry" means brick or CMU, but not brick veneer. Thus, the Court does not proceed to step three of *Yogman* to apply maxims of construction.

## 2.  The Concrete Slab Floors and Columns

12.    In § 16.02, the 1956 Richmond Lease requires the tenant to render the Richmond Building "an entirely independent and self-sufficient structure."[65] The Severance Clause of the Failing Lease also requires the tenant to render the Failing Building "entirely independent and self-sufficient."[66] Ross argues that in order to render the buildings entirely independent and self-

---

[65] Ex. 1 at 42.

[66] Ex. 301B at 4.

sufficient, Ross need only construct exterior walls without severing the concrete slab floors at the property line. Defendants argue that in order to render the buildings entirely independent and self-sufficient, Ross must sever the concrete slab floors at the property line, remove the concrete between the buildings, cut the concrete fireproofing around the buildings' columns, and remove the 19 to 28 inches of concrete fireproofing between the columns.

13.    At summary judgment, the Court determined that the text "entirely independent and self-sufficient" is unambiguous in the following respects: Ross must "separate" the buildings such that different owners may separately exercise complete control over each building. The term "entirely independent and self-sufficient" does not mean that that Ross must create a "joint" or gap between the buildings, must ensure that the Richmond Building and the Failing Building do not "touch," or must add lateral (horizontal) support sufficient to comply with current seismic regulations applicable to new construction.[67] The Court did not determine at summary judgment whether "entirely independent and self-sufficient" is unambiguous regarding the severing of the floors and the columns. That question must be addressed now.

14.    The Court again begins at step one of the *Yogman* analysis. The 1956 Failing Lease gives a non-exclusive list of work that must be done to render the building independent and self-sufficient. The list includes:

> removal of the escalators and the closing in of the openings in the floors and walls of the Failing Building which accommodate the same; construction of footings and masonry curtain walls along the easterly boundary line of the demised premises; and such appropriate alterations, changes and relocations of portions of the plumbing, electric, and other systems and apparatuses as may be necessary to make the "Failing Building" space independent of the "Richmond Building".[68]

---

[67] *See* Dkt. 99 at 20.

[68] Ex. 301B at 4.

15. The 1956 Richmond Lease gives a similar non-exclusive list of work that must be done, stating that is necessary for the tenant to complete:

> the removal of escalators, the construction of footings and a masonry curtain wall along the westerly boundary line of the demised premises, the removal of any facing encroaching upon adjoining premises, the removal of signs, the relocation of plumbing, drain pipes, sprinklers, electrical wiring, lighting fixtures and exhaust ducts, the installation of a new soil connection to the city sewer, a new steam connection and new electrical service conduits and equipment and provision for a new toilet and rest room.[69]

16. Although the list of work that must be done in order to make the buildings "entirely independent and self-sufficient" is explicitly non-exhaustive, the examples given indicate the type of work that the parties envisioned would be necessary to "separate" the buildings. The examples primarily concern the buildings' systems, such as the plumbing and electrical systems. Some of the items are mainly cosmetic in nature, such as "the removal of signs." The 1956 Failing Lease also states that the "space" of the two buildings must be "independent." In addition, in § 9.01, the 1956 Richmond Lease required Newberry to "make no structural alterations to the building or buildings now or hereafter erected upon the demised premises."[70]

17. The text and context of the leases and the terms used by the parties establish that the parties intended both the Richmond Building and the Failing Building to allow separate owners to exercise all the ordinary incidents of separate ownership. Such incidents of ownership would require separate heating, plumbing, and electrical systems, separate ingress and egress, and access to each floor via the building's own stairways or elevators. The requirement to have a

---

[69] Ex. 1 at 42-43.

[70] Ex. 1 at 20.

masonry curtain wall or walls indicates that each building must have its own functional space such that one building's exterior boundary clearly ends that building and the other building's boundary clearly begins. The text and context of the leases do not make clear, however, whether the ordinary incidents of separate ownership would include buildings that are disconnected or that do not share floors or any other structural features. Therefore, the Court concludes that the lease provisions are ambiguous regarding whether rendering the buildings "entirely independent and self-sufficient" requires severing the floors and columns and removing concrete between the buildings. The Court therefore proceeds to step two of the *Yogman* analysis to determine what the leases require.

18.    At *Yogman* step two, the Court examines the extrinsic evidence regarding whether the original parties intended that the buildings be severed, as Defendants urge.[71] Both parties to the 1956 Failing Lease negotiated the Newberry Deed. Both parties to the 1956 Richmond Lease negotiated the New York Life Deed. Because the deeds were negotiated at approximately the same time that the original parties negotiated the leases, the deeds provide some extrinsic guidance as to what the original parties intended by "entirely independent and self-sufficient." The deeds call for Newberry and its successors to ensure "completely separate buildings."[72] Despite this requirement, both deeds also provide for "common" foundations and footings "so

---

[71] The parties' course of dealings reveals little regarding whether they expected that the leases would require severing the floors. Mr. Anderson's correspondence with Ross on May 17, 2013, indicates that Walker Place did not, in 2013, contemplate saw-cutting the floors at all levels as a lease requirement. On the other hand, Camco's estimates for Ross and correspondence with Mr. Post and Mr. Wheeler suggest that Camco and Ross thought the leases might require saw-cutting portions of the floors. This evidence shows only mutual confusion about what the leases require.

[72] Ex. 107 at 2; Ex. 108 at 1.

long as [said] foundations and footings shall stand."[73] Further, the deeds expressly reserve easements for crossing the property lines to remove the escalators and the electrical, plumbing, and other systems, but do not allow for the removal of the common foundations or footings.

