# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ROSS DRESS FOR LESS, INC.**, | Case No. 3:14-cv-1971-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **MAKARIOS-OREGON, LLC**, | |
| Defendant. | |

Gregory D. Call and Tracy E. Reichmuth, CROWELL & MORING LLP, 3 Embarcadero Center, 26th Floor, San Francisco, CA 94111; Joel A. Parker, Rebecca A. Boyette, and Jessica Schuh, SCHWABE WILLIAMSON & WYATT PC, 1211 SW Fifth Avenue, Suite 1600, Portland, OR 97204. Of Attorneys for Plaintiff.

Jeffrey M. Edelson, Molly K. Honoré, Dallas DeLuca, Paul S. Bierly, and Vivek A. Kothari, MARKOWITZ HERBOLD PC, 1211 SW Fifth Avenue, Suite 3000, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff Ross Dress for Less, Inc. ("Ross") has moved for partial summary judgment against the first two supplemental counterclaims asserted by Defendant Makarios-Oregon, LLC ("Makarios"). These counterclaims relate to Ross' lease of commercial space in the Richmond Building in downtown Portland, Oregon. Under a 1956 lease and its amendments (collectively, the "Richmond Lease") (ECF 61-1), Ross was the successor-in-interest to the original lessee, and

Makarios was the successor-in-interest to the original lessor. The lease expired on September 30, 2016. Ross vacated the Richmond Building on or about that date. Makarios' first and second supplemental counterclaims allege that Ross failed to return the Richmond Building in the condition required under Section 16 of the Richmond Lease.[1] As a result, Makarios alleges, Ross has both breached an express term of the lease (first supplemental counterclaim) and breached the implied covenant of good faith relating to the lease (second supplemental counterclaim).

Ross asserts that it first learned in 2017 that Makarios is not, and never has been, the owner of the Richmond Building. Instead, from June 30, 2011, through September 2017, the legal owners of the Richmond Building have been Charles W. Calomiris, Katherine Calomiris Tompros, and Jenifer Calomiris (collectively, the "Calomiris Siblings"), as tenants in common. Among other things, Ross argues that only the actual landowners, the Calomiris Siblings, may assert the claims at issue in the pending motion because the covenants on which those claims are based "run with the land" and the Calomiris Siblings never transferred ownership of the Richmond Building to Makarios. In response, Makarios argues that after a covenant that runs with the land is breached, the cause of action arising from that breach may freely be assigned separate from the land itself and that Makarios received at least one and possibly two valid assignments from the Calomiris Siblings. The first assignment was in 2011 (before the alleged breach), and the second assignment was in 2018 (after the alleged breach). Thus, according to Makarios, it may properly assert its supplemental counterclaims against Ross. Because under

---

[1] Makarios also alleges that Ross failed to return the Richmond Building in the condition required under Section 7.01 of the Richmond Lease. Section 7.01, however, describes the lessee's obligations to maintain and repair the leased premises and prevent waste during the term of the lease. Because the lease has expired, the lessee's obligations under Section 7.01 will be treated as having merged into its return obligations under Section 16, and the Court will refer only to Section 16 in this Opinion and Order.

modern real property law, causes of action arising from a breach of a covenant that runs with the land are freely assignable post-breach, the Court agrees with Makarios.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

### A. Procedural History

This case originally involved a dispute over a lessee's obligations upon the expiration of two leases, negotiated in 1956, with two separate landlords for two conjoined buildings in downtown Portland. One building is known as the "Richmond Building." The other is known as the "Failing Building." The Richmond Building is located at 600 SW Fifth Avenue, Portland, Oregon; the Failing Building is located at 620 SW Fifth Avenue.

The two leases, as amended and extended, spanned more than 50 years. They ultimately expired on September 30, 2016. The original lessee of both buildings was J.J. Newberry Co. ("Newberry"). In 1996, Ross became the successor-in-interest to Newberry for both leases. After various assignments, Makarios and Walker Place, LLC ("Walker Place") became the successors-in-interest to the original lessors of the Richmond and Failing Buildings, respectively.

