# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ROSS DRESS FOR LESS, INC.,** | Case No. 3:14-cv-1971-SI |
| Plaintiff and<br>Counterclaim-Defendant, | **FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW<br>AT PHASE II** |
| v. | |
| **MAKARIOS-OREGON, LLC;<br>WALKER PLACE, LLC;<br>CHARLES W. CALOMIRIS;<br>KATHERINE CALOMIRIS TOMPROS;<br>and JENNIFER CALOMIRIS**, | |
| Defendants and<br>Counterclaim-Plaintiffs. | |

Gregory D. Call and Tracy E. Reichmuth, CROWELL & MORING LLP, 3 Embarcadero Center, 26th Floor, San Francisco, CA 94111; Joel A. Parker, Rebecca A. Boyette, and Jessica Schuh, SCHWABE WILLIAMSON & WYATT PC, 1211 SW Fifth Avenue, Suite 1600, Portland, OR 97204. Of Attorneys for Plaintiff.

Jeffrey M. Edelson, Molly K. Honoré, Paul S. Bierly, and Vivek A. Kothari, MARKOWITZ HERBOLD PC, 1455 SW Broadway, Suite 1900, Portland, OR 97201. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

This lawsuit involves a dispute over the contractual obligations of a commercial tenant upon the expiration of two leases, each spanning more than 50 years, with two landlords for two adjacent and partially conjoined buildings in downtown Portland, Oregon. Before the leases

expired, the tenant (or lessee) filed this action, seeking declaratory relief regarding its end-of-lease obligations. After bifurcating the case, the Court held a bench trial on the lessee's request for declaratory relief and issued a ruling. That was Phase I. After the leases expired, the lessee surrendered the premises. The two landlords (or lessors) filed supplemental counterclaims for damages, alleging that the lessee failed to comply with its end-of-lease obligations. This is Phase II. The lessee (Ross Dress for Less, Inc.) eventually settled with one of the lessors (Walker Place, LLC) but not with the other (Makarios-Oregon, LLC).

A nonbreaching party to a contract typically is entitled to the benefit of its bargain (also known as its "expectation" interest).[1] Upon the expiration of a lease, a lessor generally may recover damages caused by a commercial lessee's breach of an express covenant to return the premises in good order, condition, and repair, reasonable wear and tear excepted. In most cases, the cost of repair is a convenient and appropriate way to measure the damages that a lessor suffers in these circumstances. When the facts of a specific case, however, indicate that the cost of repair is unrelated to a lessor's actual damage, the general rule might not fully apply. Instead, when the cost of repair substantially and disproportionately exceeds any diminution in market value of the relevant property caused by the lessee's nonperformance of its express obligations, the diminution in market value may be a better measure of damages.

The pending dispute focuses on whether the lessee (Ross Dress for Less, Inc.) surrendered the premises of the non-settling lessor (Makarios-Oregon, LLC) in the condition required under the parties' relevant lease and, if not, whether that lessor is entitled to the full cost

---

[1] *See Restatement (Second) of Contracts* § 344 (defining "expectation interest" as a party's "interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed"); *see also* Brian H. Bix, *Contract Law: Rules, Theory, and Context* 99 (2012) ("expectation damages are meant to put the nonbreaching party in the same position it would have been in had the agreement been performed").

of remediating all deficiencies in performance without regard to whether a specific deficiency (or all deficiencies collectively) caused any loss in market value to the leased premises. Stated another way, this case concerns the application of the "economic waste doctrine" in the context of a commercial building with a lease spanning more than 50 years.

Oregon contract law applies to the commercial lease in this case. As discussed more fully below, Oregon's version of the economic waste doctrine provides that when the cost of repair is not the "prudent" remedy to apply because that remedy would create "economic waste," the diminution in market value is the better measure of damages. As also discussed more fully below, to avoid the risk of denying a contracting party the benefit of its bargain, this alternative remedy must be applied carefully and cautiously. When a commercially leased building is vacated, or surrendered, in a condition that materially breaches the lessee's express covenant in multiple respects, especially when the costs to repair some items are disproportionately high in relation to any effect the condition of those specific items might have on the market value of the premises, this caution militates in favor of evaluating the appropriate measure of damages on an item-by-item basis.

In December 2019, the Court held a four-day bench trial on the supplemental counterclaims asserted by the non-settling lessor (Makarios-Oregon, LLC) against the lessee (Ross Dress for Less, Inc.). Afterward, the Court allowed the parties to file post-trial briefs and responses. The Court then weighed and evaluated all evidence in the same manner that it would instruct a jury to do and has fully considered the legal arguments of counsel. The Court now makes the findings of fact and conclusions of law stated below. Any finding of fact that constitutes a conclusion of law also is adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact similarly is adopted as a finding of fact.

In the opinion of the Court, the facts found are all supported by the record, even though the Court might not provide specific record citations. Also, unless otherwise noted, when evidence is subject to an objection and the Court has relied on that evidence, the Court has overruled the objection for the reason or reasons identified either by the Court or, if the Court is silent, by the party offering the evidence in response to the other side's objection. When the Court has declined to consider evidence subject to an objection, the Court may state its basis for sustaining the evidentiary objection; alternatively, the Court simply may have found that the evidence subject to objection was not persuasive, thus making the objection moot. All objections to evidence that the Court has not relied on and all procedural objections not expressly addressed are denied as moot.

For the reasons stated below, the Court finds that Ross Dress for Less, Inc. materially breached its end-of-lease and rent-payment obligations owed to Makarios-Oregon, LLC. The Court separately will enter a judgment in favor of Makarios-Oregon, LLC in the total amount of $2,931,829, which include prejudgment interest through January 8, 2021.

## PROCEDURAL BACKGROUND

Plaintiff and Counterclaim-Defendant Ross Dress for Less, Inc. (Ross) filed this lawsuit in December 2014. At that time, Ross leased portions of two buildings from Defendants and Counterclaim-Plaintiffs Makarios-Oregon, LLC (Makarios) and Walker Place, LLC (Walker Place). Both leases expired on September 30, 2016. Before their expiration, Ross sought a judicial declaration that, among other things, Ross's proposed end-of-lease plans would satisfy its contractual obligations under the two leases. Makarios and Walker Place asserted that Ross's plans were inadequate; they also asserted counterclaims, seeking both a judicial declaration clarifying the extent of Ross's end-of-lease obligations and money damages for breach of contract.

PAGE 4 – FINDINGS OF FACT AND CONCLUSIONS OF LAW AT PHASE II

All parties moved for partial summary judgment, which the Court granted in part and denied in part in March 2016. *Ross Dress for Less, Inc. v. Makarios-Oregon, LLC*, 180 F. Supp. 3d 745 (D. Or. 2016). The parties then agreed to bifurcate this lawsuit and waive their right to have a jury resolve all factual disputes. In Phase I, the Court held a bench trial to determine the extent of Ross's end-of-lease obligations. In June 2016, the Court issued Phase I Findings of Fact and Conclusions of Law. *Ross Dress for Less, Inc. v. Makarios-Oregon, LLC*, 191 F. Supp. 3d 1189 (D. Or. 2016).

On September 6, 2016, Ross moved for an order determining whether, over the objections of Makarios and Walker Place, Ross could remain on the premises of the two buildings after the leases expired to complete any work that still needed to be done to surrender the premises in the condition required under the leases. On September 27, 2016, the Court ruled that after the two leases expired on September 30, 2016, neither Ross nor its agents could enter or remain on the premises of either building over the objection of the respective lessor. *Ross Dress for Less, Inc. v. Makarios-Oregon, LLC*, 210 F. Supp. 3d 1259 (D. Or. 2016). In April 2017, both Makarios and Walker Place filed supplemental counterclaims for money damages against Ross, to be resolved in Phase II. Several months later, Walker Place settled its dispute with Ross. In December 2018, Makarios amended its supplemental counterclaims. ECF 306.

As its first supplemental counterclaim, Makarios alleged that when Ross's lease expired on September 30, 2016, and Ross vacated the building leased from Makarios (the Richmond Building), Ross failed to return the premises in the condition contractually required under the relevant lease (the Richmond Lease). Makarios sought money damages for "costs of the required work and repairs, architectural, engineering, and other professional fees, legal fees, permit fees, inspection fees, and fees and costs associated with bringing the Richmond Building to the

condition required by the Richmond Lease." ECF 306, ¶ 13. As its second supplemental counterclaim, Makarios alleged breach of the implied covenant of good faith and fair dealing and sought "damages in an amount to be proved at trial." ECF 306, ¶ 24.[2] As its third supplemental counterclaim, Makarios alleged that Ross breached its obligation under the Richmond Lease to pay rent and now owes Makarios unpaid rent through the end of the lease period. ECF 306, ¶33.

## FINDINGS OF FACT

The Court finds the following facts by a preponderance of the evidence:

### A. Background

1.      From 1907 through 1976, members of the Failing family and related entities (collectively, the Failings) owned a building located at 620 SW Fifth Avenue, in Portland, Oregon (the Failing Building). It was originally constructed in 1907 as a six-story building. In 1913, an additional six floors were added. The Failing Building currently consists of twelve floors and is listed on the National Register of Historic Buildings. In 1976, the Failings sold the Failing Building to Henry Miller. In 1997, Miller sold the Failing Building to 620 Associates. In 2006, 620 Associates sold the Failing Building to Walker Place.

2.      The Richmond Building is located at 600 SW Fifth Avenue, Portland, Oregon. It is next to (and partially conjoined with) the Failing Building. Constructed in 1953, the Richmond Building consists of five floors and a mezzanine. The predecessor building to the Richmond Building (the Original Richmond Building) also was owned by the Failings.

3.      J.J. Newberry Company (Newberry) was a national retail chain operating variety stores across the United States. Newberry operated a retail store in downtown Portland, Oregon from 1927 to 1996.