19.    Because the deeds call for the buildings to be completely separated and yet also allow for shared foundations and footings in perpetuity, the deeds indicate that achievement of complete physical separation does not preclude continuing to have shared features such as foundations and footings. If the buildings could share foundations and footings despite being physically separate, it is reasonable to infer that the buildings also could have continuous floors and still be separate. Moreover, despite reserving an easement for specific work such as removing the escalators that cross the property line, the deeds do not grant an easement for the specific work of severing the common floors.[74] This also is consistent with the 1956 leases' prohibition on any structural alterations to the building because cutting through a concrete floor would be a structural alteration.

20.    Additionally, Mr. Thompson testified that severing the floors of the buildings would confer no benefits beyond making the buildings independent for purposes of lateral (horizontal or seismic) support. As discussed in the Court's March 25, 2016 Opinion and Order,

---

[73] Ex. 107 at 1; Ex. 108 at 1.

[74] Conversely, the deeds do not grant an easement for the continued sharing of floors. Defendants argue that because the deeds do not grant such an easement, the deeds establish that the parties to the 1956 leases intended the floors to be separated. The deeds, however, concern what the original parties affirmatively wanted. The parties wanted the foundations and footings to remain in common, and the easements allow for this. At the end of Newberry or its successors' occupancy of the buildings, the parties wanted to have work such as the removal of the escalators completed, and the easements allow for this. The omission of any provision concerning the shared floors is consistent with the conclusion that the original parties neither affirmatively wanted the floors separated nor affirmatively wanted the floors to remain in common. The original parties were neutral on this matter and therefore left the building owners the option of either severing the floors or allowing the floors to stay connected.

however, in 1956, the original parties would have had no understanding of lateral forces.[75] The construction of the neighboring Caplan Building and Kress Building, which physically abut against the Richmond Building and the Failing Building, respectively, confirm that in 1956, the original parties would have had no objection to buildings having points of physical contact such that, in modern terms, the buildings are not "laterally" independent.

21.    The extrinsic evidence thus establishes that in 1956, the parties did not intend that "entirely independent and self-sufficient" would include severing floors and columns and removing the concrete between the buildings. With sufficiently durable exterior walls separating the buildings, the buildings may continue to have conjoined features and yet comply with the intent of the original parties. Accordingly, the Court concludes that the 1956 leases do not require Ross to slice the floors and columns and remove the 19 to 28 inches of concrete between the buildings.[76]

### 3. The Escalator Beams

22.    Both 1956 leases expressly require the tenant to remove the escalators that cross the property lines as part of the separation obligations. Both the Newberry Deed and the New York Life Deed reserve easements for the parties to remove the escalators. Ross argues that the requirements to remove the escalators and separate the buildings do not include removing the

---

[75] *See* Dkt. 99 at 19-23.

[76] Slicing the floors between the buildings is not currently a prohibitively expensive task. It could cost as little as $2,500. If Ross erects masonry curtain walls, however, slicing the floors will become impossible to complete without first tearing down the walls. Therefore, based on the implied covenant of good faith and fair dealing, Ross must give Defendants the option of severing the floors themselves before Ross constructs the required masonry curtain walls. If, however, Defendants elect to sever the floors before Ross constructs masonry curtain walls with footings, Defendants must bear the burden of any further regulatory requirements imposed by the City arising out of that decision by Defendants.

escalator beams. Defendants argue the opposite but would allow Ross to sever and support the beams instead of removing the beams entirely.

23.     Beginning at step one of *Yogman*, the Court examines the text of the leases. Nothing in the leases indicates that the beams supporting the escalators are separate and distinct from the rest of the escalators. A term is ambiguous only "if it is capable of more than one sensible and reasonable interpretation; it is unambiguous if its meaning is so clear as to preclude doubt by a reasonable person." *Deerfield Commodities, Ltd. v. Nerco, Inc.*, 72 Or. App. 305, 317 (1985). Under a plain reading of the leases, Ross's interpretation of the leases is not sensible or reasonable. A reasonable person would have no doubt that "removal of escalators" would include removal of the escalator beams. The Court concludes that the term "escalator" unambiguously includes the escalator beams and thus does not reach *Yogman* step two.[77]

24.     In the alternative, Ross argues that Defendants have waived the requirement that the tenant remove or sever the escalator beams. A waiver requires "the intentional relinquishment or abandonment of a known right." *Ionian Corp. v. Country Mut. Ins. Corp.*, 88 F. Supp. 3d 1187, 1199 (D. Or. 2015). A party's conduct may imply a waiver, but there must be

---

[77] Ross urges the Court to reach *Yogman* step two and consider extrinsic evidence of the parties' course of dealing. This extrinsic evidence consists of letters that Ross sent the landlords. According to Ross, the letters show that the parties did not consider the escalator beams part of the escalators. In a November 23, 2003 letter to the Calomiris family, Ross states that "Ross Stores is considering removing the escalators from the Richmond Building next year." Ex. 275 at 1. The letter does not specifically mention the escalator beams. Approximately five months later, the Calomiris family approved plans to "remove the escalator" by signing and returning a letter from Ross concerning "interior improvements that involve removal of the escalators." Ex. 277 at 2. A letter from Ross to the Failing Building landlord on February 18, 2004, also confirms that the Failing Building landlord knew that Ross was "completing improvements that involve removal of the escalator." Ex. 274. This extrinsic evidence does not, however, establish whether the parties had any further expectations about the removal of escalator beams twelve years later at the expiration of the leases on September 30, 2016. Moreover, the letters from Ross in 2004 state that Ross's work will "involve removal of the escalators," not that Ross considers the work to entail the complete removal of the entire escalator structures. Therefore, the extrinsic evidence does not support a different conclusion than the Court reaches at *Yogman* step one.

PAGE 44 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

a "clear, unequivocal, and decisive act." *Brown v. Portland Sch. Dist. No. 1*, 291 Or. 77, 84 (1981) (quoting *Waterway Terminals v. P. S. Lord*, 242 Or. 1, 26-27 (1965); *see also Bank of E. Or. v. Griffith*, 101 Or. App. 528, 536 (1990) ("[T]he intention to waive must clearly appear; it will not be inferred, except from a clear and unequivocal act manifesting an intent to waive.").