In December 2014, Ross filed this lawsuit, seeking a judicial declaration that Ross' proposed plans upon the expiration of the leases would satisfy Ross' obligations under the leases, including Section 16 of the Richmond Lease. Makarios and Walker Place asserted counterclaims, seeking both a judicial declaration clarifying the extent of Ross' end-of-lease obligations and money damages for breach of contract. All three parties moved for partial summary judgment, which the Court granted in part and denied in part on March 25, 2016. *Ross Dress For Less, Inc. v. Makarios-Oregon, LLC*, 180 F. Supp. 3d 745 (D. Or. 2016). The parties then agreed to bifurcate this lawsuit. In Phase I, the Court held a bench trial to determine the extent of Ross' end-of-lease obligations, resulting in the Court's written Findings of Fact and Conclusions of Law, issued on June 10, 2016. *Ross Dress for Less, Inc. v. Makarios-Oregon*, LLC, 191 F. Supp. 3d 1189 (D. Or. 2016).

On September 6, 2016, Ross moved for an order determining whether Ross, over the objections of Makarios and Walker Place, could remain on the premises of the two buildings after the leases expired to complete any work still needed to surrender the premises in the condition required under the leases. On September 27, 2016, the Court ruled that after the leases expire on September 30, 2016, neither Ross nor its agents could enter or remain on the premises of the Richmond or Failing Buildings over the objection of Makarios or Walker Place, respectively. *Ross Dress for Less, Inc. v. Makarios-Oregon, LLC*, 210 F. Supp. 3d 1259

(D. Or. 2016). On April 3, 2017, both Makarios and Walker Place filed supplemental counterclaims against Ross, to be resolved in Phase II. Several months later, Ross and Walker Place settled their dispute, and Walker Place is no longer a party in this action. On December 26, 2018, Makarios filed its Second Supplemental Counterclaims for Phase II, restating its three supplemental counterclaims. ECF 306.

As its first supplemental counterclaim, Makarios alleges that the Richmond Lease expired on September 30, 2016, and that Ross vacated the Richmond Building on or about that date but failed to return the premises in the condition required under Section 16 of the Richmond Lease. Makarios seeks money damages for, among other things, "costs of the required work and repairs, architectural, engineering, and other professional fees, legal fees, permit fees, inspection fees, and fees and costs associated with bringing the Richmond Building to the condition required by the Richmond Lease." ECF 242, ¶¶ 11-12; ECF 306, ¶ 13. As its second supplemental counterclaim, Makarios alleges breach of the implied covenant of good faith and fair dealing and seeks "damages in an amount to be proved at trial." ECF 242, ¶ 19; ECF 306, ¶ 24.[2] As its third supplemental counterclaim, Makarios alleges that Ross breached the rental payment obligations contained in the Richmond Lease and owes Makarios $48,166.61 in unpaid rent through the end of the lease period. ECF 242, ¶¶ 22-25; ECF 306, ¶33.[3]

---

[2] Makarios' second supplemental counterclaim is based on the same operative facts that underlie its first supplemental counterclaim. Accordingly, for purposes of the issues presented in the pending motion, the two claims may be treated together.

[3] Makarios' third supplemental counterclaim is not at issue in the pending motion.

**B. The Ownership of the Richmond Building, the Lease, and the Related Assignments**

   **1. Building Ownership from 1956 Through 2017**

On September 24, 1956, New York Life Insurance Company ("NYLI"), as owner and landlord of the Richmond Building, leased a portion of that building to Newberry for a term of 30 years, with rights of renewal. ECF 276-1. On September 23, 1986, NYLI sold the Richmond Building to William Calomiris. ECF 261-5, at p. 36. In approximately 2000, William Calomiris passed away. Under the terms of his will, the Richmond Building was bequeathed to his wife, Mary Calomiris, in fee simple absolute. ECF 261-5, at p. 30. On September 5, 2001, Mary Calomiris disclaimed one-half of her interest in the Richmond Building to the William Calomiris Marital Trust Under the Will of William Calomiris. *Id*. On December 1, 2001, the Estate of William Calomiris, as grantor, deeded its interest in the Richmond Building in fee simple to the William Calomiris Marital Trust and to Mary Calomiris individually. *Id*.; *see also id.* at 34 (correcting personal representatives' deed as of August 15, 2002).