---

[2] Makarios's second supplemental counterclaim is based on the same operative facts that underlie its first supplemental counterclaim, and the Court will treat these two claims together.

4.      In 1946, when the Failings owned both the Original Richmond Building and the Failing Building, the Failings leased both the Original Richmond Building and a portion of the Failing Building to Newberry (the 1946 Lease). The 1946 Lease envisioned that Newberry would raze the Original Richmond Building and construct a new Richmond Building, consistent with various design mandates. Newberry razed the Original Richmond Building sometime before 1951 and oversaw construction of the new Richmond Building, which was completed in 1953. Upon completion of the new construction, the basement, first, and second floors of the Failing Building connected openly and seamlessly with the basement, first, and second floors of the adjacent, newly built Richmond Building. These combined floors, spanning the two buildings, created Newberry's new retail space in downtown Portland. Newberry also used a portion of the upper floors in the Richmond Building for storage.

5.      In 1956, the Failings sold the Richmond Building to Newberry. Almost contemporaneously, Newberry entered a sale-lease back transaction for the Richmond Building with the New York Life Insurance Company (New York Life). From 1956 through 1986, New York Life owned the Richmond Building.

6.      When New York Life bought the Richmond Building from Newberry, New York Life leased the Richmond Building back to Newberry for a term of 30 years, with rights of renewal (the 1956 Richmond Lease or, simply, the Richmond Lease).

7.      At approximately the same time in 1956, the Failings restated and amended the 1946 Lease with Newberry, specifically relating to the Failing Building (the 1956 Failing Lease).

8.      After several extensions and amendments, both the 1956 Richmond Lease and the 1956 Failing Lease were set to expire on September 30, 2016.

9.      In 1986, New York Life sold the Richmond Building to William Calomiris, who died in approximately 2000. After several estate-related and intrafamily transactions, Charles W. Calomiris, Katherine Calomiris Tompros, and Jennifer Calomiris (collectively, the Calomiris Family) became the owners of the Richmond Building. In 2011, Makarios-Oregon, LLC (an entity affiliated with the Calomiris Family) received an assignment of all rights under the 1956 Richmond Lease.

10.     In 1992, Newberry's parent corporation filed for Chapter 11 bankruptcy. This resulted in Newberry closing its downtown Portland store in 1996.

11.     Ross is a Virginia corporation that operates discount retail department stores across the United States.

12.     In 1996, Newberry and Ross negotiated the terms of an assignment and submitted that assignment to the bankruptcy court for approval. The assignment stated that Ross would assume from Newberry all of assignor's leasehold estate and right, title, interest, and obligations in, to, and under both the 1956 Failing Lease and the 1956 Richmond Lease (and the Failing and Richmond Buildings) in their respective and existing "as is" physical conditions. Later in 1996, the bankruptcy court approved the assignment.

13.     The 1956 Failing Lease and the 1956 Richmond Lease required the tenant (originally Newberry, and later Ross) to pay $34,000 annually in rent for the last 30 years of the two leases. Ross paid $34,000 annually in rent for its 20-year tenancy. This rental obligation is substantially below fair market value.

14.     Ross spent more than $2 million to renovate the leased premises in both the Richmond and Failing Buildings before opening its retail store at that location in 1996. Ross operated a "Ross Dress for Less" store at that site from 1996 until 2014. Ross operated a "dd's

Discounts" store there from 2014 until it vacated and surrendered the premises on approximately September 30, 2016.

15.     Before vacating the Richmond Building, Ross engaged Craig Stockbridge of GBD Architects in Portland (GBD) to prepare three sets of plans related to the Richmond and Failing Buildings: Non-Permit Plans; Permit Plans #1 (including structural work); and Permit Plans #2 (involving utility separation; mechanical, electrical, and plumbing work; equipment removal, and elevator modernization). Permit Plans #1 and #2 ultimately were combined for review by the City of Portland. Ross submitted Permit Plans #1 to the City on August 10, 2016.

16.     In 2017, the Calomiris Family sold the Richmond Building to MDI Alder Street, LLC (MDI) for $4.5 million. Even before title was formally transferred by the Calomiris Family, MDI entered into an agreement to resell the Richmond Building for $5.25 million to an entity owned by Brandon Anderson, a principal of Walker Place. Shortly after the Calomiris Family transferred ownership of the Richmond Building to MDI, MDI deeded the Richmond Building to an affiliate of Walker Place. At that point, both the Richmond Building and the Failing Building once again came under common control and essentially common ownership.

**B.  Article 16 of the Richmond Lease ("Surrender of Premises")**

1.     Article 16 of the Richmond Lease is captioned "Surrender of Premises." Section 16.01 under that article provides:

> ***The Tenant shall, upon the expiration or termination of this lease*** for any reason whatsoever, ***surrender to the Landlord the buildings***, structures and building equipment then upon the demised premises, together with all alterations and replacements thereof then on the demised premises, ***in good order, condition and repair, except for reasonable wear and tear***; provided, however, that if the Tenant shall have made any alteration or alterations adapting the buildings, structures and building equipment upon the demised premises for multiple occupancy, then, in such event, prior to the expiration or termination of this lease, the Tenant, at the Landlord's request, shall restore said

buildings, structures and building equipment to the order and
condition which existed prior to such alteration or alterations.

(Emphasis added.)

2.      Section 16.02 of the Richmond Lease provides:

The Tenant agrees that, ***prior to the expiration of this lease or, in
the event of termination of this lease for any reason whatsoever,
promptly after such termination, the Tenant, at the Tenant's sole
cost and expense, shall make such alterations to the building
then erected on the demised premises as shall be necessary to
constitute such building an entirely independent and self-
sufficient structure.*** Such alterations shall include, without in any
way limiting the generality of the foregoing, the removal of
escalators, the construction of footings and a masonry curtain wall
along the westerly boundary line of the demised premises, the
removal of any facing encroaching upon adjoining premises, the
removal of signs, the relocation of plumbing, drain pipes,
sprinklers, electrical wiring, lighting fixtures and exhaust ducts, the
installation of a new soil connection to the city sewer, a new steam
connection and new electrical service conduits and equipment and
provision for a new toilet and rest room. The provisions of this
Section 16.02 shall survive the expiration or any termination of
this lease.

(Emphasis added.)

## C.  Condition of the Richmond Building upon Surrender; Remediation Costs

### Overview

1.      Upon the expiration of the Richmond Lease on September 30, 2016, Ross was

obligated under § 16.01 to surrender the Richmond Building "in good order, condition, and

repair, except for reasonable wear and tear."

2.      In addition, upon the expiration of the Richmond Lease, Ross was obligated under

§ 16.02 to make alterations to the Richmond Building "as shall be necessary to constitute such

building an entirely independent and self-sufficient structure." In other words, upon expiration of

the Richmond Lease, Ross was obligated to make the Richmond Building a self-sufficient

structure that was entirely independent of the Failing Building.

PAGE 10 – FINDINGS OF FACT AND CONCLUSIONS OF LAW AT PHASE II

3.      At trial, the Court heard testimony from, among others, William S. Bailey, AIA, a certified architect. Mr. Bailey is the managing partner of Waterleaf Architecture. The Court finds Mr. Bailey credible and his testimony generally persuasive. Mr. Bailey described the condition of the Richmond Building as of the date of its surrender by Ross, September 30, 2016. He also testified about the reasonable costs needed to repair or restore the deficiencies and conditions in the Richmond Building that he identified and described.

**Hard Costs Sought by Makarios under § 16.01**

4.      As of the date of surrender, many aspects of the Richmond Building had been repaired satisfactorily and were left in reasonably good order and condition. Several important features in that building, however, had not been repaired satisfactorily, resulting in a material breach of § 16.01 of the Richmond Lease.

5.      The deficient conditions, features, or aspects of the Richmond Building and the remediation work and related hard costs for that work, not including general contractor costs or other soft costs needed to bring the Richmond Building into compliance with § 16.01 are as follows:

      a.      <u>Window Repair</u>

Ross did not return the exterior windows on the upper floors in good order, condition, and repair. The windows had significant dry rot, worn away paint, and missing caulking. The damage to the windows at the end of the lease was not the result of reasonable wear and tear. Had the windows been conscientiously and reasonably maintained, they would have been in good order, condition, and repair at the end of the Richmond Lease. Ross's work on the windows before the end of the lease did not sufficiently repair the windows to good order, condition, and

repair. Ross painted over dry rot, installed plastic shopping bags as backer, and did not replace caulk where needed. The hard cost to repair these windows is $122,500.

        b.     <u>Roof Parapet Repair</u>

Ross did not return the roof in good order, condition, and repair. The parapet coping that Ross installed in 2015 did not meet industry standards. The hard cost to fix the sheet metal flashing and coping on the roof is $7,128.

        c.     <u>Terra Cotta Repair</u>

Ross did not surrender the terra cotta exterior tile in good order, condition, and repair. The damage to the tile was not the result of reasonable wear and tear. Had the tiles been conscientiously and reasonably maintained, they would have been in good order, condition, and repair at the end of the Richmond Lease. Ross's repair to shallow spalls in the terra cotta tile was deficient, causing those patches to fail shortly after they were applied. The hard cost to repair the terra cotta tile is $44,760.

        d.     <u>Fire Escape Doors Repair</u>

Ross did not surrender the fire escape doors in good order, condition, and repair. The hard cost to remediate the rust that Ross allowed to accumulate on the fire escape doors during Ross's tenancy is $18,000.

        e.     <u>Exterior Stucco Repair</u>

Ross did not surrender the Richmond Building with its exterior stucco finishes in good order, condition, and repair. The damage to the stucco was not the result of reasonable wear and tear. Had the stucco been conscientiously and reasonably maintained, it would have been in good order, condition, and repair. The hard cost to repair and repaint the exterior stucco is $26,387.

f.    <u>Basement and Third Floor Finish Repair</u>

Ross did not surrender the Richmond Building with its finishes in the basement and third floor in good order, condition, and repair. The damage to those finishes was not the result of reasonable wear and tear. Conscientious and reasonable maintenance would have included patching and repairing damaged walls, floors, and ceilings. The hard cost to repair these finishes is $47,200.

g.    <u>Elevators 2 and 3 Repair</u>

What the parties refer to as "Elevators 2 and 3" in the Richmond Building are a working freight elevator and a working passenger elevator, respectively. Ross did not surrender these two elevators in good order, condition, and repair, although they are both operable. The deteriorated condition of these two elevators was not the result of reasonable wear and tear. Ross had a maintenance contract in place that would have provided ongoing maintenance to the elevators if Ross had used it. Ross terminated the maintenance contract in August 2016 without doing the necessary work to repair these two elevators. The hard cost needed to bring these two elevators into good order, condition, and repair is $175,000.