25.     Ross removed the majority of the escalator structures in 2004. At that time, Ross informed the landlords of its plans. The landlords did not object. The communications between Ross and the landlords do not, however, indicate, one way or the other, whether the landlords expected Ross to complete the removal of the escalators at the time of separation. If Ross remained uncertain of its obligations under the separation provisions, it could have asked and gained clarity, but it did not. The landlords' approval of part of Ross's end-of-lease obligations in 2004—specifically, the removal of the majority of the escalator structures—does not constitute unequivocal relinquishment of any other obligations under the 1956 leases, including removing the remaining parts of the escalator structures.[78] Accordingly, the landlords have not waived the requirement to remove or sever and support the escalator beams.

26.     At a minimum, the 1956 leases require removing the connection between the escalator beams that span the property line. To the extent that severing the escalator beams requires supporting the severed beams in order to ensure the structural integrity of the buildings, the leases require the tenant to complete that work.

---

[78] As discussed in more detail below, a tenant does not breach and a landlord cannot sue to enforce an end-of-lease obligation until the actual or anticipatory breach of that obligation. *See, e.g.*, *Cote v. A. J. Bayless Mkts., Inc.*, 128 Ariz. 438, 443 (Ct. App. 1981) (holding that a "covenant to surrender the premises in good repair at the end of the term could not be breached until the term ended").

### 4.   Summary and Remainder of Ross's Separation Obligations

27.     The 1956 leases require Ross physically to separate the Richmond Building from the Failing Building at the time of surrender by constructing either multi-story exterior, non-loadbearing walls on both sides of the property line or single-story exterior, non-loadbearing walls at the basement, first, and second floors on both sides of the property line. Further, these exterior curtain walls must be built entirely of brick or CMU and include footings at the basement level. Other than what may be necessary to install the footings at the basement level, the leases do not require Ross to sever the concrete slab floors or columns or to remove the concrete between the buildings. Ross must however, remove or sever and then provide adequate support for the escalator beams that cross the property line.

28.     Walker Place argues that "an entirely independent and self-sufficient" building also requires Ross to create a loading zone and a separate elevator bank for retail use in the basement, first, and second floors of the Failing Building. The Severance Clause of the 1956 Failing Lease does not, however, state that Ross must return a space or structure that satisfies all the needs of a future retail tenant.[79] Nor does the Severance Clause of the 1956 Failing Lease state that the space leased by the Ross in the Failing Building must be independent of other areas in the Failing Building, such as the elevator lobby, for purposes of vertical ingress and egress. Additionally, the evidence shows that the Failing Building did not, at the time of Newberry's construction in 1951, have its own loading zone and separate elevator bank for retail use on the

---

[79] The 1956 Failing Lease requires that the tenant use the Failing Building exclusively for "the sale of merchandise." Ex. 301B at 9. All improvements that the tenant makes must "befit a high-grade retail store." Ex. 301B at 6. The lease says nothing regarding whether the space that the tenant returns to the landlord at the end of the lease term must be suitable in every way for a future retail tenant once the space is made separate and independent from the Richmond Building.

basement, first, and second floors.[80] The 1956 leases thus do not require Ross to make these improvements to the Failing Building.

29.     The plain text of the 1956 leases requires the complete separation of all HVAC, electrical, gas, plumbing, and other systems in the two buildings. This means that each building must have functioning HVAC, electrical, gas, and plumbing systems that do not rely on the other building.

30.     The 1956 leases require Ross to do whatever "shall be necessary" to complete the above requirements for separating the buildings.[81] Section 4.02 of the 1956 Richmond Lease requires Ross to "cause compliance, with all laws and ordinances and the orders, rules, regulations and requirements of all federal, state, county and municipal governments . . . which may be applicable to the demised premises."[82] The 1956 Failing Lease requires Ross:

> to comply with and observe . . . all laws, ordinances, rules and regulations . . . pertaining to the leased premises, occasioned by or affecting the use of the leased premises by Lessee, except in so far as such laws, ordinances, rules and regulations may require structural changes in or additions or improvements to the foundation, exterior walls, roof or sidewalks thereof.[83]

---

[80] Walker Place argues that the 1946 Lease's use of the term "sidewalk elevator" establishes that the Failing Building had a loading zone in 1946. Ex. 301A at 1. The 1946 Lease, however, concerned both the original Richmond Building and the Failing Building, meaning that the term "sidewalk elevators" could refer to a loading area on either the original Richmond Building or Failing Building side of the property. Further, the parties do not dispute that at the time of the Failing Building renovation in 1951, the Failing Building did not have its own loading zone separate from the Failing Building. Regarding elevators, Mr. Bailey testified that in the early 1950s and when the original parties signed the 1956 Failing Lease, there was no elevator in the portion of the Failing Building leased by Newberry.

[81] Ex. 1 at 42; Ex. 301B at 4.

[82] Ex. 1 at 9.

[83] Ex. 301B at 9-10.

PAGE 47 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

It is possible that the City, in order to ensure compliance with current laws, ordinances, and regulations, may require additional work either before Ross can complete its separation obligations or as a result of the steps Ross takes to comply with its obligations. The text of the leases puts the burden of such compliance on Ross. Therefore, if the City—for reasons including insufficient restrooms, insufficient ingress or egress between floors, or seismic issues—will not approve separation plans that comply with the Court's Opinion and Order, Ross must satisfy the City's requirements in order actually to achieve the scope of work required by the 1956 leases.