On June 17, 2011, the William Calomiris Marital Trust granted its remaining interest in the Richmond Building to Mary Calomiris. ECF 261-5, at p. 21. Thus, at that point, Mary Calomiris owned the Richmond Building in fee simple as sole owner. Less than two weeks later, on June 30, 2011, Mary Calomiris, as grantor, deeded the Richmond Building in fee simple to Katherine Calomiris Tompros, Jennifer Calomiris, and Charles W. Calomiris (*i.e*., the Calomiris Siblings), as tenants in common, each with a one-third interest. ECF 261-5, at p. 14. From June 30, 2011, until September 22, 2017, the Richmond Building was owned in fee simple by the Calomiris Siblings.

On September 22, 2017, the Calomiris Siblings sold the Richmond Building to MDI Alder Street, LLC for $4.5 million. ECF 261-5, at 8. On that same day, September 22, 2017, MDI Alder Street, LLC deeded to the Richmond Building to an entity known as "Richmond

Building, LLC." ECF 261-5, at 1. Based on this record of ownership, Makarios-Oregon, LLC

never owned the Richmond Building, including on September 30, 2016, when Ross vacated that

building. At that time, the Richmond Building was owned by the Calomiris Siblings.

### 2. The 2011 Assignment of the Lease and Related Security Deposits

The only interest related to the Richmond Building held by Makarios-Oregon, LLC

before the expiration of the Richmond Lease arose under an Assignment and Assumption

Agreement dated July 27, 2011 (the "2011 Assignment"). ECF 261-6. This document was

entered into among Mary Calomiris, Charles W. Calomiris, Katherine Calomiris Tompros, and

Jenifer Calomiris (collectively described in the 2011 Assignment as "Assignor"), on the one

hand, and Makarios-Oregon, LLC (described in the 2011 Assignment as "Assignee") on the

other.

In relevant part, the 2011 Assignment provides:

> Assignor, by and through Makarios, LLC[4] which is owned by
> Assignor, hereby transfers, conveys, and assigns to Assignee
> [Makarios-Oregon, LLC] all of their right, title, and interest in, to
> and under *the Leases and Security Deposits* with respect [the
> Richmond Building] 600 SW 5th Avenue, Portland, OR, as such
> property is more particularly described in Exhibit A, to Assignee,
> including, all but not limited to, all rights, obligations, claims, and
> causes of actions.

ECF 261-6, at p. 1 (emphasis added). Thus, Makarios-Oregon, LLC never acquired any

ownership interest in the Richmond Building, only an assignment of the Richmond Lease and its

related security deposits.

---

[4] According to the 2011 Assignment, the sole member of Makarios-Oregon, LCC was
Makarios, LLC. The 2011 Assignment also recites that the "Assignor holds legal title for the
benefit of Makarios, LLC, a District of Columbia limited liability company owned by Assignor."
ECF 261-6, at p. 1.

### 3. Makarios-Oregon, LLC's Representations about the Richmond Building

On numerous occasions, both in this lawsuit and in a related state court FED action, Makarios represented that it was the owner of the Richmond Building. On May 26, 2015, Makarios represented in its Commercial Eviction Complaint, filed in the FED action in Oregon state court, that Makarios-Oregon, LLC "is the owner of the Richmond Building." ECF 261-14, at p. 1. On February 1, 2016, in its motion for partial summary judgment in this federal action Makarios asserted that Makarios-Oregon, LLC "owns" the Richmond Building. ECF 57, at p. 6.

On April 15, 2016, in its proposed findings of fact and conclusions of law, submitted after the Phase I bench trial in this action, Makarios represented that the "Richmond Building is owned by defendant Makarios-Oregon, LLC." ECF 139, at p. 4. Makarios added that Makarios-Oregon, LLC "is an Oregon limited liability company, owned by members of the Calomiris family." *Id*. Also on April 15, 2016, in its Phase I trial brief, Makarios represented that Makarios-Oregon, LLC is the "current owner" of the Richmond Building. ECF 162, at p. 8.[5] All of these representations by Makarios-Oregon, LLC were false, although the Court accepts Makarios' representation that this was not intentionally done.

### 4. The Sale of the Richmond Building in 2017

On March 15, 2017, Makarios-Oregon, LLC signed a letter of intent with Mortenson Development, Inc. ("Mortenson"), reciting the terms under which Makarios would sell the Richmond Building to Mortenson or its assigns for $4.5 million. ECF 261-2. When the final purchase agreement was signed, however, which resulted in the sale of the Richmond Building to Mortenson for $4.5 million, the actual sellers were identified as Charles W. Calomiris, Katherine

---

[5] In addition, on October 17, 2016, Makarios' counsel stated to the City of Portland: "I represent Makarios-Oregon, LLC, the 100% owner of the Richmond Building at 601 SW Fourth Avenue." ECF 261-1, at p. 1.