6.    Makarios also is seeking other costs under § 16.01 that the Court is not allowing for the reasons described below. Specifically, Makarios seeks to recover repair costs for the following:

a.    <u>Unused Freight Elevator (Elevator 1)</u>

Makarios seeks $450,000 to bring a third elevator (*i.e.*, a second freight elevator), which the parties refer to as "Elevator 1," into good order, condition, and repair. Ross decommissioned and abandoned this second freight elevator after Ross took over the Richmond Lease in 1996. Ross "cannibalized" Elevator 1 by taking its parts to make repairs to the other two elevators

(Elevators 2 and 3). Ross never installed a new elevator to replace Elevator 1, nor did Ross remove the abandoned elevator equipment. The hard cost to replace Elevator 1, including the cost to demolish and remove the abandoned equipment, is $450,000. Makarios, however, did not meet its burden of showing that a prudent lessor, upon the expiration of the Richmond Lease, would have spent $450,000 to replace Elevator 1.[3] The Court is not persuaded that Makarios has met its burden of showing that a prudent lessor of the Richmond Building would have spent $450,000 to install a third elevator (which would have been a second freight elevator) in that five-story building.[4] To reach any other conclusion would require unreasonable speculation by the factfinder. Moreover, although a prudent lessor might have removed the abandoned equipment from Elevator 1, Makarios did not separately provide any evidence of that specific and more limited cost. *See* Ex. 785, at 2. The Court will not speculate on that cost.

    b.  <u>Plumbing for Floors Three through Five</u>

    The boiler that had provided hot water to the upper floors (floors three through five) was abandoned and left in place at the end of the Richmond Lease. Ross did not install any replacement system to provide hot water to the upper floors. Also, the existing pipes were unused and corroded. The sanitary sewer drain line was damaged and caused flooding in toilets

---

   [3] As mentioned earlier and discussed more fully below, Oregon's version of the economic waste doctrine provides that when the cost of repair is not the prudent remedy to apply because that remedy would create economic waste, the diminution in market value is the better measure of damages, and economic waste occurs when the defect is one that cannot be remedied without an expenditure disproportionate to the end to be attained. The Court interprets this standard as consistent with requiring the factfinder to consider what a prudent (or reasonable) person would do under the relevant circumstances.

   [4] As discussed more fully below, the Court places the burden of showing that diminution of value is the appropriate measure of damages when that amount is substantially (and grossly) lower than the cost of repair. This is different, however, from requiring a plaintiff (or a counterclaim-plaintiff) landlord to bear the burden of proving what a prudent (*i.e.*, reasonable) landlord would do or expect in making certain repairs.

in the upper floors. Makarios seeks $340,000 in hard costs to repair the plumbing for floors three through five. At some point, a lessee (or lessees) who occupied any of floors three through five would have needed plumbing, including hot water, on the occupied floors. Thus, at some point, a prudent lessor likely would have installed such plumbing. But precisely where and in what configuration (and thus at what cost) would depend on the specific use or uses of those spaces. To reach any specific conclusions would require unreasonable speculation by the factfinder. Makarios did not meet its burden of showing that a prudent lessor upon the expiration of the Richmond Lease would have spent $340,000 to repair the plumbing on floors three through five.

c.    <u>Air Conditioning for Third Floor</u>

When Ross took over the Richmond Lease in 1996, Ross did not use the third-floor air conditioning system. Instead, Ross installed a freeze protection system that did not provide the same zone heating and cooling as the air conditioning system that was originally installed in the building. Makarios seeks $274,420 in hard costs to repair the air conditioning system on the third floor. At some point, a lessee (or lessees) who occupied the third floor would have needed air conditioning on that floor. Thus, at some point, a prudent lessor likely would have installed air conditioning on that floor. But precisely where and in what configuration and whether in conjunction with air conditioning for the other floors in the Richard Building (and thus at what cost) would depend on the use or uses of that floor or those floors. To reach any specific conclusion would require unreasonable speculation by the factfinder. Makarios did not meet its burden of showing that a prudent lessor upon the expiration of the Richmond Lease would have spent $274,420 to install air conditioning on the third floor.

**Hard Costs Sought by Makarios under § 16.02**

7.      Ross did not perform two important obligations necessary for the Richmond Building to be in compliance with § 16.02. First, Ross did not adequately erect a wall between the Richmond Building and the Failing Building. Second, Ross did not adequately separate the utilities in those two buildings. Further, Ross's proposed plans, even if undertaken and completed, were insufficient to achieve compliance.

8.      To separate the Richmond Building from the Failing Building, as required under § 16.02, would Ross to construct a concrete masonry unit (CMU) or brick wall on or near the property line between the Richmond Building and the Failing Building. In addition, separation of the Richmond and Failing Buildings required the installation of proper footings and severance of the beams that spanned the property line with separate footings installed for the Richmond Building that were not interconnected with the Failing Building.

9.      Further, to make the Richmond Building self-sufficient would require Ross to install functioning HVAC, electrical, gas, and plumbing systems for the Richmond Building that do not rely on the systems for those utilities located in the Failing Building. Separation and self-sufficiency also would require compliance with applicable code provisions for separate buildings. Not counting general contractor costs or other soft costs, a reasonable estimate for the hard costs associated with the appropriate work needed to separate the Richmond Building and make it self-sufficient is $927,079.

**General Contractor Costs and Soft Costs**

10.      In addition to hard costs (or trade costs), there are general contractor costs that must be incurred in making repairs of the scope required here. These include estimating and design contingencies, market interest, general conditions and insurance bonds, and general

PAGE 16 – FINDINGS OF FACT AND CONCLUSIONS OF LAW AT PHASE II

contractor overhead and reasonable profit. The Court finds that a total of 31.5 percent of total hard costs (or trade costs) is a reasonable estimate of these general contractor costs.

11.     Beyond the hard costs and general contractor costs, the following estimated additional soft costs also are reasonable, necessary, and appropriate:

| | | |
|---|---|---|
| a. | Architectural and engineering design fees: | 12 percent of hard costs |
| b. | Reimbursable expenses: | 2 percent of hard costs |
| c. | Construction materials testing: | 2 percent of hard costs |
| | Sub-total: | 16 percent of hard costs |
| d. | Permits:        $58,934 | |

### Summary of Makarios's Recoverable Costs under Article 16

12.     The following is a summary of Makarios's recoverable costs, not including unpaid rent:

| | | |
|---|---|---|
| a. | Window repair: | 122,500 |
| b. | Roof parapet repair: | 7,128 |
| c. | Terra cotta repair | 44,760 |
| d. | Fire escape doors repair | 18,000 |
| e. | Exterior stucco repair | 26,387 |
| f. | Basement and third floor finish repair | 47,200 |
| g. | Elevators 2 and 3 repair | 175,000 |
| h. | Separation costs | <u>927,079</u> |
| | **Sub-total:** | **1,368,054** |
| i. | General contractor costs (31.5 percent) | 430,937 |
| j. | Soft costs (other than permits) (16 percent) | 218,889 |

k.    Permits                                        58,934

**Total:**                              **$2,076,814**

**D. Ross's Unpaid Rent on the Richmond Building**

1.    In May 2015, Makarios brought a forcible entry and detainer (FED) action against Ross in state court. In that lawsuit, Makarios alleged that Ross had allowed the Richmond Building to fall into gross disrepair in violation of Ross's obligations under the Richmond Lease. A judge of the Multnomah County Circuit Court conducted a trial and ruled against Makarios, based on the equitable doctrine of laches, among other things. The state trial court also awarded Ross its attorney's fees.[5] Makarios appealed, and the Oregon Court of Appeals affirmed in part and vacated and remanded in part. The court of appeals held that Makarios failed to preserve for appellate review its claim that the trial court erred in concluding that laches barred the Makarios's claim. *See Makarios-Oregon, LLC v. Ross Dress-for-Less, Inc*., 293 Or. App. 732, 734 (2018). The court of appeals, however, vacated and remanded the award of attorney's fees. *Id*. Ross sought reconsideration of the designation of Makarios as the prevailing party for purposes of costs on appeal. Makarios did not oppose that request, which the court of appeals granted on December 12, 2018. *See Makarios-Oregon, LLC v. Ross Dress-for-Less, Inc*., 295 Or. App. 1125 (2018). The state court judgment on Makarios's FED action became final and unappealable on March 6, 2019.

---

[5] Section 6.02 of the Richmond Lease stated that the "Tenant" shall pay and indemnify the "Landlord" for all legal costs and charges, including counsel fees, reasonably incurred in obtaining possession of the demised premises after default of the Tenant or in enforcing any covenant or agreement of the Tenant. This provision, as written, would only allow the Landlord (Makarios) to recover attorney's fees from the Tenant (Ross). Oregon law, however, makes such contractual provisions reciprocal by statute. *See* Or. Rev. Stat. § 20.096(1). On this basis, the state trial court awarded Ross, as the prevailing party, its attorney's fees.