**C.    Good Order, Condition, and Repair Obligations at Surrender**[84]

    **1.    When the Obligations Arise and May Be Enforced**

    31.    As discussed in the Court's March 25, 2016 Opinion and Order,[85] in general, a lessor can enforce an obligation to surrender the leased premises in good order, condition, and repair only when the obligation becomes due, which is at the end of the lease term.[86] *See, e.g.*, *Cote v. A. J. Bayless Mkts., Inc.*, 128 Ariz. 438, 443 (Ct. App. 1981) (holding that a "covenant to surrender the premises in good repair at the end of the term could not be breached until the term ended"); *Primock v. Jew*, 680 P.2d 1347, 1348 (Colo. App. 1984) ("The covenant to surrender

---

[84] Oregon appellate courts and the Ninth Circuit have not had many occasions to address the meaning of "good order, condition, and repair," "reasonable wear and tear," and "alterations" in the context of landlord-tenant disputes. In the absence of case law from Oregon and the Ninth Circuit, the Court considers the law of other jurisdictions for guidance in reaching its conclusions in Part C.

[85] *See* Dkt. 99 at 25-28.

[86] A party may also bring a claim for anticipatory breach of contract if the other "party to a contract clearly and unequivocally signifies before his performance is due that he will not perform." *Jitner v. Gersch Dev. Co.*, 101 Or. App. 220, 224 (1990). At that time, "the second party has the option of treating the contract as breached and bringing an action, without tendering performance or awaiting the time that the first party's performance would be due." *Id.* The parties have agreed that the doctrine of anticipatory breach does not apply in this case, and that portion of Defendants' counterclaims is dismissed.

the premises in good condition cannot be breached until the end of the term. Therefore, no action will lie against lessee until that time."); *Kantor v. Boise Cascade Corp.*, 75 Or. App. 698, 703 (1985) ("A cause of action for breach of contract accrues when the contract is breached."); *City Hotel Co. v. Aumont Hotel Co.*, 107 S.W.2d 1094, 1095 (Tex. Civ. App. 1937) ("[O]n a covenant to leave the premises in as good condition as he found them, no action will lie against the lessee until the end of the term, for obvious reasons."). Therefore, Ross's obligations to surrender the premises in good order, condition, and repair arise only at the end of the lease terms.

32.     Ross argues that by bringing the FED action, Makarios elected to pursue its remedies under § 7.01 of the 1956 Richmond Lease, relating to the conditions of the building during Ross's tenancy, and thus cannot now pursue a remedy under § 16.01 of the lease, which governs Ross's surrender obligations. Election of remedies applies to "the situation in which a plaintiff who has two or more available avenues to the same general relief pursues one to judgment." *Ladd v. Gen. Ins. Co.*, 236 Or. 260, 264 (1963). In such a situation, a plaintiff may thereafter be precluded from pursuing the other remedies. *Id.* Election of remedies bars subsequent litigation only in these situations "where initially there were two efficacious remedies." *Id.* Here, at the time of the FED action in 2015, the 1956 Richmond Lease had not expired, and therefore, Makarios could only pursue its remedy under § 7.01. The end-of-lease obligation to surrender the premises in good order, condition, and repair had not yet arisen. Accordingly, at the time of the FED action, Makarios did not have "two efficacious remedies," and the election of remedies doctrine therefore does not apply.[87]

---

[87] Ross argues that the FED action and the declaratory action in this Court constitute "two efficacious remedies." In support of its argument, Ross cites *City of Glenn Heights v. Sheffield Development Company*, 55 S.W.3d 158 (Tex. App. 2001). There, the court applied the election of remedies doctrine and held that the plaintiff could not recover both a judgment for monetary damages and a later declaratory judgment. *Id.* at 165. According to the court, the election of

## 2. Scope of the Obligations

### a. Whether the 1956 Richmond Lease Requires Ross to Maintain the Third through Fifth Mezzanine Floors in Good Order, Condition, and Repair

33.     Ross argues that although the original parties to the 1956 Richmond Lease intended the tenant to return the third through fifth mezzanine floors in good order, condition, and repair, Makarios and its predecessors in interest have waived that requirement. According to Ross, waiver occurred because the Richmond landlords knew or should have known that Ross was neither using nor maintaining the third through fifth mezzanine floors and yet took no action against Ross before the 2015 FED lawsuit. Regardless of whether Defendants waived any covenants to keep the leased premises in good order, condition, and repair during the term of the lease, covenants to surrender leased premises in good order, condition, and repair are separate and distinct contractual obligations. *See Cote*, 128 Ariz. at 442 ("Where the lease contains a covenant to repair and a covenant to leave in repair, the covenants are generally treated as independent covenants[.]" (quoting 49 Am. Jur. 2d *Landlord and Tenant* § 949 at 925 (1970)); *City Hotel*, 107 S.W.2d at 1095 ("The courts have uniformly observed a distinction between a covenant upon the part of a lessee to keep leased premises in repair, and a covenant to deliver up

---

remedies barred the plaintiffs' suit because the remedies sought were "inconsistent." *Id.* The plaintiff sought both damages from the City of Glenn Heights resulting from the City's passage of a new ordinance and a declaratory judgment permanently enjoining the City from enforcing that ordinance against the defendant's property. *Id.* The Court explained that these remedies were inconsistent in the same way that "the remedies of monetary damages for loss of property and restoration of full property rights are inconsistent." *Id.* (citing *Bayou Terrace Inv. Corp. v. Lyles*, 881 S.W.2d 810, 816-17 (Tex. App. 1994)). In contrast, the FED action and this declaratory action are not inconsistent. The FED action had the potential to give Makarios possession of the Richmond Building through the enforcement of § 7.01 of the 1956 Richmond Lease. In contrast, this declaratory action (and the remaining Phase II breach of contract action) redresses Makarios's separate and distinct rights under § 16.01 of the lease. The doctrine of election of remedies thus does not apply to Makarios as it did to the plaintiff in *Glenn Heights*.

PAGE 50 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

the premises at the expiration of the term in as good condition of repair as they were at the beginning of the term."). The waiver of one covenant is not sufficient to waive the other.