Calomiris Tompros, and Jenifer Calomiris (*i.e.*, the Calomiris Siblings), not Makarios-Oregon, LLC. ECF 261-3. Also, the statutory warranty deed for the Richmond Building, dated September  22, 2017, identified the grantors as Charles W. Calomiris, Katherine Calomiris Tompros, and Jenifer Calomiris. ECF 261-4; ECF 261-5 at 8.

Even before title was formally transferred by Charles W. Calomiris, Katherine Calomiris Tompros, and Jenifer Calomiris to Mortenson's company, MDI Alder Street, LLC, Mortenson entered into an agreement on August 23, 2017, to sell the Richmond Building for $5.25 million to Edmund Eliott LLP, an entity owned by Brandon Anderson, a principal of Walker Place. ECF 261-13 at Tr. 4:8-11; 93:21-94:23. On September 22, 2017, the Calomiris Siblings sold the Richmond Building to MDI Alder Street, LLC. ECF 261-5 at p. 8. Almost immediately thereafter, MDI Alder Street resold the Richmond Building to an entity known as "Richmond Building, LLC." ECF 261-5, at p. 1. After the sale documents for the Richmond Building were recorded, they were produced in discovery in December 2017 to Ross by Makarios-Oregon, LLC. According to Ross, that is when Ross first discovered that Makarios-Oregon, LLC never owned the Richmond Building. ECF 259 at 9.

## C.  Ross' First Motion for Partial Summary Judgment

On March 22, 2018, Ross filed a motion seeking summary judgment on Makarios' first two supplemental counterclaims. Ross argued that because Makarios never owned the Richmond Building, Makarios could not have suffered any damages caused by Ross' alleged failure to return the Richmond Building at the expiration of the lease in the condition demanded by the lease. ECF 259. In the alternative, Ross requested leave to add the Calomiris Siblings as parties in this action to avoid the possibility of Ross incurring double or multiple liability.

The Court denied Ross' motion for summary judgment against Makarios' counterclaims, holding that

Ross's contractual obligations under the Richmond Lease may be enforced either by the lessee (Makarios) or by the third-party beneficiary (collectively, Charles W. Calomiris, Katherine Calomiris Tompros, and Jenifer Calomiris, as tenants-in-common). Makarios, however, cannot recover damages suffered by the beneficiary, but may recover for any damages foreseeably and proximately caused to Makarios itself. As previously discussed, Ross is not asking the Court at this time to determine the proper measure of any damages foreseeably and proximately caused to Makarios itself. It is possible that because Makarios' interest is only as an assignee of the lease (and the related security deposits), Makarios may have no economic interest in the performance of the lease after it expires. In that case, Makarios may be entitled to no more than nominal damages, but that is a matter for another day.

ECF 271. The Court conditionally granted Ross' motion to add the Calomiris Siblings as parties in order to avoid the possibility of incurring multiple liability. The Court held:

> Unless Charles W. Calomiris, Katherine Calomiris Tompros, and Jenifer Calomiris all file with the Court not later than June 15, 2018, a written statement unambiguously, unconditionally, and irrevocably disclaiming any interest in personally seeking any recovery from Ross related to the Richmond Lease or the Richmond Building, Ross has leave to file, not sooner than June 18, 2018, a supplemental complaint adding Charles W. Calomiris, Katherine Calomiris Tompros, and Jenifer Calomiris as additional declaratory judgment defendants.

ECF 271.

## D. The 2018 Assignment of the Calomiris Siblings' Rights and Claims

On June 25, 2018, the Calomiris Siblings filed a "Notice of Assignment and Disclaimer of Rights" ("2018 Assignment"). ECF 276. In that Assignment, the Calomiris Siblings, as Assignors,

> unequivocally and subject to the terms of paragraph 4 below irrevocably transfer, convey, and assign to [Makarios] all assignable rights arising out of or relating to the Property, or arising under the Lease, including, but not limited to, all rights, duties, obligations, title to, interest in, claims, causes of action, and choses in action that Assignor currently has and may have in the future against Ross. This assignment specifically includes, but is not limited to, any reversionary rights or third-party beneficiary rights as owners of the Property to seek damages, costs and attorney fees for Ross's failure to meet its surrender obligations

under the Lease, i.e. separation and good-order-and-repair obligations under Section 16.