2.      In May 2015, when Makarios filed its FED action to evict Ross from the premises, it returned rent to Ross for the remainder of the Lease. Makarios returned the rent pending the final resolution of the state court action. Makarios did so because it was required by law to refuse any further rent payments from Ross if Makarios wanted to sue for breach of the lease. *C & K Mkt., Inc. v. Roccasalva*, 246 Or. App. 277, 282 (2011) (stating that landlord's acceptance of rent payments waived landlord's right to terminate lease; acceptance of rent after landlord sent notice of default to tenant "was legally incompatible with [landlord's] purported termination of the lease"); *KMT Enters., Inc. v. Nyssen*, 154 Or. App. 477, 482 (1998) (noting that by accepting rent payment after giving commercial tenant notice of default and intent to terminate lease, landlord waived right to terminate lease). Makarios, however, did not intend to waive its right eventually to collect rent if it were unsuccessful in its FED action.[6]

3.      From time to time, Ross continued to attempt to pay its rent, but while the FED action was pending, Makarios either returned or refunded Ross's payments. On January 6, 2017, Ross wrote to Makarios's property manager to advise that it was canceling all outstanding and undeposited checks to avoid escheatment and stating Ross's position that Makarios's voluntary return of the rent checks demonstrates Makarios's waiver of its right to collect rent.

4.      When Ross vacated the Richmond Building on September 30, 2016, the total unpaid rent for Ross's possession of the Richmond Building from May 2015 through September 2016 was $48,161.

---

[6] Oregon law provides that when a lessee remains in possession of premises pending litigation over breach of the lease—as Ross did—the lessee remains obligated to pay rent. *See Hendrickson v. Carson*, 69 Or. App. 482, 485 (1984); *KMT*, 154 Or. App. at 483-84 (explaining *Hendrickson*).

PAGE 19 – FINDINGS OF FACT AND CONCLUSIONS OF LAW AT PHASE II

5.      It was not ascertainable, however, that Ross owed this rent until the Oregon Court of Appeals issued it final decision on Makarios's FED action on December 12, 2018 and that decision became final and unappealable on March 6, 2019.

**E.  Additional Findings Relevant to Ross's Affirmative Defenses**

1.      Makarios did not fail to mitigate its damages.

2.      Makarios did not interfere with Ross's performance.

3.      Makarios did not voluntarily waive its right to receive rent or otherwise relinquish any rights in connection with Ross's rent obligation or end-of-lease obligations for surrender and separation.

4.      Makarios did not take any action that would have reasonably led Ross to act inconsistently with Ross's rent obligation or Ross's end-of-lease separation and surrender obligations.

5.      Ross did not reasonably rely on any action or inaction by Makarios that resulted in Ross's failure to fulfill its rent obligation or its end-of-lease surrender and separation obligations.

6.      Makarios did not act inequitably in connection with Ross's tenancy or surrender.

7.      Makarios did not delay in taking action to enforce its right to receive rent or obtain the benefit of Ross's end-of-lease separation and surrender obligations.

8.      Makarios asserted its claims against Ross promptly upon the expiration of the Richmond Lease.

9.      Makarios did not cause Ross to fail to pay rent or otherwise fail to fulfill Ross's end-of-lease surrender and separation obligations.

**F.  Additional Findings Relating to the Testimony of Messrs. Anderson and Calomiris**

1.    At trial, the Court also heard testimony from, among others, Brandon Anderson. The Court finds Mr. Anderson credible. Mr. Anderson is a real estate developer and owns, through affiliated entities, several commercial buildings in Portland. As noted earlier, Mr. Anderson is affiliated with Walker Place, which owns the Failing Building. Further, an affiliate of Walker Place now owns the Richmond Building. Thus, the Richmond and Failing Buildings, essentially, are currently under common ownership and, through Mr. Anderson and his affiliates, common control. At trial, Mr. Anderson stated that the Richmond and Failing Buildings are more valuable connected to each other, assuming common ownership and control, than they would be if fully separated. Mr. Anderson explained that *if a common owner owed both buildings*, it would not make economic sense to separate the two buildings. No one testified, however, that the Richmond Building standing alone would have no value; nor would such a conclusion be reasonable under the facts presented. Thus, all that can be reasonably concluded is that the two buildings, if there were common ownership, would be worth more together than would be the sum of their independent, stand-alone values. That says nothing, however, about the situation when the two buildings are not under common ownership.

2    At trial, the Court also heard testimony from, among others, Charles W. Calomiris. The Court finds Mr. Calomiris credible.[7] Among other things, Mr. Calomiris testified on direct examination that he (and Makarios) wanted Ross to perform its end-of-lease obligations by making appropriate repairs to the Richmond Building and by separating the Richmond Building from the Failing Building. Mr. Calomiris explained that the Richmond Building needed to be separated from the Failing Building so that he (and Makarios) could be able to operate and

---

[7] Other witnesses also testified at trial, whom the Court has not expressly mentioned. The Court generally finds these witnesses to be credible as well.

lease the Richmond Building and obtain bank financing for that building. On cross-examination,

Mr. Calomiris confirmed that during his deposition previously taken in this case he explained

that a commercial lease gives a landlord certain rights by defining the obligations of a tenant,

that these rights have value, and that this has "nothing to do" with a landlord making its own

decisions about how to spend the landlord's own money on a building.

## CONCLUSIONS OF LAW

### A.  Applicable Law

In this case based on diversity jurisdiction, Oregon's substantive law governs. *See Getlin*

*v. Md. Cas. Co.*, 196 F.2d 249, 250 (9th Cir. 1952) ("The case is in federal court by diversity of

citizenship only. The law of the state in which the court sits must apply."); *see also Snook v. St.*

*Paul Fire & Marine Ins. Co.*, 220 F. Supp. 314, 316-17 (D. Or. 1963) ("This being a diversity

case, jurisdiction is grounded on that fact and the [insurance] policy must be interpreted and

construed in accordance with the Laws of Oregon, the place where the contract was made.").

Because resolution of the parties' dispute turns upon the interpretation and application of

their commercial lease agreement, ordinary principles of contract law apply. *See Harold*

*Schnitzer Props. v. Tradewell Grp., Inc.*, 104 Or. App. 19, 23 (1990) ("Oregon treats a

commercial lease as a contract and, in the absence of a provision in the lease to the contrary,

ordinary contract principles apply."). Under Oregon law, the "central issue" in interpreting a

lease is "the intent of the parties at the time of the execution of the lease." *Stark St. Props., Inc. v.*

*Teufel*, 277 Or. 649, 658 (1977). In addition, the Ninth Circuit has confirmed that the

"'fundamental goal of contract interpretation is to give effect to the mutual intent of the parties

*as it existed at the time of contracting*.' This fundamental axiom is widely accepted and

uncontested." *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v.*

*California*, 813 F.3d 1155, 1165 (9th Cir. 2015) (citation omitted) (emphasis in original).

## B.  History of the Economic Waste Doctrine

The origin of the economic waste doctrine is generally considered to be Justice Cardozo's opinion for the New York Court of Appeals in *Jacob & Youngs v. Kent*, 230 N.Y. 239, 129 N.E. 889 (1921), although the term "economic waste" does not appear anywhere in that decision. In that case, a residential construction contract expressly called for the use of a specific brand of plumbing pipe, known as "Reading pipe." After the owner discovered that the builder used an alternative, but fully satisfactory, brand of pipe (known as "Cohoes pipe"), the owner refused to pay for any of the work performed. The builder sued. The trial court ruled for the owner, and the intermediate appellate court reversed. Affirming the appellate court and ruling for the builder, Justice Cardozo wrote:

> The evidence sustains a finding that the omission of the prescribed brand of pipe was *neither fraudulent nor willful*. It was the result of the oversight and inattention of the plaintiff's subcontractor. Reading pipe is distinguished from Cohoes pipe and other brands only by the name of the manufacturer stamped upon it at intervals of between six and seven feet. Even the defendant's architect, though he inspected the pipe upon arrival, failed to notice the discrepancy. The plaintiff tried to show that the brands installed, though made by other manufacturers, were the same in quality, in appearance, in market value and in cost as the brand stated in the contract—that they were, indeed, the same thing, though manufactured in another place. The evidence was excluded, and a verdict directed for the defendant. The Appellate Division reversed and granted a new trial.

> We think the evidence, if admitted, would have supplied some basis for the inference that the defect was insignificant in its relation to the project. The courts never say that one who makes a contract fills the measure of his duty by less than full performance. *They do say, however, that an omission, both trivial and innocent, will sometimes be atoned for by allowance of the resulting damage*, and will not always be the breach of a condition to be followed by a forfeiture. . . . Considerations partly of justice and partly of presumable intention are to tell us whether this or that promise shall be placed in one class or in another. . . .

> In the circumstances of this case, we think the measure of the allowance is not the cost of replacement, which would be great, but the difference in value, which would be either nominal or nothing. . . . It is true that in most cases the cost of replacement is the measure. . . . *The owner is entitled to the money which will permit him to complete, unless the cost of completion is grossly and unfairly out of proportion to the good to be attained. When that is true, the measure is the difference in value.* The rule that gives a remedy in cases of substantial performance with compensation for *defects of trivial or inappreciable importance*, has been developed by the courts *as an instrument of justice*. The measure of the allowance must be shaped to the same end.

*Id.*, 230 N.Y. at 244-45 (emphasis added).

In 1932, the American Law Institute (ALI) published its *Restatement (First) of Contracts*.