34.     Further, as previously discussed, waiver requires "the intentional relinquishment or abandonment of a known right." *Ionian Corp.*, 88 F. Supp. 3d at 1199. In a landlord-tenant dispute, inaction by either party "does not constitute the unequivocal manifestation required by the rule [of waiver]" when the inaction "can reasonably be attributed to other motivations as well as to a purpose to relinquish [the party's] legal right to object to [a violation of the lease]." *Guardian Mgmt., LLC ex rel. Villa v. Zamiello*, 194 Or. App. 524, 529 (2004). Here, Makarios's failure to notify Ross that it did not consider the building in good order, condition, or repair can reasonably be attributed to an intent to wait until the lease's end and require Ross to restore the premises under § 16.01.

35.     Ross also argues that waiver occurred because the lessors allowed Ross to renew its lease in 2006. Ross points to § 21.01 of the 1956 Richmond Lease as evidence that by renewing Ross's lease, the Richmond Building landlords waived any claim that the building is not currently in good order, condition, and repair. Section 21.01 allows the tenant to renew the lease if the tenant is not in default. Section 21.01 does not bar the landlord from waiving any default under § 7.01 and renewing the lease for reasons such as Ross timely pays its rent. Such a waiver, if it occurred, does not indicate that Ross will one day be in full compliance with its separate obligation to surrender the building in good order, condition, and repair. Therefore, the text of § 21.01 does not establish that Makarios relieved Ross of any surrender obligations by renewing the lease. Renewal of Ross's lease in 2006 indicates nothing about the landlord's intent to enforce § 16.01 on September 30, 2016, the date the last renewal expires. If Ross wanted to gain clarity about the implications of the 2006 renewal, it could have asked the landlord or

negotiated for a signed release of any claims. Ross instead chose to stay silent. As Ross's Group Senior Vice President of Property Development, Gregg McGillis, acknowledged during his testimony, "If you have an issue with anything, speak up, make your claim. Silence is not your friend."

36.     Additionally, Ross argues that Makarios has waived the requirement to surrender the premises in good order, condition, and repair because Makarios's predecessor did not raise any issues or advise Ross of any defaults during the 1996 bankruptcy proceedings. During the bankruptcy proceedings, however, Ross had the option of requiring Newberry to obtain an estoppel certificate from the landlords effecting a waiver of end-of-lease rights. Ross did not require such a certificate. Ross's own silence during the bankruptcy proceedings and failure to require an estoppel certificate cannot serve to prove that the lessor waived the § 16.01 surrender obligations. In many instances in this case, silence was nobody's friend.

37.     For these reasons, Makarios and its predecessors have not waived the requirement under § 16.01 of the 1956 Richmond Lease that Ross return the third through fifth mezzanine floors in good order, condition, and repair, reasonable wear and tear excepted.

### b. Whether the 1956 Failing Lease Requires Ross to Maintain the Sidewalk Vaults and Vent Stack in Good Order, Condition, and Repair

38.     Ross asserts that under the 1956 Failing Lease, the leased premises do not include the sidewalk vaults or the vent stack, and therefore, Ross has no obligation to maintain these items or to surrender them in good condition. The 1956 Failing Lease defines the "premises" as "certain space in the building known as the Failing Building."[88] Specifically, the lease specifies that the "premises" consists of:

---

[88] Ex. 301B at 2.

All of the first or ground floor of said building except the building entrance, elevator lobby, elevators and main stairway; all of the basement under said building except the space occupied by the heating plant and necessary space now used by Lessors in the operation and management of said building . . . ; and all of the second floor of said building except the portion thereof used for elevators and stairways.[89]

The lease further states that the tenant covenants to maintain and surrender the "leased premises in good condition."[90] The 1956 Failing Lease also provides:

The Lessors ***do not warrant to the Lessee a continued use of the open space under the sidewalks adjoining the leased premises***, but the Lessee shall have the use of this space and shall enjoy all the rights to such space as would accrue to the Lessors had they remained in full possession of the premises.[91]

39.    In its March 25, 2016 Opinion and Order, the Court concluded that the text of the 1956 Failing Lease was ambiguous concerning whether the "leased premises" includes the

---

[89] Ex. 301B at 2.

[90] Ex. 301B at 8-9.

[91] Ex. 301B at 9-10 (emphasis added). Under the rule of the last antecedent, "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). This grammatical "rule is not an absolute and can assuredly be overcome by other indicia of meaning." *Id.* But the Supreme Court finds it "quite sensible as a matter of grammar." *Id.* (quoting *Nobelman v. American Savings Bank*, 508 U.S. 324, 330 (1993)). Here, the limiting clause or phrase is "adjoining the leased premises." This limiting clause or phrase could modify either the noun immediately preceding it, which is "sidewalks," or the immediately preceding phrase, which is "the open space under the sidewalks." If only the sidewalks are "adjoining the leased premises," then the open space under the sidewalks (also known as the sidewalk vaults) may still be part of "the leased premises." On the other hand, if "the open space under the sidewalks" is "adjoining the leased premises," then the sidewalk vaults would not be part of the leased premises. Other than the landlord's grant of any use of the open space that the landlord would itself have, the 1956 Failing Lease contains no further indicia of whether the open space under the sidewalks, to which the tenant has access for retail or storage purposes, is included in "leased premises." Because the rule of the last antecedent could be used to interpret this lease provision in multiple ways, the term "the open space under the sidewalks adjoining the leased premises" is of little assistance to the Court in deciding whether the parties intended "leased premises" to include the sidewalk vaults.

sidewalk vaults and the vent stack. At summary judgment, the parties disputed the extrinsic

evidence, and the Court thus denied summary judgment and reserved these matters for trial.[92]

Therefore, at this stage, the Court continues its analysis at *Yogman* step two and examines the

extrinsic evidence introduced at trial to interpret what the original parties meant by "leased

premises."