ECF 276. Paragraph 4 of the 2018 Assignment states:

> Assignors disclaim all rights assigned herein; provided, however, should Ross claim that this assignment is not effective, and should a court of competent jurisdiction determine that any portion of this assignment is ineffective, such unassignable portion(s) shall revert to Assignors, who shall then have the right to prosecute such claims against Ross.

*Id.* The 2018 Assignment also referenced the previous 2011 Assignment and Assumption Agreement, stating:

> It was Assignors' intent to assign to Assignee all of their rights arising under the Lease that are assignable under applicable law. Ross has argued in the Lawsuit that Assignors did not properly assign their so-called reversionary rights or third-party beneficiary rights as owners to seek damages, costs and attorney fees for Ross's failure to meet its surrender obligations under the Lease, *i.e.* separation and good-order-and-repair obligations under Section 16. The purpose of this document is to eliminate any possible ambiguity on this issue.

*Id.* After the 2018 Assignment, Ross filed the pending motion for partial summary judgment, which is Ross' second motion for partial summary judgment. ECF 282.

## DISCUSSION

Ross makes four arguments for why it is entitled to summary judgment as to the first two supplemental counterclaims asserted by Makarios-Oregon, LLC. First, Ross argues that covenants to surrender leased property in a certain condition, specifically Section 16 of the Richmond Lease, "run with the land" and therefore cannot be transferred independent of the land. Second, Ross maintains that even if the Calomiris Siblings' assignment of the covenant to repair is valid, Makarios still cannot recover for any breach that occurred before June 20, 2018, because the assignee of a covenant cannot proceed against a tenant for a breach prior to the assignment of the covenant. Third, Ross asserts that the 2018 Assignment did not meet the

requirements imposed by the Court because the assignment is not "unconditional," as it allows for a reversion to the Calomiris Siblings. Finally, Ross states that Makarios-Oregon, LLC cannot recover damages suffered by the owners of the Richmond Building.

Covenants to return leased premises in a particular condition, such as a covenant to keep leased premises in good order, condition, and repair, run with the land. *See, e.g., Cote v. A. J. Bayless Markets, Inc.*, 626 P. 2d 602, 607 (Ariz. 1981) (citing 51 C.J.S., Landlord and Tenant § 36813) p. 948 (1968)) (noting that covenants to repair and to surrender in good condition run with the land). Makarios does not dispute that such covenants run with the land. Nor does Makarios dispute that Section 16 of the Richmond Lease is this type of covenant.

Ross argues that when a covenant runs with the land, the covenant cannot be assigned without also transferring an ownership interest in the land itself. *See, e.g., Tucker v. McArthur*, 103 Ga. 409, 30 S.E. 283, 284 (1898) ("[I]t seems to be well established that, in order for covenants to pass with the land, there must in fact be a conveyance of some estate to which the covenant is incident, and that, if no estate really passes by the deed which contains the covenant, no subsequent conveyance by the grantee thereunder can transfer such covenants."); *Pike v. Galvin*, 29 Me. 183, 186 (1848) ("[A c]ovenant, which may run with the land, can do so only when the land is conveyed. It can only run, when attached to the land, as its vehicle of conveyance."). "The reason why covenants real run with the land is, because they are, in contemplation of law, attached to the land, and remain with it. . . . [T]he covenants could not pass with the land unless the land also passed to carry the covenants with it." *Allen v. Wooley*, 1 Blackf. 148, 149-50 (Ind. 1821).

The Court recognizes the older vintage of these cases. The result is the same, however, under modern law. According to Restatement (Third) of Property (Servitudes) (2000), a

"servitude is a legal device that creates a right or an obligation that runs with land or an interest in land." *Id*. at § 1.1(1). "A right that runs with land is called a 'benefit.'" *Id*. at § 1.1(1)(b). "A covenant is a servitude if either the benefit or the burden runs with land. A covenant that is a servitude 'runs with land.'" *Id*. at § 1.3(1). "The terms 'real covenant' and 'equitable servitude' describe servitudes encompassed within the term 'covenant that runs with land' and are not used in this Restatement except to describe the evolution of servitudes law." *Id*. at § 1.4. "An appurtenant benefit or burden transferable under the rules stated in §§ 4.6 and 4.7 passes automatically with the property interest to which it is appurtenant." *Id*. at § 5.1. And finally:

> Except as provided in subsections (1) through (3) [not relevant here], *an appurtenant benefit may not be severed and transferred separately from all or part of the benefitted property*. An attempted severance that is not effective to transfer the benefit does not extinguish the benefit unless manifestly intended to do so."