The *Restatement* refocused the terminology away from *Jacob & Youngs'* direction that courts avoid damages that are "grossly and unfairly out of proportion to the good to be attained" and instead advised courts to avoid "economic waste." The *Restatement*, however, did not define "economic waste." Also, the *Restatement* made no mention of the nonperformance needing to be trivial and innocent (*i.e*, unintentional), as stated by Justice Cardozo in *Jacob & Youngs*. Section 346 addressed damages for breach of a construction contract. Subsection 1(a) provided:

> (1)     For a breach by one who has contracted to construct a specified product, the other party, can get judgment for compensatory damages for all unavoidable harm that the builder had reason to foresee when the contract was made, less such part of the contract price as has not been paid and is not still payable, determined as follows:
>
> (a)     For defective or unfinished construction[,] he can get judgment for either
>
> (i)     the reasonable cost of construction and completion in accordance with the contract, if this is possible and *does not involve unreasonable economic waste*; or
>
> (ii)     the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff; *if construction*

PAGE 24 – FINDINGS OF FACT AND CONCLUSIONS OF LAW AT PHASE II

> *and completion in accordance with the contract would involve*
> *unreasonable economic waste.*

*Restatement (First) of Contracts*, § 346(1)(a) (emphasis added).

Further, as explained, in relevant part, in comment (b):

> Sometimes defects in a completed structure cannot be physically
> remedied without tearing down and rebuilding, at a cost that would
> be imprudent and unreasonable. *The law does not require damages*
> *to be measured by a method requiring such economic waste*. If no
> such waste is involved, the cost of remedying the defect is the
> amount awarded as compensation for failure to render the
> promised performance.

*Id*. § 346, cmt. b (emphasis added).

The next significant development occurred in 1962, in a decision from the Supreme Court

of Oklahoma in the case of *Peevyhouse v. Garland Coal & Mining Co*., 1962 OK 267, 382

P.2d 109 (1962). In that case, the plaintiffs owned a farm containing coal deposits. They leased

their land to the defendant for five years for coal mining, specifically strip-mining. The contract

contemplated that coal would be taken from pits on the surface of the ground, instead of from

underground mine shafts, and the defendant expressly agreed to perform certain restorative and

remedial work on the land at the end of the lease period. This included needing to move many

thousands of cubic yards of dirt, at a cost estimated at about $25,000. Upon the expiration of the

lease, the defendant refused to perform that work, arguing that the damages should be limited to

the diminution in value of plaintiffs' farm resulting from the failure of the defendant to render

performance as agreed, *i.e*., the difference between the present value of the farm and what its

value would have been if the defendant had done what it agreed to do.

The trial court instructed the jury that it must return a verdict for plaintiffs but left the

amount to be decided by the jury. On the measure of damages, the trial court instructed the jury

that it may consider the cost of performance of the work the defendant agreed to do, together

with all the evidence offered on behalf of either party. The jury returned a verdict for the

plaintiffs in the amount of $5,000, which was a fraction of the cost of performance, but much

more than the total value of the farm, even if the remedial work had been done. On appeal, the

plaintiff sought the full cost of performance (about $25,000), and the defendant argued that the

damages must be limited to the difference in the market value of the property, which was only

about several hundred dollars. After discussing § 346 of the *Restatement (First) of Contracts* and

its concept of "economic waste," the Supreme Court of Oklahoma stated:

> We therefore hold that where, in a coal mining lease, lessee agrees
> to perform certain remedial work on the premises concerned at the
> end of the lease period, and thereafter the contract is fully
> performed by both parties except that the remedial work is not
> done, the measure of damages in an action by lessor against lessee
> for damages for breach of contract is ordinarily the reasonable cost
> of performance of the work; *however, where the contract provision
> breached was merely incidental to the main purpose* in view, and
> where the economic benefit which would result to lessor by full
> performance of the work is *grossly disproportionate* to the cost of
> performance, *the damages which lessor may recover are limited to
> the diminution in value* resulting to the premises because of the
> non-performance.

*Peevyhouse*, 382 P.2d at 113 (emphasis added). The court concluded that "[u]nder the most

liberal view of the evidence herein, the diminution in value resulting to the premises because of

non-performance of the remedial work was $300.00." *Id*. at 114. The *Peevyhouse* court did not

explain why the breach by the lessee was held to be "merely incidental to the main purpose" of

the contract. Nor did the court attach any significance to the fact that the breach was willful or

intentional, rather than innocent.

The next step in the evolution of the "modern" doctrine of economic waste occurred in

1981, when the ALI published the *Restatement (Second) of Contracts*. Here, the *Restatement*

explained that an injured party has a right to damages based on expectation interests as measured

by "(a) the loss in the value to him of the other party's performance caused by its failure or

deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the

breach, less (c) any cost or other loss that he has avoided by not having to perform." *Restatement*

*(Second) of Contracts* § 347. Comment (b) explains this concept of "loss in value," in relevant

part, as follows:

> If defective or partial performance is rendered, the loss in value
> caused by the breach is equal to the difference between the value
> that the performance would have had if there had been no breach
> and the value of such performance as was actually rendered. In
> principle, this requires a determination of the values of those
> performances to the injured party himself and not their values to
> some hypothetical reasonable person or on some market.

*Id*. at § 347, cmt. b.

The next section (§ 348) is captioned, "Alternatives to Loss in Value Performance." It

provides the current articulation of the economic waste doctrine, although it does not use term

"economic waste." Instead, § 348 discusses costs that are "disproportional" to the "probable loss

in value." Subsection (2) of § 348 provides:

> (2)    If a breach results in defective or unfinished construction
> and the loss in value to the injured party is not proved with
> sufficient certainty, he may recover damages based on.
>
> (a)    the diminution in the market price of the property
> caused by the breach, or
>
> (b)    the reasonable cost of completing performance or of
> remedying the defects *if that cost is not clearly disproportionate to
> the probable loss in value to him.*

*Id*. at § 348(2) (emphasis added). Comment (c) explains this rule and its relationship to economic

waste, stating:

> Sometimes, especially if the performance is defective as
> distinguished from incomplete, it may not be possible to prove the
> loss in value to the injured party with reasonable certainty. In that
> case he can usually recover damages based on the cost to remedy
> the defects. *Even if this gives him a recovery somewhat in excess of
> the loss in value to him, it is better that he receive a small windfall*

> *than that he be undercompensated by being limited to the resulting diminution in the market price of his property.*
>
> *Sometimes, however, such a large part of the cost to remedy the defects consists of the cost to undo what has been improperly done that the cost to remedy the defects will be clearly disproportionate to the probable loss in value to the injured party. Damages based on the cost to remedy the defects would then give the injured party a recovery greatly in excess of the loss in value to him and result in a substantial windfall. Such an award will not be made. It is sometimes said that the award would involve "economic waste," but this is a misleading expression since an injured party will not, even if awarded an excessive amount of damages, usually pay to have the defects remedied if to do so will cost him more than the resulting increase in value to him.* If an award based on the cost to remedy the defects would clearly be excessive and the injured party does not prove the actual loss in value to him, damages will be based instead on the difference between the market price that the property would have had without the defects and the market price of the property with the defects. This diminution in market price is the least possible loss in value to the injured party, since he could always sell the property on the market even if it had no special value to him.

*Id.* at § 348, cmt. c (emphasis added).

More recently, the doctrine of economic waste has come under a fair amount of criticism, especially from the "law and economics" school of legal theory. *See, e.g.*, Juanda Lowder Daniel & Kevin Scott Marshall, *Avoiding Economic Waste in Contract Damages: Myths, Misunderstandings, and Malcontent*, 85 Neb. L. Rev. 875, 906-11 (2007); *see also* Alan Schwartz and Robert E. Scott, *Market Damages, Efficient Contracting, and the Economic Waste Fallacy*, 108 Colum. L. Rev. 1610 (2008). In addition, many states have their own articulation of the doctrine, some with their own nuances. In the pending case, Oregon law applies, so it is to Oregon law that the Court turns next.

## C.  The Economic Waste Doctrine as Applied in Oregon

The most recent case from the Oregon Supreme Court to address the economic waste doctrine is *Montara Owners Ass'n v. La Noue Dev., LLC*, 357 Or. 333 (2015), written by then-

Chief Justice Balmer. In that case, a homeowners' association sued its general contractor for townhouse development. The association sought damages allegedly caused by defective design and construction. The general contractor asserted third party claims against its subcontractors and settled with the homeowners' association. During the jury trial between the general contractor and several subcontractors, the trial court instructed the jury about economic waste, telling the jury that, as to damages, it could choose between the cost of repair and the diminished value of the properties, depending on whether the jury found undue, or gross, economic waste.[8] The jury returned a verdict in favor of the general contractor but for substantially less than the general contractor sought. The general contractor appealed, arguing that the instruction misstated the law and that the instruction should not have been given (even if it did correctly state the law) because there was no evidence in the record to support the instruction.

The Oregon Court of Appeals affirmed in part and reversed in part. On the economic waste issue, the court of appeals rejected the general contractor's suggestion that the court create an exception to the economic waste doctrine for disputes between a general contractor and a subcontractor. 259 Or. App. at 264-65. The court of appeals, however, agreed with the general contractor that, in this case, there was no evidence at trial from which the jury could determine

---

[8] The trial court instructed the jury as follows:

> The cost of replacement or repair is the correct measure of damage for defects in construction work unless that remedy generates undue economic waste. If you find that, *except for technical, nonsubstantial, or immaterial departures by the defendants from the plans and specifications*, the [framing] [siding] work is satisfactory, and that an award to La Noue for claimed repair costs would result in gross economic waste, the proper measure of damages is not the cost of repair but rather the difference in the value of Montara as built and what its value would be if it had been built according to the contracts.