40.     The evidence establishes that Ross has had continuous access to the sidewalk

vaults through the basement. Ross has also used the sidewalk vaults for storage. No barrier or

demarcation separates the sidewalk vaults from the rest of the basement. Nor is the heating plant

located in the sidewalk vaults. Although the sidewalk vaults are geospatially located under the

sidewalks rather than the building, for all practical purposes, including Ross's use of that area,

the sidewalk vaults are part of the basement. The Court therefore concludes that the parties to the

1956 Richmond Lease intended "all of the basement under said building" to include the sidewalk

vaults that could be accessed through and used as part of the basement. *See Tarlow v. Arntson*,

264 Or. 294, 300 (1973) ("How the original parties and their successors conducted themselves in

relation to the agreement is instructive in our determination of what must have been intended.").

Accordingly, Ross is obligated to return the sidewalk vaults in good order, condition, and repair,

reasonable wear and tear excepted. Because the Court concludes at *Yogman* step two that the

"leased premises" includes the sidewalk vaults, the Court does not reach *Yogman* step three.

41.     Regarding the vent stack, the evidence establishes that Ross's predecessor,

Newberry, used the vent stack, which originates on the second floor, to vent exhaust from a

lunch counter and several restrooms. No other tenant in the Failing Building, or any lessor at any

time in the building's history, used the vent stack. Ross therefore concedes that it is obligated to

---

[92] *See* Dkt. 99 at 42-45.

return the portion of the vent stack on the second floor in good order, condition, and repair, reasonable wear and tear excepted. Ross argues, however, that the "leased premises," defined as "certain space in the building," cannot include the portion of the vent stack that extends through the roof of the second floor and up the exterior of the building.

42.     Ross interprets "leased premises" as including only the interior space of the basement, first, and second floors, while Walker Place interprets "leased premises" to include all the equipment that originates on these floors and that the tenant exclusively used. Although the text of the lease is unclear, the extrinsic evidence sheds light upon the meaning of the "leased premises." The vent stack existed in 1951 when Newberry began renovating the Failing Building and continued to exist in the same form in 1956 when the parties negotiated the 1956 Failing Lease. Despite the existence of the vent stack, which extended up the Failing Building's exterior, the parties defined the leased premises as only "certain space *in* the building."[93] In light of the vent stack's existence in 1956, the omission from the lease of any discussion of equipment or areas *outside* the building is significant. The omission indicates that the parties did not intend that the leased premises include the part of the vent stack that is not physically located within the second floor of the Failing Building.

43.     Additionally, nothing in the parties' course of dealing suggests that the tenant had an obligation to repair the vent stack if the exterior vent stack was damaged at the third-floor level or above. The Failing Building landlords never requested repairs during Newberry's and Ross's tenancy. The tenant's continued use of the vent stack appears to be entirely optional, and, indeed, Ross never used the vent stack for any purpose. Therefore, the Court concludes at *Yogman* step two that the term "leased premises" does not include the external portion of the

---

[93] Ex. 301B at 2 (emphasis added).

vent stack above the second floor. Therefore, Ross is obligated to surrender only that internal portion of the vent stack within the second floor of the Failing Building in good order, condition, and repair, reasonable wear and tear excepted. The remaining portion of the vent stack is not part of the leased premises, and Ross has no obligation with regard to that portion.[94] Because the intent of the parties is clear at *Yogman* step two, the Court does not proceed to *Yogman* step three to apply relevant maxims of construction.

44.     For the same reasons that Ross has not shown that Makarios waived any surrender obligations, Ross has not shown that Walker Place waived any surrender obligations. These obligations include returning the sidewalk vaults and the portion of the vent stack on the Failing Building's second floor in good order, condition, and repair. Specifically, Ross has not presented sufficient evidence that Walker Place intentionally relinquished any of its rights. That the lessors allowed Ross to renew or amend the lease does not indicate that Walker Place or its predecessors intended to relieve Ross of any obligations on September 30, 2016, the date on which Ross must return the building. Additionally, just as Ross failed to obtain an estoppel certificate from the Richmond Building landlords, Ross failed to obtain such a certificate from the Failing Building

---

[94] Walker Place also argues that restoring the vent stack is part of Ross's obligations under the Severance Clause of the 1956 Failing Lease. The Severance Clause states that the tenant must "do and perform such work as shall be necessary to physically separate, and constitute entirely independent and self-sufficient," the Failing Building from the Richmond Building. This work includes "changes and relocations of portions of the plumbing, electric, and other systems and apparatuses as may be necessary to make the 'Failing Building' space independent of the 'Richmond Building.'" Ex. 301B at 4. According to Walker Place, a vent stack in good condition is an "apparatus" that is necessary for the Failing Building to be an independent space. The vent stack, however, vented exhaust from the lunch counter and restrooms in the 1950s. Modern buildings, including the Richmond Building, do not require such a 12-story vent stack in order to function as independent spaces. Therefore, the Severance Clause does not obligate Ross to restore the portion of the vent stack on the exterior of the building above the second floor.

landlords. Ross's own failure to discuss its end-of-lease obligations with the lessors does not prove that the lessors waived those obligations.

> ### c. Whether Decommissioned and Abandoned Portions of the Premises Constitute "Alterations" that Are Exempt from the Good Order, Condition, and Repair Requirements

45.     Ross argues that it is not required to restore alterations to which Defendants impliedly consented. According to Ross, these alterations include decommissioning a freight elevator in the Richmond Building and using it for spare parts, decommissioning the HVAC system in the upper floors of the Richmond Building, decommissioning restrooms, and otherwise abandoning the upper floors of the Richmond Building. "An alteration . . . denotes a substantial change" in the leased premises, *Ten-Six Olive, Inc. v. Curby*, 208 F.2d 117, 122 (8th Cir. 1953), or "a substantial change therein varying or changing the form or nature of such building without destroying its identity," *Leong Won v. Snyder*, 94 N.Y.S.2d 247, 249 (Sup. Ct. 1949). Courts have also defined "alteration" as a change in the "structural quality" of a building. *City of Le Mars v. Fisch*, 251 Iowa 149, 151 (1959). "In short, for a change in a building to constitute an alteration, the change must be substantial, not trifling. It must be one that alters the nature and character of the building." *Select Mgmt. Res., LLC v. Runnymede Corp.*, 273 Va. 710, 714 (2007).[95]