*Id*. at § 5.6 (emphasis added).

Makarios responds by emphasizing not the transferability of covenant itself, but the transferability of the cause of action arising from the *breach* of the covenant. Makarios argues that in Oregon, *all* causes of action are assignable unless: (1) the claim is a personal tort that would not survive the death of the plaintiff; (2) the claim is for a statutory penalty; or (3) the contract at issue specifically precludes assignment. Makarios contends that although the covenants contained in Section 16 run with the land, the Calomiris Siblings validly assigned their causes of action for the *breach* of those covenants in either the 2011 Assignment, the 2018 Assignment, or both, even without any transfer of the ownership of the Richmond Building to Makarios, because the cause of action arising under the covenant is not one of the "non-assignable" types of claims.

In support, Makarios first cites *Nichols v. Jackson Cty. Bank*, 136 Or. 302, 307 (1931). In *Nichols*, the Oregon Supreme Court noted that the "common-law rule that no chose in action was

negotiable or assignable has been changed by statute in this state." *Id.* According to Makarios, the Oregon statute that changed this common law rule provided: "No action shall abate by the death, marriage, or other disability of a party, or by the transfer of any interest therein, if the cause of action survive or continue." *Id.* [*sic*] (citing Section 1-311, Oregon Code 1930). A different section of that statute defined the causes of action arising out of an injury that end with the death of a person, and another section provided that "[a]ll other causes of action, by one person against another, whether arising on contract or otherwise, survive to the personal representatives of the former and against the personal representatives of the latter." *Id.*[6] In *Nichols*, the Oregon Supreme Court expressly held that "[a]ny claim which affects the estate of the party may be assigned, but the rule is otherwise where it arises out of an injury to the person, such as slander, assault and battery, and kindred cases." *Id.* (citing *Dahms v. Sears*, 13 Or. 47, 58 (1886)). Makarios then cites *Wallace v. Paulus Bros. Packing Co.*, to show that Oregon's rule that "[a]ny claim which affects the estate of the party may be assigned" applies in the context of a breach of a covenant that runs with the land. 191 Or. 564 (1951).

The Court notes that the argument about real property law that Ross puts forward—that when a covenant runs with the land, the covenant cannot be assigned without also assigning an ownership interest in the land itself—does not necessarily conflict with Makarios' argument that after a *breach* of that covenant has occurred, the cause of action based on that breach may be assigned. *Wallace* confirms this view and provides that in Oregon, a cause of action for breach of

---

[6] Makarios also asserts that this statute was later "renumbered" as Rule 34A of the Oregon Rules of Civil Procedure. The Court notes, however, that Rule 34, titled "Substitution of parties," only contains the non-abatement provision of the previous Section 1-311, which stated that "No action shall abate by the death or disability of a party, or by the transfer of any interest therein, if the claim survives or continues." Or. R. Civ. P. 34A.

a covenant that runs with the land contained in a lease may be assigned after a breach has

occurred:

> It is a general rule that a grantee may sue for a breach of the
> covenant in a lease occurring after the acquires title, but not for a
> breach of covenant before the conveyance to him, *unless the cause
> of action has been assigned to him*. . . . As grantees, plaintiffs
> acquired no rights in and to the said cause of action, *because it is
> not alleged nor claimed that the corporation assigned the same to
> them.*

*Wallace*, 191 Or. at 569-70 (emphasis added). The *Wallace* Court did not give any indication that

that it was solely because the plaintiffs were grantees and thus acquired title to the land that the

cause of action could be assigned to them, or that it was otherwise of any consequence that an

assignee of a cause of action arising from the breach of a covenant that ran with the land also be

a grantee of the land.