*Montara Owners Ass'n v. La Noue Dev., LLC*, 259 Or. App. 657, 663-64 (2013), *aff'd in part, rev'd in part*, 357 Or. 333 (2015) (emphasis added) (brackets in original).

economic waste, or diminished value. *Id*. at 265. The court of appeals further held that the error was not harmless, noting that because the subcontractor was arguing for an instruction on a different measure of damages (*i.e.*, diminished value), the subcontractor had the burden to present sufficient evidence under that measure. *Id.*

The Oregon Supreme Court affirmed in part and reversed in part. Regarding the issue of the jury instruction on economic waste, the Supreme Court agreed with the court of appeals that the instruction should not have been given because no evidence was presented at trial regarding diminution in value but disagreed with the appellate court's conclusion that the error substantially affected the general contractor's right; that is, the Oregon Supreme Court held that the error was harmless.[9] *Montara*, 357 Or. at 350-51. For purposes of the pending dispute, the principal teaching of the Oregon Supreme Court's decision in *Montara* concerns the general application of the economic waste doctrine under Oregon law, including its application to lessors and lessees. Although much of this teaching comes from *dicta*, the Oregon Supreme Court's comments provide a generally reliable guide for a federal court to use in predicting how the Oregon Supreme Court would likely resolve the issues in the pending case.[10]

---

[9] In *Montara*, the subcontractor's expert testified that the entire cost of repair would be about $1 million, with only five percent of that amount attributable to this specific subcontractor. The general contractor sought $2 million from this subcontractor. The jury awarded $43,711 in damages, which was very close to the damages figure presented by the subcontractor's expert. Under these circumstances, because no party presented any evidence of diminution of value and the Oregon Supreme Court presumed that the jury followed the instructions, the Supreme Court concluded that any error in giving an instruction about diminution in value when no such evidence was presented was harmless. *Montara*, 357 Or. at 351-52.

[10] "When interpreting state law, federal courts are bound by decisions of the state's highest court." *Arizona Elec. Power Co-op., Inc. v. Berkeley*, 59 F.3d 988, 991 (9th Cir.1995). In the absence of a decision from the state's highest court, "a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990).

In *Montara*, the Oregon Supreme Court, under the heading "The Economic Waste Doctrine in Oregon," explained that when a "contractor fails to keep an agreement, the measure of damages is always the sum which will put the injured party in as good a position as if the contract had been performed." *Montara*, 357 Or. at 346 (simplified). The Supreme Court next said: "In Oregon construction defect cases, that sum is the amount of money equal to the cost of curing the defects, *provided repair is the prudent remedy to apply*." *Id.* (simplified) (emphasis added). The Supreme Court added that the injured plaintiff "usually" recovers such amount as he has reasonably expended, or will reasonably have to spend, to remedy the defect and that the cost of repair calculation is "ordinarily" the measure of damages in a construction defect case. *Id.*

The Oregon Supreme Court continued:

> However, Oregon courts use an alternative measure of damages— the diminution in the market value of the property—when the cost of repair is not "the prudent remedy to apply" because that remedy would create "economic waste." See Turner [v. Jackson], 139 Or. 539[,] 560 [(1932)]. In the case of economic waste, "damages will be measured not by the cost of remedying the defect, but by the difference between the value of the building as it is and what it would have been worth if it had been built in conformity with the contract"—in other words, the diminution in value. . . .
>
> Economic waste occurs where "the defect in material or construction is one that cannot be remedied without an expenditure for reconstruction disproportionate to the end to be attained, or without endangering unduly other parts of the building." Id.; see also Restatement (Second) of Contracts § 348(2)(b) (1979) (courts award "the reasonable cost of completing performance or of remedying the defects if that cost is not clearly disproportionate to the probable loss in value to" the injured party). Stated differently, "[d]iminution in value is the proper measure of damages only when the cost of repair is disproportionate to the diminution in value." Hanset v. General Construction Company, 285 Or. 101, 106 (1979) (emphasis in original).

*Montara*, 357 Or. at 346-47 (footnotes omitted).[11]

In *Montara*, the Oregon Supreme Court also rejected the general contractor's argument that for the economic waste doctrine to apply, the party injured by the defective work must be a homeowner. *Id.* at 348-49. The Supreme Court explained:

> One of the leading cases on economic waste arose from the breach of a lease contract requiring a lessee to regrade a family farm at the conclusion of a mining lease term. *Peevyhouse v. Garland Coal & Min. Co.*, 1962 OK 267, ¶ 14, 382 P.2d 109, 114 (1962) (where the cost of regrading was $29,000 and the market value was diminished only $300, court measured property owners' lost expectancy by the lesser amount). [The general contractor] cites no authority that limits the application of Oregon's economic waste doctrine to cases where one party is a homeowner or landowner, and we see no principled reason to adopt that limitation.

*Id.* at 349.[12]

In *Montara*, the general contractor also argued that even if the economic waste doctrine applies to this type of case, the subcontractor failed to meet his burden of proof to show economic waste. *Id.* at 349. The subcontractor responded, first, by arguing that the burden was not his and, alternatively, to the extent it was, then he met it. *Id.* Second, the subcontractor argued that after he made some showing of economic waste, the subsequent burden to prove damages—the amount of the diminution in value—shifted back to the party seeking damages (in this case, the general contractor) because the party seeking damages always has the burden of proof on damages. *Id.*

---

[11] The economic waste doctrine has long been part of the rule in Oregon. *See, e.g., Beik v. Am. Plaza Co.*, 280 Or. 547, 555 (1977) ("The rule in Oregon is that the cost of replacement or repair is the correct measure of damage for defects in work unless that remedy generates undue economic waste.") (citing *Schmauch v. Johnston*, 274 Or. 441 (1976), and *Turner v. Jackson*, 139 Or. 539, 560 (1932)).

[12] The Oregon Supreme Court's reference in *Montara* to *Peevyhouse* also confirms that Oregon law applies the economic waste doctrine to commercial lease restoration cases and does not limit that doctrine to lawsuits involving defective construction.

The Oregon Supreme Court in *Montara* declined to resolve the issues of burden of

production and burden of proof, explaining:

> Regardless of which party ultimately bore the burden of production
> or proof on economic waste, if there was no evidence in the record
> to support that part of the instruction, the instruction was
> erroneous.
>
> As discussed above, the proper determination of whether economic
> waste would result from an award of cost of repair damages
> requires a comparison of the cost of repair and the diminution in
> value. Thus, it was error to give the part of the instruction that
> dealt with economic waste unless there was some evidence in the
> record of both measures of damage. Here, there was no evidence in
> the record regarding diminution in value. [The subcontractor]
> points only to evidence that some (but not all) of his breaches of
> contract were merely "technical" deviations from the plans and to
> evidence of the cost to build the townhouses. Neither party put on
> evidence of the value of the townhouses or of any reduction in
> value as a result of [the subcontractor's] breach of contract. And
> neither party sought to tie that breach to any particular reduction in
> value or in market price. At least some evidence of diminution in
> value was required to support an instruction that would have
> allowed the jury to base its verdict on that theory. Because there
> was no such evidence, the trial court erred in giving that part of the
> instruction.

*Id*. at 573.[13]

---

[13] Arguing that Makarios, and not Ross, bears the burden of showing no economic waste, Ross cites *San Nicolas v. United States*, 617 F.2d 246 (Ct. Cl. 1980). In that case, the court stated that "Plaintiff has the burden to establish by a preponderance of the evidence that the fair market value of the property in the condition which the defendant had covenanted to restore it was greater than the property's fair market value in an unrestored state at the termination of the lease." *Id*. at 249. San Nicolas, however, brought that lawsuit against the United States, as lessee. The Court of Claims in *San Nicolas* cited another case against the United States in support of this proposition, *Dodge St. Bldg. Corp. v. United States*, 341 F.2d 641, 645 (Ct. Cl. 1965), which itself cited an even earlier case against the United States, *Realty Assocs. v. United States*, 138 F. Supp. 875, 878 (Ct. Cl. 1956). Headnote 3 in *Realty Assocs*. reads: "In proceeding on claim *against government* for breach of agreement to restore property leased to government by plaintiff's predecessor in title, plaintiff failed to sustain burden of showing actual damage by virtue of breach of contract." (emphasis added). Thus, in contractual restoration claims brought against the United States, the Court of Claims consistently required that the plaintiff bear the burden of showing no economic waste. Ross, however, is not the United States and this is not the Court of Claims.

Although the Oregon Supreme Court did not resolve that specific question in *Montara*, the Washington Supreme Court has done so in a persuasive opinion. In a decision applying Washington law in the context of the economic waste doctrine in a case involving a breach of commercial lease by a lessee, the Washington Supreme Court described the relevant burdens of proof and production as follows:

> Damages for breach of lease are determined by two methods: the cost of restoration of the premises to a prescribed condition or the diminution in market value of the property as a result of the failure to comply with the lease. The appropriate measure of damages is the method which yields the lesser amount. *Fisher* [*Props., Inc. v. Arden-Mayfair, Inc.*], 106 Wash. 2d [826,] 843-44, [(1986)]; 2 M. Friedman, *Leases* § 18.1 (2d ed. 1983). The plaintiff must come forward with evidence on only one of the measures of damages and then the burden of production shifts to the defendant to present evidence that the other measure of damages is less.

*Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 115 Wash. 2d 364, 368 (1990). This is a reasonable allocation of the burdens of production and proof that likely would be followed by the Oregon Supreme Court.[14]

Makarios also argues that the economic waste doctrine does not apply when the party asserting the doctrine willfuly or intentionally breached its contractual duties. No Oregon case, however, expresses that proposition. Further, such a rule would be inconsistent with *Peevyhouse*, which the Oregon Supreme Court recognized as "[o]ne of the leading cases on economic waste." *Montara*, 357 Or. at 349. *Peevyhouse* involved a lessee of land that breached a provision in its

---

[14] Indeed, this conclusion appears similar to the view held by then-Oregon Court of Appeals Judge Nakamoto, now Oregon Supreme Court Justice Nakamoto, in her concurring opinion in *Montara*. *See* 259 Or. App. at 686 ("Although the contours of the economic waste doctrine in Oregon are not as specifically defined as in cases from other jurisdictions, . . . given the present circumstances, where [the subcontractor] did not make it evident that he was going to rely on the economic waste doctrine at trial, I concur that [the subcontractor] bore the burden to produce evidence of the diminution in the value of the buildings before the jury was instructed on his theory of damages.") (Nakamoto, J., concurring).

coal mining lease by failing to perform the required end-of-lease restorative and remedial work after completing its strip-mining operations.