---

[95] In *Select Management*, 273 Va. 710, the Virginia Supreme Court expressly retreated from its opinion in *Bolin v. Laderberg*, 207 Va. 795 (1967). In *Bolin*, the court held that "alteration," when given its usual meaning and viewed in the context in which it is used in the lease, "can mean only something changed about the premises." *Id.* at 801. In contrast, the court in *Select Management* gave "alteration" a more narrow legal meaning that ordinarily excludes changes that are "merely cosmetic in nature." 273 Va. at 714. The *Select Management* court noted that the *Bolin* decision "provide[s] only limited assistance in defining the term 'alteration.'" *Id.* at 713. Ross cites the *Bolin* opinion in support of a broad definition of "alteration" without acknowledging the effect of *Select Management*.

46.     Installing air conditioning in a building does not constitute an alteration, *Leong Won*, 94 N.Y.S.2d at 249. Installing carpet and moving heating ducts also do not constitute alterations. *Le Mars*, 251 Iowa at 151. On the other hand, painting natural stone a bright yellow may be classified as an alteration. *Select Mgmt.*, 273 Va. at 712-15.

47.     Here, the purported "alterations" do not constitute substantial changes that vary the ***form or nature*** of the buildings. Instead, these more minor changes—including the decisions to decommission certain equipment and use it for spare parts—constitute only neglect and a failure to maintain and repair the premises as the leases require. That Ross did not include these changes to the buildings in the plans submitted to the City in 1996 confirms that these changes do not rise to the level of alterations.

48.     Ross had the option to defer maintenance through neglect, abandonment, or decommissioning equipment because the lessors did not insist on the tenant's continuing maintenance and repair. Now, however, Ross must comply with its independent surrender obligations to restore all floors and equipment of the leased premises to good order, condition, and repair, except for reasonable wear and tear. Ross cannot escape these obligations by arguing that its lack of conscientious stewardship constitutes an "alteration" to which the landlords impliedly consented.

49.     In its March 25, 2016 Order and Opinion, the Court found, in contrast, that zoning portions of the basements for "no occupancy" constituted an alteration to which the landlords expressly or impliedly consented.[96] The "no occupancy" designation was expressly shown on the plans that Ross submitted to the City during the 1996 remodel. Evidence introduced at trial further confirms that the landlords expressly or impliedly consented to the alterations.

---

[96] Dkt. 99 at 28-34.

50.    The evidence establishes that Walker Place's predecessor received copies of Ross's remodel plans in 1996 and approved them, thereby expressly consenting to that alteration. Because the 1956 Failing Lease does not require Ross to remove alterations to which the landlord consented, Ross is not obligated to restore the allowable occupancy level in the Failing Building basement. *See Fairway Outdoor Advert. v. Edwards*, 197 N.C. App. 650, 660 (2009) ("The lessee is not required to remove improvements made by him or her with the consent of the landlord or under authority of the lease, unless the lease so provides. . . ." (quoting 52A C.J.S. *Landlord and Tenant* § 884 (2003))).

51.    On the other hand, evidence introduced at trial shows that Makarios's predecessor did not receive copies of the plans or approve the plans during the 1996 remodel. When a tenant makes alterations to which the landlord consents, "the general rule is that in absence of a specific lease provision directing otherwise, a tenant has the right, but not the obligation, to restore the leased property to its original condition." *Fairway*, 197 N.C. App. at 660. The 1956 Richmond Lease does not expressly obligate Ross to restore alterations other than those that adapt the building for multiple occupancy.[97] Nonetheless, Makarios argues that because it never authorized alterations to the allowable occupancy level in the basement, Ross must restore the allowable occupancy level before surrendering the building. *See Trick v. Eckhouse*, 82 Ind. App. 196, 145 (1924) (holding that a tenant is liable for any damages caused by alterations to which the landlord did not consent); *Leventhal v. 128 W. 30th St. Corp.*, 158 N.Y.S.2d 398, 402 (Sup. Ct. 1956) (requiring the tenant to restore and reinstall the original light fixtures before surrendering the leased premises because the tenant made the alterations without the landlord's consent).

_____

[97] Makarios does not argue that the alterations to the Richmond Building adapted the building for multiple occupancy.

52.     The evidence establishes, however, that the Calomiris family had access to the building and to the publicly-filed plans and could have objected to the "no occupancy" designation at any time during the 1996 remodel. The Calomiris family did not object in 1996 despite this access, suggesting implied consent. "The cases generally hold that where, as here, the alterations were made with the landlord's knowledge and implied consent, the tenant has no implied obligation to restore the leased premises at the end of the term." *Lamonica v. Bosenberg*, 73 N.M. 452, 455 (collecting cases).

53.     Makarios argues that the implied consent cases are distinguishable because the Richmond Building landlord was located on the East Coast and did not have contemporaneous knowledge of the alterations. This case, however, closely resembles that of *Petrelli v. Kagel*, 235 N.Y.S.2d 383, 387 (Civ. Ct. 1962), where the court found implied consent even in the absence of evidence that the landlord knew about the alterations as they occurred. There, the court looked to the landlord's long silence and concluded:

> In view of the fact that some of the alterations were made at the commencement of the occupancy twenty-one years before and that the balance were made some seven years ago, and in the absence of any evidence of any action by the landlords or their predecessor to prevent them, either by remonstrance or legal action, there was at least an implied consent, which precludes any claim to restoration in the absence of any affirmative covenant.

*Id.* (citation omitted).