The *Wallace* court noted that at common law, a covenant that runs with the land

becomes, immediately upon its breach, a non-assignable chose in action upon which no one

except the grantee then in possession or entitled to the possession or his personal representative

can sue. But because the court in *Wallace* noted that it was not alleged that the previous

landowner had assigned the cause of action to the grantee, it follows that the common law rule of

non-assignability no longer applies in Oregon. Otherwise such an allegation of assignment would

not have mattered for the purpose of the court's analysis. *Id.* at 570; *c.f. Chesapeake & Ohio

Railway Co. v. Willis*, 105 S.E.2d 833, 837 (Va. 1958) ("It is equally well settled that a covenant

of the nature of a covenant running with land, when broken ceases to pass with the land and

becomes a mere personal covenant or chose in action.")

Finally, the *Wallace* court cited approvingly *American Jurisprudence*'s discussion of

Covenants, Conditions and Restrictions. 14 Am. Jur., Covenants, Conditions and

Restrictions, 514, § 40. That section confirms that although under the common law, a covenant

that runs with the land becomes, upon its breach, a nonassignable chose, under the modern rules, "rights of action arising from breach of contract are assignable and in most jurisdictions may be enforced by the assignee in his own name." The Court does not have any basis to conclude there is a different rule that applies when a grantee in possession at the time of breach decides to assign its cause of action to a person or entity that does not also receive an ownership interest in land.

In summary, Section 16 of the Richmond Lease contains servitudes, or covenants that run with the land. Upon breach, these covenants became a cause of action that belonged to the grantee then in possession—the Calomiris Siblings. Under the modern real property law, this cause of action could be freely assigned. When the Calomiris Siblings signed the 2018 Assignment[7] in favor of Makarios, they no longer owned the Richmond Building. Unless the Calomiris Siblings transferred their cause of action against Ross for the alleged breach to the new property owner when they transferred the Richmond Building, they would have still held that cause of action.[8] Therefore, the Calomiris Siblings' assignment of "all assignable rights arising out of or relating to the [Richmond Building], or arising under the Lease, including . . . causes of action" allows Makarios to maintain a cause of action against Ross for breach of Section 16.[9] To this extent, the Court DENIES Ross' motion for partial summary judgment as to the first two supplemental counterclaims asserted by Makarios.[10]

---

[7] The 2011 Assignment could not have validly assigned the cause of action relating to the alleged breach of Section 16 because the alleged breach did not occur until 2016.

[8] If Ross desires to reopen discovery for the purpose of deposing the Calomiris Siblings, or any of them, or obtaining additional documents, Ross may do so. The parties should confer regarding an appropriate schedule, and if agreed submit a joint proposal to the Court. If the parties disagree, they may each submit their own proposed schedule.

[9] Ross argues in its reply that the 2018 Assignment cannot retroactively create standing for the supplemental counterclaims filed by Makarios on April 3, 2017. Makarios cured this

**CONCLUSION**

Plaintiff's motion for partial summary judgment (ECF 282) is DENIED.

**IT IS SO ORDERED**.

DATED this 3rd day of January, 2019.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge

---

defect by filing further supplemental counterclaims on December 26, 2018, which allege that the rights to the causes of action asserted are based derive from the 2018 Assignment. *See* ECF 306. Because the substance of the 2018 supplemental counterclaims is the same as the previously-asserted supplemental counterclaims, the Court finds that the 2018 supplemental counterclaims do not cause any unfair prejudice to Ross, provided that Ross be permitted to obtain additional appropriate discovery, which the Court allows.

[10] The Court also rejects Ross' other arguments. Ross argues that the *assignee of a covenant* cannot proceed against a tenant for a breach that occurred before the assignment of the covenant. That is not what is occurring under the 2018 Assignment. Instead, under the 2018 Assignment, Makarios is simply the *assignee of the causes of action* held by the Calomiris Siblings as of the time of the alleged breach in September 2016. Ross also argues that the 2018 Assignment did not meet the requirements imposed by the Court because the assignment was not "unconditional." The Court, however, concludes that the 2018 Assignment substantially and materially satisfies the Court's requirements. Finally, Ross argues that Makarios, as a non-owner, cannot recover damages suffered by the owner of the Richmond Building at the time of the alleged breach, *i.e.*, the Calomiris Siblings. As the Court has already addressed in this Opinion and Order, however, under the 2018 Assignment, Makarios may assert all claims that that Calomiris Siblings could have asserted, including their claims based on their reversionary and third-party beneficiary rights as the owners of the Richmond Building in 2016.