Relatedly, in *Bowes v. Saks & Co.*, 397 F.2d 113 (7th Cir. 1968), landlords brought an action against a commercial tenant for damages caused by the tenant's breach of a clause in the lease requiring the tenant to restore the premises at the end of the lease. The trial court entered judgment adverse to the landlords. The Seventh Circuit affirmed, holding that the landlords suffered no damages caused by the commercial tenant's failure to restore the premises at the end of the lease because the landlords sold the premises before the expiration of the lease. The Seventh Circuit, referring to several cases, including *Peevyhouse*, explained:

> In an action for breach of contract, as opposed to a suit sounding in specific performance, the lessor is entitled only to the damages that were caused to the property by the failure to restore. Where the expense of restoration exceeds the diminution in the market value of the property caused by the lessee's nonperformance, the diminution in fair market value is the proper measure of damages. . . . If the cost or repair rule will give lessors a greater benefit from the breach than could be gained from full performance, a different measure of damages must be applied to avoid injustice.

*Id.* at 116-17. Nothing was said in *Bowes* about this doctrine not applying in cases of willful or intentional breach. There are, however, cases from other jurisdictions that appear to support Makarios's assertion, at least in construction defect cases.[15]

---

[15] *See, e.g.*, *Roudis v. Hubbard*, 574 N.Y.S.2d 95, 96 (1991) ("The 'diminution in value' measure of damages which defendant insists is applicable herein may only be judicially applied where the contractor's breach was *unintentional and constituted substantial performance in good faith*." (emphasis added)); *Shell v. Schmidt*, 164 Cal. App. 2d 350, 355 (1958) (noting that when a contractor intentionally deviated from the plans and specifications, notwithstanding a claimed justification for the deviation, it was not entitled to the diminution in value damage measure, as good faith compliance is one of the elements of substantial performance). These two cases, and others that are similar, arise in the context of a contractor failing to perform fully under a construction agreement and derive from *Jacob & Youngs v. Kent*. Other cases, however, in the context of a lessee failing to comply with restoration obligations in a lease and deriving from *Peevyhouse*, do not appear to contain any requirement of unintentional breach. The Court is

**D.  Application of Economic Waste Doctrine**

Fundamentally, Ross argues that the repair, restoration, and separation work that Makarios contends Ross was contractually obligated to perform under the Richmond Lease had no economic value. In other words, Ross contends that there would be no diminution in value caused by Ross's failure to perform that work. From this, Ross concludes that the cost of performing that work, estimated to be in the millions of dollars, is disproportionately greater than any nonexistent diminution in value caused by Ross's failure to perform. Thus, under the doctrine of economic waste, Ross argues, Makarios should recover nothing. Stated in still another way, Ross contends that Makarios already was in as good a position as it would have been had Ross fully performed its contractual end-of-lease obligations. Thus, according to Ross, Makarios merely is seeking a "windfall."

At trial, Ross presented evidence that the highest and best use of the Richmond Building was "adaptive reuse," while the building remaining conjoined and open with the Failing Building.[16] Ross also presented evidence showing that MDI purchased the Richmond Building without requiring any additional repair, restoration, or separation work, before promptly reselling the Richmond Building to an affiliate of Walker Place. After that, the Richmond Building and the Failing Building again came under common ownership and control.

---

unaware of any case law or secondary literature explaining this apparent divergence, and neither Makarios nor Ross has provided any.

[16] Adaptive reuse involves taking an older building, such as the Richmond Building, and reusing it for a purpose other than the purpose for which it was originally designed. At trial, Ross called Gregory Close as a witness. Mr. Close has experience in commercial real estate development and real estate investment advice. Among other things, Mr. Close described the concept of "adaptive reuse." Similarly, Mr. Anderson described one potential adaptive reuse of the Richmond Building and portions of the Failing Building as providing for creative space in a high-density open floor plan.

PAGE 36 – FINDINGS OF FACT AND CONCLUSIONS OF LAW AT PHASE II

Ross also argues that Makarios presented no evidence that the repair, restoration, and separation work demanded by Makarios would have provided any increase in the economic value of the Richmond Building. Instead, Ross maintains, Makarios merely wanted to "monetize" Ross's contractual obligations and exploit the economic "power" that the Richmond Lease gave to the lessor, Makarios. Stated another way, according to Ross, Makarios did not really want Ross to perform any of the required end-of-lease work on the Richmond Building. Instead, Makarios, believing that the lease provided Makarios will the legal ability to require Ross to incur significant end-of-lease expenses, wanted to exploit that economic power by eventually "compromising" with Ross so that Ross would pay Makarios for a release of Ross's end-of-lease obligations. In that way, Makarios will have "monetized" the economic power and leverage over Ross created by the terms of the Richmond Lease. According to Ross, however, that is precisely what the economic waste doctrine is intended to prevent. That doctrine applies when enforcement of a contractual obligation would require a party to incur repair costs that are grossly disproportional to any economic benefit, as measured by the avoidance of a diminution of value if the work were not performed. As the commentary to the *Restatement (Second) of Contracts* notes:

> It is sometimes said that the award would involve "economic waste," but this is a misleading expression since an injured party will not, even if awarded an excessive amount of damages, usually pay to have the defects remedied if to do so will cost him more than the resulting increase in value to him.

*Restatement (Second) of Contracts* § 348, cmt. c. Instead, the "injured party," if awarded excessive damages (either by judgment or settlement), would thereby receive a windfall beyond what was needed to make that party whole.

The Court agrees in part with Ross's arguments. First, the Court is persuaded, for the reasons described by Mr. Anderson, that the highest and best use of the Richmond Building is

adaptive reuse, with that building remaining conjoined and open with the Failing Building. Second, the Court also agrees with Ross that it is *not* the purpose of judicial enforcement of contracts to facilitate a nonbreaching party in monetizing the economic leverage that it has over a breaching party by obtaining compensation above the amount of harm caused by a breach when that harm is significantly less than the cost of performance by the breaching party. It is beyond serious dispute that the objective of American contract law is to protect the nonbreaching party in receiving the benefit of her bargain by being put in as good a position as she would have been in had the contract been performed. *See Montara*, 357 Or. at 346 ("the measure of damages is always the sum which will put the injured party in as good a position as if the contract had been performed"); *see also* n.1, *supra*. Thus, *if* performance by Ross of its contractual obligations under §§ 16.01 and 16.02 would have provided *no* economic benefit for the Richmond Building, then Ross's failure to perform would have caused no damages recoverable under contract law. That does not mean, however, that Ross prevails.

Just because the highest and best use of the Richmond Building may be adaptive reuse by remaining conjoined and open with the Failing Building, that does not show that performance by Ross of its repair, restoration, and separation obligations would have provided *no* value for the Richmond Building. But even if there was some increase in value that would have been provided to the Richmond Building by Ross's performance, that still is not the end of the analysis. For the economic waste doctrine to apply, the Court must find that any increase in value to the Richmond Building resulting from performance (or the avoidance of a diminution in value) is "grossly disproportionate to the cost of performance." *Peevyhouse*, 382 P.2d at 113. Or, explained by the Oregon Supreme Court in *Montara*, "[i]n Oregon construction defect cases, that sum is the amount of money equal to the cost of curing the defects, *provided repair is the*

*prudent remedy to apply*." *Montara*, 357 Or. at 346 (simplified). The question then becomes whether the *Montara* standard is functionally the same as the *Peevyhouse* standard.

The Court concludes that these two standards are functionally equivalent. As explained by the Oregon Supreme, "Oregon courts use an alternative measure of damages—the diminution in the market value of the property—when the cost of repair is not 'the prudent remedy to apply' because that remedy would create 'economic waste.'" *Montara*, 357 Or. at 346. In the very next paragraph, the Supreme Court explains the concept of "economic waste" by stating, in relevant part: "Economic waste occurs where 'the defect in material or construction is one that cannot be remedied without an expenditure for reconstruction *disproportionate to the end to be attained*.'" *Montara*, 357 Or. at 346 (quoting *Schmauch v. Johnston*, 274 Or. 441, 447 (1976)) (emphasis added). The Oregon Supreme Court then adds: "Stated differently, '[d]iminution in value is the proper measure of damages only when the cost of repair is *disproportionate* to the diminution in value.'" *Montara*, 357 Or. at 346-47 (quoting *Hanset v. General Constr. Co.*, 285 Or. 101, 106 (1979) (emphasis in original) (brackets in original)). This makes the central question whether the costs of repair, restoration, and separation are disproportionate to the diminution in value. Further, *Montara* explains that the diminution in value is just another way of saying "the difference between the value of the building as it is and what it would have been worth if it had been built in conformity with the contract." *Montara*, 357 Or. at 346 (quoting *Schmauch v. Johnston*, 274 Or. at 447).

Thus, the Court must compare the costs of repair, restoration, and separation, which Makarios's witness Mr. Bailey says totals more than several million dollars, with the difference between the value of the Richard Building as it was on September 30, 2016 and what it would have been worth if Ross had not materially breached its §§ 16.01 and 16.02 lease obligations.

That comparison, however, cannot be done given the record in this case because the Court rejects Ross's conclusory assertion that the repairs would have offered no value at all.