54.     Here, the Calomiris family had actual knowledge of the change in occupancy by at least 1997, as established by communications between the family's representative and Ross. After receiving notice that Ross considered the matter resolved in 1998, the Calomiris family remained silent regarding the occupancy issue until this litigation. Importantly, this silence was unbroken in 2004, when the City added Title 24 to the Code. The Calomiris family said nothing to Ross about the effect of Title 24 on Ross's surrender obligations or the lessor's expectation

PAGE 60 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

that Ross would restore the pre-1996 occupancy capacity of the basement by completing seismic upgrades. If not before, Makarios's predecessor impliedly consented to the basement alterations by silently standing by after 1998, as the Code significantly changed in 2004, and for the remaining decade until Ross brought this declaratory action. Just as silence did not aid Ross, silence worked against Makarios. Therefore, Ross is not obligated to restore the occupancy level of the basement, but "implied consent by the landlord, . . . although excusing the tenant from any requirement to restore, does not excuse the tenant from leaving the premises in good order and condition, reasonable wear and tear and damage from the elements excepted." *Id.*

55.     For the same reasons as discussed above, Defendants have not waived the requirement to surrender any neglected or decommissioned portions of the premises in good order, condition, and repair, except for reasonable wear and tear.

### 3. Meaning of "Good Order, Condition, and Repair, Except for Reasonable Wear and Tear"

56.     Both 1956 leases are triple-net leases that require the tenant, not the landlord, to bear "responsibility for taxes, insurance, and maintenance of the property." *Swenson v. Mills*, 198 Or. App. 236, 239 (2005). The 1956 leases also require the tenant to surrender the buildings in good order, condition, and repair, except for reasonable wear and tear.[98] A "wear and tear" provision contemplates some deterioration over time and does not require that a tenant to return premises in a like-new or nearly-new condition. *Capitol Funds, Inc. v. Arlen Realty, Inc.*, 755 F.2d 1544, 1549 (11th Cir. 1985). Provisions relating to maintenance and restoration also "must take into account not only the age of the property but the nature of it," such as whether the property is "constantly exposed to the elements and subjected to heavy and daily blows." *Black & Yates, Inc. v. A. R. Fuels, Inc.*, 210 N.Y.S.2d 171, 173 (1960).

---

[98] *See* Ex. 1 at 41; Ex. 301B at 8-9.

57.    Nonetheless, the line between reasonable wear and tear and damages that a tenant must remedy is crossed "[w]hen an older property is neglected" such that "problems soon escalate out of control." *In re Evergreen Ventures*, 147 B.R. 751, 760 (Bankr. D. Ariz. 1992). In these circumstance, "'[m]ere wear and tear' proliferates into vast problems requiring hundreds of thousands of dollars to cure," and the tenant can be held liable for these problems. *Id.*[99]

58.    Here, the surrender provisions, taken together with the other lease provisions, require Ross to return the buildings in as good a condition as they would have been in, taking into account their age, ***but for*** the tenant's failure to perform the regularly-scheduled maintenance, repairs, and replacements reasonably required by the leases throughout the sixty-year terms. *See Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 106 Wash. 2d 826, 838-41 (1986) (affirming a trial court's determination that surrendering leased premises in "as good state and condition as reasonable use and wear and damage by fire will permit" means that "no component or element of the building which was required to be returned at the termination of the Lease be in a state or condition beyond (substandard to) its normal maintenance cycle").[100]

---

[99] Ross argues that this case is distinguishable because it involved a lease for an apartment complex that was not fully depreciated. These facts do not, however, meaningfully distinguish the case from the circumstances surrounding Ross's tenancy. Ross, like the tenant in *Evergreen*, is liable for any damage to the premises that exceeds ***reasonable*** wear and tear, or that could have been avoided by conscientious and reasonable maintenance and repair.

[100] Ordinarily, a covenant relating to good order, condition, and repair "does not include the restoration of a part of a building which has become so run-down that it cannot be repaired." *Scott v. Prazma*, 555 P.2d 571, 579 (Wyo. 1976) (involving a ten-year lease that had approximately seven and a half years to run at the time the tenant quit the premises). This general rule, however, does not apply in the case of a long-term commercial lease that contains covenants relating to good order, condition, and repair. Such a lease incorporates an understanding that the leased premises will be kept or returned in a "serviceable" condition. *Capitol Funds*, 755 F.2d at 1549 (quoting the trial court opinion). Keeping or returning the leased premises in a "serviceable" condition after decades of use means that the tenant "assume[s] the risk under the contract that major elements of the premises, such as the roof, would require replacement—rather than repair—before the term of the lease expired." *Id.* Here, the 1956 Richmond Lease was for a term of 30 years, renewable. Ex. 1 at 2. The 1956 Failing

59.     Ross had the option to put off regularly-scheduled maintenance. Ross had this option because the lessors did not insist on enforcing the obligation to maintain the premises in good order, condition, and repair during the lease terms. Reasonable wear and tear, however, does not include deterioration that results from deferred maintenance. Although Ross had the option of when to perform its obligations, "Time will have his fancy / To-morrow or to-day."[101]

## CONCLUSION

Based on the evidence presented at the Phase I trial and the record in this case, the Court DENIES IN PART AND GRANTS IN PART the requests for declaratory relief of Ross, Makarios, and Walker Place. Although Ross's modified plans to separate and surrender the buildings are insufficient to meet the requirements of the two leases at issue, Ross is not obligated to perform the full scope of work that Defendants demand. The Court retains jurisdiction to address in Phase II of these proceedings any matters that may still require resolution by the Court.

**IT IS SO ORDERED**.

DATED this 10th day of June, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

---

Lease was for a term of 36 years, renewable. Ex. 301B at 3. Accordingly, because Ross entered into long-term commercial leases containing covenants to return the buildings in good order, condition, and repair, expect for reasonable wear and tear, Ross must, as part of its surrender obligations, replace items that have become so run-down that they cannot be repaired.

[101] W.H. Auden, *As I Walked Out One Evening* (1940).

PAGE 63 – FINDINGS OF FACT AND CONCLUSIONS OF LAW