It would have been easy enough to offer in evidence two appraisals, one appraising the Richmond Building as it stood on September 30, 2016, and the other providing a hypothetical appraisal of what that building would have been worth had the contractually obligated repairs, restoration, and separation work been performed. Neither side offered this evidence, and thus the party who bears the burden of proof (or at least of production) loses on this point. As previously discussed, the Court believes that the Oregon Supreme Court would follow the approach of the Washington Supreme Court here. *See Fisher Props.*, 115 Wash. 2d at 368 ("The plaintiff must come forward with evidence on only one of the measures of damages and then the burden of production shifts to the defendant to present evidence that the other measure of damages is less."). Here, Makarios (as Counterclaim-Plaintiff) came forward with one of the measures of damages, namely the cost of repair, restoration, and separation. The burden then shifted to Ross to present evidence of the other measure of damages (diminution of value, *i.e,* the difference between the value of the Richmond Building as it is and what it would have been worth if it had Ross performed its end-of-lease obligations). Because Ross did not produce that evidence, Ross cannot receive the benefit of the economic waste doctrine.

This analysis does not mean that Makarios is entitled to all the damages that it sought. As previously discussed, the Court finds that Makarios has not met its burden of showing that a reasonable landlord would have made the extensive and expensive repairs to the unused freight elevator (Elevator 1), the plumbing for floors three through five, and the air conditioning for the third floor. Although Mr. Bailey testified persuasively about the costs of repair for items those

items, Makarios did not present persuasive testimony from any witness that a prudent landlord would have incurred those significant expenses, and the Court may not speculate.

The Court, however, did not find that all prudent landlords in the position of Makarios necessarily would incur the significant costs associated with separating the Richmond Building from the Failing Building, especially considering Mr. Anderson's testimony that separation would not achieve the highest and best use of the Richmond Building. A prudent landlord simply might have decided to sell the Richmond Building to the owner of the Failing Building (or buy the Failing Building) to obtain the benefits that Mr. Anderson described. It is not necessarily imprudent, however, to fail to do something that achieves the highest and best use, especially when legitimate reasons are offered. Here, Mr. Calomiris testified about why he and his family wanted a standalone building, and the Court accepts that testimony.

Although the separation cost issue in this case presents a close question (indeed, probably the most difficult question in this lawsuit), what tips the balance for the Court is the unequivocal expression in the Richmond Lease that, at the conclusion of the lease, the tenant must separate the Richmond Building from the Failing Building and make the Richmond Building into a standard alone, self-sufficient building. *See* Richmond Lease, § 16.02. In 1956, the landlord for the Richmond Building appears to have believed that separation would be prudent, and the then-lessee (Newberry) contractually agreed to do that. The Court, applying a preponderance standard to the record evidence in this case, concludes that such a decision still would be at least one of several reasonable, or prudent, options in 2016.

As discussed previously, this decision might have been otherwise had Ross presented persuasive evidence, probably in the form of two appraisals from qualified experts, comparing the fair market value of the Richmond Building as it existed on September 30, 2016 with what its

fair market value would have been had it been separated from the Failing Building, as the leased required, *without assuming common ownership of the two buildings*. Ross appears to argue that the Court should find that the fair market value of the Richmond Building would have gone *down* after separation, resulting in no *diminution* in value caused by Ross's failure to separate the buildings. According to Ross, that would have made the separation costs ($927,079) grossly disproportionate to any diminution in value caused by nonperformance (none). This, according to Ross, would support a conclusion of no damages resulting from the breach of § 16.02. Ross's argument, however, *assumes common ownership*. If there were common ownership of the two buildings, then—based on Mr. Anderson's testimony—Ross might be correct.

But as of September 30, 2016, there was not common ownership of the Richmond and Failing Buildings. Thus, the data that is needed—but was not provided—is whether separating the Richmond Building from the Failing Building would have added value (and in what amount), subtracted value, or not have affected value for the Richmond Building as a standalone entity, without making any assumptions about common ownership. Only then could a factfinder correctly compare separation costs with the relevant diminution of value, if any.

In the absence of expert appraisals that do not assume common ownership, Ross is simply asking the factfinder to speculate about the effect that separation might have on the value of the Richmond Building without common ownership. Further, it is plausible that leaving the Richmond Building connected to the Failing Building in violation of § 16.02 would substantially *diminish* the fair market value of the Richmond Building, because it would leave only one potential buyer for that building—the owner of the Failing Building. Any other potential buyer would need to bear the costs of separation (or the even greater costs of purchasing the Failing Building). Indeed, it looks likely that leaving the Richmond Building connected to the Failing

Building in violation of the lease would reduce the fair market value of the Richmond Building by approximately the amount of the separation costs. To confirm (or refute) this, however, appraisals would have been helpful, and perhaps even necessary. Finally, if the diminution in value resulting from Ross's breach of § 16.02 is approximately equal to the separation costs (or at least not grossly disproportionate to them), that would show an absence of economic waste. In any event, the Court must base its decision on evidence and not speculation.

**E.  Additional Conclusions of Law**

1.    Makarios did not fail to mitigate its damages. Makarios was not obligated to perform Ross's end-of-lease obligations to mitigate its damages.

Further, Makarios was not obligated to sell the Richmond Building to Brandon Anderson (or to anyone else) to be entitled to recover damages for Ross's breach of its end-of-lease obligations. Ross did not meet its burden of showing the affirmative defense of failure to mitigate.

2.    Ross asserts that it wanted to complete its §§ 16.01 and 16.02 obligations after September 30, 2016, but Makarios would not permit Ross to do so. Considering the long-running disputes between the parties regarding the way in which Ross wanted to perform its repair, restoration, and separation obligations, Makarios was not required to allow Ross perform work on the Richmond Building after September 30, 2016, to be entitled to recover damages for Ross's breach of its end-of-lease obligations.

3.    Makarios also did not interfere with any performance by Ross of its end-of-lease obligations before September 30, 2016. The defense of interference requires the asserting party to prove that the other party unjustifiably prevented the breaching party's performance or that the breaching party did not bear the risk, under the circumstances, that it would be prevented from

performing the obligations under the contract. Ross did not meet its burden of showing the affirmative defense of interference.

4.    Makarios did not waive its rights to seek damages for Ross's breach of its end-of-lease obligations. The defense of waiver requires the asserting party to prove that the other party voluntarily relinquished a known right, manifested by clear and unequivocal action. Ross did not meet its burden of showing the affirmative defense of waiver.

5.    Ross also did not meet its burden of showing the affirmative defenses of estoppel, unclean hands, or laches.

6.    Ross breached its end-of-lease obligations under the Richmond Lease on or about September 30, 2016. Makarios timely asserted its supplemental counterclaims alleging that Ross breached its end-of-lease obligations within the applicable six-year statute of limitations. *See* Or. Rev. Stat. § 12.080.

7.    Ross's failure to comply with its end-of-lease obligations under § 16.01 constitutes a material breach of the Richmond Lease.

8.    Ross's failure to comply with its end-of-lease obligations under § 16.02 constitutes a material breach of the Richmond Lease.

9.    Ross is liable to Makarios for damages for breach of §§ 16.01 and 16.02 of the Richmond Lease in the total amount of $2,076,814, not including prejudgment interest.

10.    Ross's failure to pay rent for the Richmond Building from May 2015 through September 30, 2016 constitutes a material breach of the Richmond Lease. Ross owes unpaid rent for that period in the total amount of $48,161, not including prejudgment interest.

11.    A federal court sitting in diversity applies state law, not federal law, regarding the issue of prejudgment interest. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138,

1156 (10th Cir. 2000). Unless the parties have agreed otherwise, "in diversity actions, state law determines the rate of prejudgment interest, and postjudgment interest is governed by federal law." *Citicorp Real Estate, Inc. v. Smith*, 155 F.3d 1097, 1108 (9th Cir. 1998). In Oregon, prejudgment interest is allowed at the rate of nine percent per year, unless the parties have agreed otherwise, on all moneys after they become due. Or. Rev. Stat. § 82.010(1)(a). Further, "the fact that the amount owed cannot be ascertained without resolving complex issues of fact does not bar a determination that the defendant owed sums certain at a date certain." *Jones v. Dorsey*, 193 Or. App. 688, 692-93 (2004). Thus, under Oregon law, "it is well settled that, even though damages are not ascertainable until issues of fact have been decided by the jury, prejudgment interest is proper." *Strader v. Grange Mut. Ins. Co*., 179 Or. App. 329, 339 (2002) (simplified).

12.     Ross owes Makarios prejudgment interest on the principal amount of $2,076,814 for its §§ 16.01 and 16.02 obligations, beginning October 1, 2016 through the date of judgment. As of January 8, 2021, this prejudgment interest totals $798,862. Thus, Ross's liability under §§ 16.01 and 16.02, including prejudgment interest, totals $2,875,676.

13.     As previously noted, it was not ascertainable that Ross owed unpaid rent in the amount of $48,161 for the Richmond Building from May 2015 through September 30, 2016, until the state court judgment on Makarios's FED action became final and unappealable on March 6, 2019. Accordingly, Ross owes Makarios prejudgment interest on the principal amount of $48,161 for unpaid rent, beginning March 6, 201 through the date of judgment. As of January 8, 2021, this prejudgment interest totals $7,992. Thus, Ross's liability for unpaid rent, including prejudgment interest, totals $56,153.

14.     As of January 8, 2021, Ross owes Makarios the total amount of $2,931,829 under the Richmond Lease.

## CONCLUSION

The Court makes the findings of fact and conclusions of law stated here. The Court separately will enter judgment in favor of Makarios-Oregon, LLC and against Ross Dress for Less, Inc. in the total amount of $2,931,829, consistent with these findings and conclusions.

**IT IS SO ORDERED**.

DATED this 8th day of January, 2021.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge